## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

KHALIL HAMMOND, *et al.*,

                    Plaintiffs,                    No. 1:25-cv-48

            v.                                     (CARLSON, M.J.)

PENNSYLVANIA DEPARTMENT OF
CORRECTIONS, *et al.*,

                    Defendants.

MALIKA HENDERSON, *et al.*,

                    Plaintiffs,                    No. 1:25-cv-49

            v.                                     (CARLSON, M.J.)

LAUREL HARRY, *et al.*,

                    Defendants.

ANTOINE WALKER, *et al.*,

                    Plaintiffs,                    No. 1:25-cv-50

            v.                                     (CARLSON, M.J.)

LAUREL HARRY, *et al.*,

                    Defendants.

## PLAINTIFFS' CONSOLIDATED RESPONSE IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

## <u>TABLE OF CONTENTS</u>

Page

INTRODUCTION ...........................................................................................1

PROCEDURAL HISTORY..............................................................................2

STATEMENT OF FACTS ...............................................................................4

QUESTIONS PRESENTED............................................................................11

LEGAL STANDARD......................................................................................12

ARGUMENT ...................................................................................................14

   I.   The complaints state valid legal claims for the named Plaintiffs, which is all that is required at this stage. ...........................................................14

      A.   Defendants' arguments about the merits of unnamed putative class members' claims are premature and should be rejected. ........................14

      B.   The *Hammond* complaint states valid disability-discrimination claims based on Plaintiffs' placement in solitary confinement despite—and sometimes because of—their mental illness. ..........................................18

      C.   The *Henderson* complaint states a valid Eighth Amendment claim against all Defendants based on the duration and conditions of Plaintiffs' solitary confinement...............................................................26

      D.   The *Walker* complaint states valid Fourteenth Amendment procedural-due-process claims based on Plaintiffs Hammond's and Walker's continued placement on the RRL and in the IMU. .................................31

         1.   Plaintiffs have a liberty interest in avoiding continued placement on the RRL and IMU, and their ineligibility for parole is a relevant consideration. ..........................................................................32

         2.   Plaintiffs have been denied the procedural protections the Due Process Clause requires. .......................................................................35

   II.   Defendants assert several frivolous arguments. ...........................................41

      A.   The more-specific-provision rule only applies to substantive-due-process claims so cannot bar Plaintiffs' statutory disability claims. ..................42

      B.   Qualified immunity is only available to individual-capacity defendants sued for damages so cannot bar Plaintiffs' ADA claim..........................44

      C.   Unnamed putative class members do not need to have standing, so dismissal of their claims for lack of standing is inappropriate. ..............48

TABLE OF CONTENTS (continued)

Page

D.   Defendants' preclusion arguments rest on multiple errors of fact
and law. ...................................................................................49

III.  Defendants are not entitled to qualified immunity. .......................................57

A.   The Eighth Amendment right asserted in the *Hammond* complaint, based
on their preexisting mental illness, is clearly established. ......................59

B.   The Eighth Amendment right asserted in the *Henderson* complaint,
based on the duration of Plaintiffs' solitary confinement, is clearly
established. ...............................................................................66

C.   The Rule 12 posture and the nature of Defendants' constitutional
violations make qualified immunity particularly inappropriate here......73

D.   Qualified immunity is an unsound doctrine and should be discarded. ....76

IV.  The PLRA's prospective-relief provisions do not impose pleading
requirements so are not a valid basis for dismissal. ....................................77

CONCLUSION ...................................................................................81

CERTIFICATE OF COMPLIANCE .........................................................................2

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Anderson v. Creighton*,
    483 U.S. 635 (1987)................................................................45–46

*Archuleta v. Archuleta*,
    No. 15-2664, 2017 U.S. Dist. LEXIS 40399 (D. Colo. Feb. 27,
    2017) ....................................................................................80

*Arizona v. California*,
    530 U.S. 392 (2000)..................................................................56

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)..................................................................13

*Ashker v. Governor of Cal.*,
    No. 09-5796, 2014 U.S. Dist. LEXIS 75347 (N.D. Cal. June 2,
    2014) ................................................................................79, 81

*Baxter v. Bracey*,
    140 S. Ct. 1862 (2020)..............................................................76

*Berardelli v. Allied Servs. Inst. of Rehab. Med.*,
    900 F.3d 104 (3d Cir. 2018) .......................................................20

*Bertolette v. Little*,
    No. 23-330, 2024 U.S. Dist. LEXIS 143243 (W.D. Pa. Aug. 6,
    2024) ................................................................................27, 70

*Bertolette v. Little*,
    No. 23-330, 2024 U.S. Dist. LEXIS 169925 (W.D. Pa. Sep. 20,
    2024) ................................................................................27, 70

*Betts v. New Castle Youth Dev. Ctr.*,
    621 F.3d 249 (3d Cir. 2010) .......................................................43

*Blanco v. Talutto*,
    No. 24-534, 2024 U.S. Dist. LEXIS 181489 (M.D. Pa. Oct. 4,
    2024) ................................................................................27, 70

*Blount v. Unit Manager Ackrom*,
No. 22-1040, 2024 U.S. Dist. LEXIS 98766 (W.D. Pa. June 4,
2024) .................................................................................................27, 70

*Bostrom v. N.J. Div. of Youth & Family Servs.*,
969 F. Supp. 2d 393 (D.N.J. 2013) ....................................................75

*Bracey v. Sec'y Pa. Dep't of Corr.*,
686 F. App'x 130 (3d Cir. 2017) ........................................................38

*Bramble v. Wetzel*,
No. 20-2394, 2022 U.S. Dist. LEXIS 2316 (M.D. Pa. Jan. 5, 2022) .................33

*Brathwaite v. Phelps*,
No. 10-646, 2023 U.S. Dist. LEXIS 54827 (D. Del. Mar. 30, 2023)................33

*Brooklyn Ctr. for Indep. of the Disabled v. Metro. Transp. Auth.*,
11 F.4th 55 (2d Cir. 2021) ............................................................23–24

*Brown v. Plata*,
563 U.S. 493 (2011).............................................................................78

*Bruni v. City of Pittsburgh*,
824 F.3d 353 (3d Cir. 2016) ...............................................................13

*Burns v. Pa. Dep't of Corr.*,
642 F.3d 163 (3d Cir. 2011) ...............................................................45

*Chase v. Baskerville*,
508 F. Supp. 2d 492 (E.D. Va. 2007) .................................................44

*In re Checking Account Overdraft Litig.*,
780 F.3d 1031 (11th Cir. 2015) ..........................................................15

*Child's Health Def., Inc. v. Rutgers*,
93 F.4th 66 ..........................................................................................36

*Chisolm v. McManimon*,
275 F.3d 315 (3d Cir. 2001) ........................................................23, 24

*Cintron v. Bibeault*,
148 F.4th 37 (1st Cir. 2025)...........................................................27, 70

iv

*Clark v. Coupe,*
    55 F.4th 167 (3d Cir. 2022) ............................................. 59, 60–64, 66, 67, 69, 71

*Cleveland Bd. of Educ. v. Loudermill,*
    470 U.S. 532 (1985)....................................................................................36

*Cnty. of Sacramento v. Lewis,*
    523 U.S. 833 (1998).....................................................................................43

*Cole v. Carson,*
    935 F.3d 444 (5th Cir. 2019) .......................................................................75

*Cruson v. Jackson Nat'l Life Ins. Co.,*
    954 F.3d 240 (5th Cir. 2020) .......................................................................15

*Davis v. Wells Fargo,*
    824 F.3d 333 (3d Cir. 2016) ...................................................................50, 51

*Dean v. McKinney,*
    976 F.3d 407 (4th Cir. 2020) ...................................................................69, 75

*Devlin v. Scardelletti,*
    536 U.S. 1 (2002).........................................................................................15

*Disabled in Action v. SEPTA,*
    539 F.3d 199 (3d Cir. 2008) ........................................................................19

*Doe v. Cnty. of Centre,*
    242 F.3d 437 (3d Cir. 2001) ........................................................................47

*Doe v. Hesketh,*
    828 F.3d 159 (3d Cir. 2016) ...................................................................51, 54

*Doe v. Princeton Univ.,*
    30 F.4th 335 (3d Cir. 2022) ...........................................................19, 36, 41

*Durham v. Kelley,*
    82 F.4th 217 (3d Cir. 2023) ....................................................................20, 43

*E.D. v. Sharkey,*
    928 F.3d 299 (3d Cir. 2019) ........................................................................57

*El v. City of Pittsburgh*,
    975 F.3d 327 (3d Cir. 2020) ...............................................................58

*Everson v. Leis*,
    556 F.3d 484 (6th Cir. 2009) ..............................................................47

*Farmer v. Brennan*,
    511 U.S. 825 (1994)...............................................................26, 28, 30

*Filarsky v. Delia*,
    566 U.S. 377 (2012)...........................................................................45

*Frazier v. Pa. State Univ.*,
    603 F. Supp. 3d 158 (M.D. Pa. 2022)................................................22

*Furgess v. Pa. Dep't of Corr.*,
    933 F.3d 285 (3d Cir. 2019) ..................................................19–20, 23

*Gibson v. Chrysler Corp.*,
    261 F.3d 927 (9th Cir. 2001) ..............................................................15

*Gorman v. Bartch*,
    152 F.3d 907 (8th Cir. 1998) ..............................................................47

*Green v. Coleman*,
    575 F. App'x 44 (3d Cir. 2014) ..........................................................71

*Green v. Thomas*,
    734 F. Supp. 3d 532 (S.D. Miss. 2024) ..............................................77

*Gregory v. Metro Auto Sales, Inc.*,
    158 F. Supp. 3d 302 (E.D. Pa. 2016)...........................................17–18

*Griffin v. Vaughn*,
    112 F.3d 703 (3d Cir. 1997) ...............................................................71

*Griggs v. Brewer*,
    841 F.3d 308 (5th Cir. 2016) ..............................................................74

*Griggs v. Holt*,
    No. 117-089, 2018 U.S. Dist. LEXIS 182592 (S.D. Ga. Oct. 24,
    2018) ...................................................................................................80

*Haberle v. Troxell*,
  885 F.3d 171 (3d Cir. 2018) .........................................................................20, 21

*Harlow v. Fitzgerald*,
  457 U.S. 800 (1982)......................................................................................45–46

*Harvard v. Inch*,
  411 F. Supp. 3d 1220 (N.D. Fla 2019) .............................................................22

*Henderson v. Thomas*,
  891 F. Supp. 1296 (M.D. Ala. 2012)............................................................79, 80

*Hoggard v. Rhodes*,
  141 S. Ct. 2421 (2021)......................................................................................75

*Home Depot USA, Inc. v. Lafarge N. Am., Inc.*,
  59 F.4th 55 (3d Cir. 2023) ..............................................................14, 15, 48, 57

*Hope v. Pelzer*,
  536 U.S. 730 (2002)...............................................................................58, 66–67

*Hovsons, Inc. v. Twp. of Brick*,
  89 F.3d 1096 (3d Cir. 1996) ..............................................................................23

*Huber v. Simon's Agency, Inc.*,
  84 F.4th 132 (3d Cir. 2023) ..............................................................................48

*Hyde v. City of Willcox*,
  23 F.4th 863 (9th Cir. 2022) .............................................................................75

*Intervarsity Christian Fellowship/USA v. Univ. of Iowa*,
  5 F.4th 855 (8th Cir. 2021) ...............................................................................75

*Johnson v. Geico Cas. Co.*,
  516 F. Supp. 2d 351 (D. Del. 2007)...................................................................18

*Johnson v. McCowan*,
  549 F. Supp. 3d 469 (W.D. Va. 2021).........................................................79, 80

*Johnson v. Wetzel*,
  209 F. Supp. 3d 766 (M.D. Pa. 2016)..........................................................26, 71

*Johnston v. Wetzel*,
    431 F. Supp. 3d 666 (W.D. Pa. 2019)................................................26, 37, 38, 71

*Jones v. Bock*,
    549 U.S. 199 (2007)................................................................................79–80

*Jones v. Treubig*,
    963 F.3d 214 (2d Cir. 2020) ..............................................................................75

*Keister v. PPL Corp.*,
    318 F.R.D. 247 (M.D. Pa. 2015) .......................................................................42

*Kerchner v. Obama*,
    612 F.3d 204 (3d Cir. 2010) ..............................................................................42

*Key v. Grayson*,
    179 F.3d 996 (6th Cir. 1999) .............................................................................47

*King v. Whitmer*,
    71 F.4th 511 (6th Cir. 2023) .............................................................................41

*Korman v. Walking Co.*,
    503 F. Supp. 2d 755 (E.D. Pa. 2007)................................................................18

*Landsman & Funk PC v. Skinder-Strauss Assocs.*,
    640 F.3d 72 (3d Cir. 2011) .........................................................................17, 18

*Lara v. Comm'r Pa. State Police*,
    91 F.4th 122 (3d Cir. 2024) ..............................................................................79

*Lubrizol Corp. v. Exxon Corp.*,
    929 F.2d 960 (3d Cir. 1991) ..............................................................................55

*Mable v. Beard*,
    No. 10-1214, 2011 U.S. Dist. LEXIS 44801 (M.D. Pa. Jan. 27,
    2011) ...............................................................................................................55–56

*Mack v. Clark*,
    No. 21-4, 2022 U.S. Dist. LEXIS 121813 (W.D. Pa. July 11, 2022)................33

*Mack v. Yost*,
    63 F.4th 211 (3d Cir. 2023) .................................................................57, 58, 64

*Martinez v. UPMC Susquehanna*,
  986 F.3d 261 (3d Cir. 2021) ...............................................................13

*Matthews v. Pa. Dep't of Corr.*,
  613 F. App'x 163 (3d Cir. 2015) .........................................................47

*Mayer v. Belichick*,
  605 F.3d 223 (3d Cir. 2010) ................................................................13

*McDonald-Witherspoon v. City of Philadelphia*,
  No. 17-1914, 2018 U.S. Dist. LEXIS 143338 (E.D. Pa. Aug. 23,
  2018) .....................................................................................................24

*McKenzie v. Dovala*,
  242 F.3d 967 (10th Cir. 2001) ............................................................24

*McTernan v. City of York*,
  577 F.3d 521 (3d Cir. 2009) ..........................................................12–13

*In re Medley*,
  134 U.S. 160 (1890) .......................................................................69–70

*Molock v. Whole Foods Mkt. Grp., Inc.*,
  952 F.3d 293 (D.C. Cir. 2020) ......................................................15, 16

*Morgan v. Allison Crane & Rigging LLC*,
  114 F.4th 214 (3d Cir. 2024) ..............................................................39

*Morgan v. Covington Twp.*,
  648 F.3d 172 (3d Cir. 2011) ........................................................50, 55

*Morrelli v. Corizon Health, Inc.*,
  No. 18-1395, 2019 U.S. Dist. LEXIS 29717 (E.D. Cal. Feb. 25,
  2019) .....................................................................................................16

*Morris v. Zaken*,
  No. 21-1338, 2022 U.S. Dist. LEXIS 217991 (W.D. Pa. Nov. 30,
  2022) ................................................................................27–28, 70–71

*Morse v. Frederick*,
  551 U.S. 393 (2007) .............................................................................45

*Mullins v. Cyranek*,
805 F.3d 760 (6th Cir. 2015) .......................................................74–75

*Neale v. Volvo Cars of N. Am., LLC*,
794 F.3d 353 (3d Cir. 2015) ........................................................48, 49

*Owen v. City of Independence*,
445 U.S. 622 (1980).............................................................................46

*P.V. v. Sch. Dist. of Phila.*,
No. 11-4027, 2011 U.S. Dist. LEXIS 125370 (E.D. Pa. Oct. 31,
2011) .....................................................................................................17

*Pa. Dep't of Corr. v. Yeskey*,
524 U.S. 206 (1998)..............................................................................20

*Palakovic v. Wetzel*,
854 F.3d 209 (3d Cir. 2017) ................................ 7, 29, 30, 31, 59–63, 66, 68, 69

*Papera v. Pa. Quarried Bluestone Co.*,
948 F.3d 607 (3d Cir. 2020) ........................................................51, 52

*Parms v. Pa. Dep't of Corr.*,
No. 14-84, 2015 U.S. Dist. LEXIS 37821 (W.D. Pa. Mar. 25,
2015) .....................................................................................................25

*Partridge v. Smith*,
No. 17-2941, 2020 U.S. Dist. LEXIS 31693 (D. Colo. Feb. 25,
2020) .....................................................................................................22

*Peroza-Benitez v. Smith*,
994 F.3d 157 (3d Cir. 2021) ........................................................57, 71

*Pinkney v. Meadville*,
648 F. Supp. 3d 615 (W.D. Pa. 2023)..................................................75

*Porter v. Clarke*,
923 F.3d 348 (4th Cir. 2019) ........................................................28, 70

*Porter v. Pa. Dep't of Corr.*,
974 F.3d 431 (3d Cir. 2020) .................. 27, 28, 29, 33, 37, 58, 59, 67, 68, 69, 71

*Powell v. Pa. Dep't of Corr.*,
No. 12-2455, ECF No. 152 (M.D. Pa. May 31, 2019) ......................................47

*Price v. Montgomery Cnty.*,
144 S. Ct. 2499 (2024)......................................................................................77

*Reaves v. Rossman*,
No. 21-1282, 2022 U.S. Dist. LEXIS 118438 (M.D. Pa. July 1,
2022) ..................................................................................................................39

*Reedy v. Evanson*,
615 F.3d 197 (3d Cir. 2010) .............................................................................75

*Rivera v. Monko*,
37 F.4th 909 (3d Cir. 2022) ..............................................................................62

*Rivera v. Wetzel*,
No. 22-716, 2025 U.S. Dist. LEXIS 19317 (W.D. Pa. Feb. 4, 2025) .........40, 41

*Rogers v. Jarrett*,
63 F.4th 971 (5th Cir. 2023) .......................................................................76–77

*Rosenberg v. Avis Rent A Car Sys.*,
No. 07-1110, 2007 U.S. Dist. LEXIS 55219 (E.D. Pa. July 31,
2007) ..................................................................................................................16

*Ross v. Blake*,
578 U.S. 632 (2016)..........................................................................................78

*Rouse v. Plaintier*,
182 F.3d 192 (3d Cir. 1999) .............................................................................59

*Ruffing v. Wipro Ltd.*,
529 F. Supp. 3d 359 (E.D. Pa. 2021)................................................................17

*S. Broward Hosp. Dist. v. MedQuist, Inc.*,
516 F. Supp. 2d 370 (D.N.J. 2007)...................................................................17

*Saleem v. Brungart*,
No. 20-1610, 2022 U.S. App. LEXIS 33018 (3d Cir. Nov. 30,
2022) ..................................................................................................................34

*Salley v. Circuit City Stores*,
    160 F.3d 977 (3d Cir. 1998) .............................................................................24

*Sandin v. Conner*,
    515 U.S. 472 (1995).........................................................................................32

*Saucier v. Katz*,
    533 U.S. 194 (2001).........................................................................................74

*Schneyder v. Smith*,
    653 F.3d 313 (3d Cir. 2011) .............................................................................67

*Sec'y U.S. Dep't of Labor v. Kwasny*,
    853 F.3d 87 (3d Cir. 2017) ...............................................................................50

*Shoats v. Horn*,
    213 F.3d 140 (3d Cir. 2000) .......................................................................33, 38

*Shoatz v. Wetzel*,
    No. 13-657, 2014 U.S. Dist. LEXIS 9386 (W.D. Pa. Jan. 27, 2014) ................37

*Shoatz v. Wetzel*,
    No. 13-657, 2016 U.S. Dist. LEXIS 17515 (W.D. Pa. Feb. 12,
    2016) .................................................................................................................38

*Shook v. El Paso Cnty.*,
    386 F.3d 963 (10th Cir. 2004) ..........................................................................81

*Simmons v. Wetzel*,
    No. 17-224, 2018 U.S. Dist. LEXIS 136500 (W.D. Pa. Aug. 10,
    2018) .................................................................................................................71

*Smith v. Bayer Corp.*,
    564 U.S. 299 (2011)..........................................................................................15

*Snider v. Motter*,
    No. 13-1226, 2016 U.S. Dist. LEXIS 72718 (M.D. Pa. June 2,
    2016) .................................................................................................................25

*Soldal v. Cook Cnty.*,
    506 U.S. 56 (1992).............................................................................................43

*Spotz v. Wetzel*,
    No. 21-1799, 2024 U.S. Dist. LEXIS 18855 (M.D. Pa. Feb. 1,
    2024) ........................................................................................................43

*Stringer v. Cnty. of Bucks*,
    141 F.4th 76 (3d Cir. 2025) ...................................................62, 73

*Stuart v. Pierce*,
    587 F. Supp. 3d 127 (D. Del. 2022)......................................................27

*Suppan v. Dadonna*,
    203 F.3d 228 (3d Cir. 2000) ...............................................55–56

*Talley v. Clark*,
    851 F. App'x 306 (3d Cir. 2021) .......................................................33

*Taylor v. Barkes*,
    575 U.S. 822 (2015).............................................................72

*Taylor v. Sturgell*,
    553 U.S. 880 (2008)..........................................50, 53, 54, 57

*Teagle v. Dep't of Corr.*,
    No. 24-5544, 2025 U.S. Dist. LEXIS 47601 (E.D. Pa. Mar. 17,
    2025) ........................................................................................................40

*Terminix Int'l Co., L.P. v. Kay*,
    150 F.R.D. 532 (E.D. Pa. 1993)............................................................42

*Tolan v. Cotton*,
    572 U.S. 650 (2014)................................................................65

*United States v. 5 Unlabeled Boxes*,
    572 F.3d 169 (3d Cir. 2009) ...............................................50

*Walker v. Snyder*,
    213 F.3d 344 (7th Cir. 2000) ...............................................47

*Walton v. Eaton Corp.*,
    563 F.2d 66 (3d Cir. 1977) ...............................................31

*Watson v. Wetzel*,
  No. 23-3246, 2024 U.S. Dist. LEXIS 224761 (E.D. Pa. Dec. 12,
  2024) ...................................................................................................64–66

*Wells v. Wetzel*,
  No. 16-842, 2021 U.S. Dist. LEXIS 60693 (M.D. Pa. Mar. 30,
  2021) ...............................................................................................................71

*Whole Woman's Health v. Hellerstedt*,
  579 U.S. 582 (2016)...................................................................................50, 55

*Wilkinson v. Austin*,
  545 U.S. 209 (2005)..................................................................33, 34, 36, 41

*Williams v. Edwards*,
  87 F.3d 126 (5th Cir. 1996) ...............................................................................78

*Williams v. Sec'y Pa. Dep't of Corr.*,
  117 F.4th 503 (3d Cir. 2024) ................................... 20, 22, 24, 43, 62, 66, 67, 68

*Williams v. Sec'y Pa. Dep't of Corr.*,
  848 F.3d 549 (3d Cir. 2017) .............................. 26, 27, 32, 33, 34, 37, 68, 69, 70

*Wyatt v. Cole*,
  504 U.S. 158 (1992)...................................................................................47, 76

*Yates v. Collier*,
  868 F.3d 354 (5th Cir. 2017) ...........................................................................81

*Young v. Quinlan*,
  960 F.2d 351 (3d Cir. 1992) ......................................................................26, 27

## Statutes

18 U.S.C. § 3626(a) ...............................................................................77, 78, 79

42 U.S.C. § 12101(b)(1) ...............................................................................19

## Rules

Fed. R. Civ. P. 8(d) ...................................................................................31, 43

Fed R. Civ P. 12(d) .............................................................................................13

Fed. R. Civ. P. 20(a)(2)..............................................................................31

## INTRODUCTION

The Pennsylvania Department of Corrections ("DOC") subjects Plaintiffs Khalil Hammond, Malika Henderson, Antoine Walker, Muwsa Green, David Thompson, and Tyrone Leonard—and many others like them—to prolonged solitary confinement. The DOC's leadership knows these conditions create grave risks of serious psychological harm, self-injury, and suicide but persists in imposing them anyway. Making matters worse, individuals on the DOC's Restricted Release List ("RRL") and Intensive Management Unit ("IMU"), like Plaintiffs Hammond and Walker, are trapped in solitary confinement indefinitely, without any meaningful opportunity to challenge their placement.

Defendants, the DOC's current and former secretary and other high-ranking DOC officials, have violated Plaintiffs' Eighth Amendment rights based on the duration of Plaintiffs' solitary confinement and the fact that all have been subjected to solitary despite Defendants' awareness of their preexisting mental illness. Because these rights are clearly established by caselaw, Defendants are not immune from damages liability. In addition, the DOC has violated Title II of the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act ("RA") by failing to modify its practices to account for the particularly detrimental effects solitary confinement has on individuals with mental-health disabilities and placing individuals in solitary in response to manifestations of their mental illness. Finally,

1

Defendants have violated the due-process rights of Plaintiffs on the RRL and IMU by failing to give them notice of the reasons for their continued placement or a meaningful opportunity to challenge it.

In seeking dismissal of Plaintiffs' complaints, Defendants give undue attention to the potential claims of unnamed members of the putative classes Plaintiffs seek to represent. But neither the merits of these hypothetical claims nor the appropriateness of certifying this case as a class action are properly before the court. Moreover, Defendants' briefs are replete with frivolous arguments—arguments that are plainly meritless, ignore binding precedent, rely on inapposite caselaw, or lack citations to authority.

Defendants' motions to dismiss should be denied in full, and these cases should proceed to discovery.

## PROCEDURAL HISTORY

These three consolidated cases were originally filed in the Eastern District of Pennsylvania as a single action challenging various aspects of the DOC's solitary-confinement policies and practices. In the originally-filed action, Plaintiffs sought relief for themselves and on behalf of three overlapping categories of individuals held in solitary confinement in the DOC: (1) individuals in solitary confinement who have mental illness, (2) individuals held in solitary confinement for prolonged

periods of time, and (3) individuals on RRL and/or in the IMU. *See Hammond* Compl. ¶¶ 369–75, ECF No. 1.

In accordance with the preferences of the judge to whom the case was assigned, Plaintiffs divided the case into three separate actions. On May 29, 2024, Plaintiffs filed (1) an Amended Complaint in the *Hammond* action, narrowing the claims to focus solely on individuals with mental illness in solitary confinement, *Hammond* Am. Compl., ECF No. 29; (2) a new action, *Henderson v. Harry*, focusing on prolonged solitary confinement, *Henderson* Compl., ECF No. 1; and (3) another new action, *Walker v. Harry*, focusing on the RRL and IMU, *Walker* Compl., ECF No. 1. On Defendants' motion, the three cases were then transferred to the Middle District of Pennsylvania. *Hammond*, ECF No. 50; *Henderson*, ECF No. 23; *Walker*, ECF No. 24.

In a memorandum order issued on April 25, 2025, Judge Bloom consolidated the three cases for discovery and pretrial purposes. ECF No. 63. He ordered that all filings related to discovery and pretrial motions in the three cases should be on the *Hammond* docket. *Id.* at 11. In rejecting Defendants' argument that consolidation would be unwiedly, Judge Bloom explained that "[t]he mere fact that the defendants would be required to respond separately to various arguments or classes of plaintiffs *in a single document* is not enough to convince us that the defendants will be prejudiced such that these cases should not be consolidated." *Id.* (emphasis

added). Defendants nonetheless filed three separate Rule 12 motions and supporting briefs, to which Plaintiffs now respond. ECF Nos. 74–79.

## STATEMENT OF FACTS

Plaintiffs Khalil Hammond, David Thompson, Antoine Walker, Muwsa Green, Tyrone Leonard, and Malika Henderson are individuals who are incarcerated in prisons operated by Defendant DOC. *Hammond* Am. Compl. ¶¶ 17–22, ECF No. 29.[1] All have been housed in solitary confinement for extended periods of time. *Id.* Defendants are current or former DOC officials responsible for holding or treating individuals in solitary confinement. *Id.* ¶¶ 24–28.

While in solitary confinement, Plaintiffs' contact with others is severely limited. *Id.* ¶¶ 86–90, 171–96. They are typically confined to their cells for more than 21 hours a day. *Id.* ¶ 86. When allowed outside of their cells, they are strip-searched and placed alone in enclosed spaces. *Id.* ¶¶ 87, 181.[2] The cells themselves

---

[1] For readability, only the *Hammond* complaint is cited in this section. But the allegations in the *Henderson* and *Walker* complaints substantially mirror those discussed here. No. 1:25-cv-49, ECF No. 1; No. 1:25-cv-50, ECF No. 1.

[2] Per DOC policies in effect until January 22, 2024, individuals in Restricted Housing Units ("RHUs"), the DOC's most prevalent solitary-confinement unit, were offered out-of-cell time of just one hour alone in outdoor recreation cages five days a week and three showers a week. *Hammond* Am. Compl. ¶ 97. The DOC then revised its policies, but the revised policies only apply to individuals who have been in RHUs for more than 30 days and state that such individuals must be offered only three hours of daily out-of-cell time. *Id.* ¶¶ 98–99. The revised policies do not require social interaction or programming and give each prison complete discretion over how the additional out-of-cell time is used. *Id.* ¶¶ 100–03.

are small, have solid steel doors, and only one small window into the cell block and no view of outside. *Id.* ¶¶ 169–76. Individuals in solitary confinement are subjected to fluorescent lighting 24 hours a day and are forced to eat all meals alone in their cell. *Id.* ¶¶ 179–80.

Mental health treatment in solitary confinement is inadequate and typically consists of infrequent, brief contact with mental health staff through cell doors. *Id.* ¶¶ 24–28. Additionally, individuals in solitary confinement do not receive the benefit of vocational, rehabilitative, or therapeutic programming, including programs that are prerequisites for being granted parole, and their visitation privileges are extremely limited. *Id.* ¶¶ 183–206, 215.

Further, Plaintiffs Hammond and Walker are on the RRL, which is a list of individuals who are subject to indefinite solitary confinement. *Id.* ¶¶ 17, 19, 104, 108. Individuals placed on the RRL are given no reason for their placement, and only the DOC's Executive Deputy Secretary for Institutional Operations ("EDSI"), currently Defendant Wenerowicz, can authorize placement and removal of an individual from the RRL. *Id.* ¶¶ 106–07. They cannot appeal their RRL status, may not participate in the annual review process for determining whether they should remain on the RRL, and are provided no timeline or criteria for their removal from solitary confinement. *Id.* ¶¶ 110–19.

Most individuals on the RRL, including Plaintiffs Hammond and Walker, are housed in the IMU, a phased solitary confinement "program" lasting at least three years. *Id.* ¶¶ 24–28. The IMU's six phases involve slightly increasing privileges, but in any phase, individuals are not allowed in-person visits and spend almost all of their time alone in a cell. *Id.* ¶¶ 132–46, 150. There are no clear criteria for phase advancement and no ways to advance sooner than the minimum phase length, yet individuals can be set back phases for various, unspecified reasons. *Id.* ¶¶ 148–49.

There is a broad consensus among medical and psychiatric professionals that isolation causes serious psychological and physiological harm. *Id.* ¶¶ 29–41. Individuals with disabilities are especially susceptible to isolation's damaging health effects. *Id.* ¶ 42. Pre-existing mental health symptoms, in particular, are significantly worsened by isolation. *Id.* ¶ 44. Due to these recognized consequences, professional correctional and healthcare organizations recommend against prolonged isolation. *Id.* ¶¶ 45–48.

DOC officials, including Defendants, are aware of the risks associated with solitary confinement through scientific literature, guidance from professional organizations, and caselaw. *Id.* ¶ 58. Indeed, DOC policy recognizes that an individual's "potential for suicide is greater" if he is placed in RHU. *Id.* ¶ 56. The U.S. Department of Justice has also recognized, in a letter sent to DOC officials including Defendants Harry and Wenerowicz, the potential for harm created by the

DOC's use of solitary confinement on individuals with serious mental illness or intellectual disabilities. *Id.* ¶¶ 59–61. And the U.S. Court of Appeals for the Third Circuit has "acknowledge[d] the robust body of legal and scientific authority recognizing the devastating mental health consequences caused by long-term isolation in solitary confinement." *Id.* ¶ 64 (quoting *Palakovic v. Wetzel*, 854 F.3d 209, 225 (3d Cir. 2017)).

DOC data bear out these risks: the rates of self-injury, suicide attempts, and suicide among individuals in the DOC's solitary-confinement units are vastly disproportionate to those among individuals in the general population. *Id.* ¶¶ 217–29. Though they house just 5% of the DOC population, these units accounted for approximately 50% of incidents of self-injurious behavior, 37% of suicide attempts, and 43% of suicides in the DOC from 2012 through 2022. *Id.*

Despite this knowledge, Defendants have continued to house individuals, including Plaintiffs, in solitary confinement, including individuals with mental illness, and have failed to take reasonable or adequate measures to ameliorate the conditions. *Id.* ¶¶ 228–30. Accordingly, each of the Plaintiffs has suffered tremendously while in solitary confinement.

The DOC has a Mental Health / Intellectual Disability Roster, and every prisoner is assigned a letter designation from A to D. *Id.* ¶¶ 157–61. C-Roster individuals are currently receiving treatment for a mental illness but are not currently

diagnosed with a "serious mental illness" ("SMI") as defined by the DOC, while D-Roster individuals are currently diagnosed with SMI, intellectual disability, or "credible functional impairment" or were found "guilty but mentally ill" in their criminal cases. *Id.* ¶¶ 160–61. DOC policy excludes D-Roster individuals from the DOC's harshest solitary-confinement units and requires that they receive a minimum of 20 hours of out-of-cell time per week. *Id.* ¶ 162. Plaintiffs all have C-Roster designations, but at least one of them previously had a D-Roster designation. *Id.* ¶¶ 234, 255, 287, 311, 321, 335, 355.

*Khalil Hammond* is on the RRL and has been in solitary confinement for over ten years. *Id.* ¶¶ 17, 236. He is currently in the IMU at SCI Phoenix. *Id.* ¶ 237. Mr. Hammond was told his placement on the RRL was due to his failure out of the Security Threat Group Management Unit, a solitary-confinement "program." *Id.* ¶¶ 237, 241. Prior to his incarceration, he was diagnosed with Bipolar I Disorder, PTSD, and ADHD, and his time in solitary confinement has caused additional mental health symptoms. *Id.* ¶¶ 17, 233, 245. Isolation and the conditions of his confinement have caused Mr. Hammond to attempt suicide eight times and engage in self-harm over 100 times. *Id.* ¶ 244.

*David Thompson*, who is in the RHU, has been in solitary confinement for five of his six years in DOC custody. *Id.* ¶¶ 18, 259. He has suffered from mental illness since childhood, and solitary confinement has worsened his anxiety and

8

depression. *Id.* ¶¶ 18, 252–54, 274–76. His housing in solitary confinement has caused him to have suicidal thoughts, and he has attempted suicide three times while in solitary confinement. *Id.* ¶ 275. He has been placed in solitary confinement as a result of misconduct violations but also due to vague reasons, like being "problematic" or because he was "under investigation." *Id.* ¶¶ 257–58, 264, 271–72. Several of Mr. Thompson's solitary-confinement placements have been due to behaviors associated with his mental illness, including a suicide attempt. *Id.* ¶¶ 261–63, 280.

**Antoine Walker**, who has a diagnosis of anxiety, has been on the RRL and in solitary confinement for six years, yet has never been given the opportunity to contest his placement. *Id.* ¶¶ 19, 286, 289–93. His mental and physical health have degraded in that time; he has attempted suicide six times and engaged in self-harm four times, and he suffers from deep-vein thrombosis. *Id.* ¶¶ 19, 303–06. He has not been told the reason for his placement on the RRL, and even prison officials told him they did not know why he was placed on the RRL. *Id.* ¶¶ 295–96.

**Muwsa Green** received inpatient psychiatric care and was diagnosed with mental-health conditions as a child, and, while incarcerated in the DOC, has been diagnosed with schizophrenia, borderline-intellectual-function disorder, and impulse-control disorder. *Id.* ¶¶ 20, 310, 321. His mental health has worsened in his more than ten years in solitary confinement, leading to approximately eight suicide

attempts and more than twenty incidents of self-harm. *Id.* ¶¶ 20, 310, 312, 317–18, 327. From October 2023 through the filing of the complaints, Mr. Green was in solitary confinement due to two nonviolent rule infractions. *Id.* ¶¶ 325–26.

**Tyrone Leonard**, who was diagnosed with bipolar disorder and antisocial personality disorder before his incarceration, has spent approximately five years in solitary confinement. *Id.* ¶¶ 21, 334, 337. His anxiety worsened in solitary confinement such that he has attempted suicide three times. *Id.* ¶¶ 21, 342–44. Though he was not in solitary confinement when the complaints were filed, Mr. Leonard is at substantial risk of being returned to solitary confinement because his past solitary-confinement placements make it harder for him to comply with prison rules in general population and actions caused by his mental illness can cause him to be placed in solitary. *Id.* ¶¶ 346–51. Indeed, his most recent solitary-confinement placement, for four months, was a result of two nonviolent rule infractions. *Id.* ¶¶ 338–39.

**Malika Henderson** has spent six years cumulatively in solitary confinement. *Id.* ¶¶ 22, 360. She has been treated for mental health conditions from a young age, and while incarcerated in the DOC, she has been diagnosed with mood disorder, anxiety, intermittent explosive disorder, ADHD, antisocial personality disorder, and PTSD. *Id.* ¶¶ 354–56. Her time in solitary confinement has caused severely

worsening anxiety, diminished self-esteem, and she has attempted suicide more than ten times. *Id.* ¶¶ 22, 371–72.

**Defendants Laurel R. Harry**, **George Little**, and **Michael Wenerowicz** authorized or acquiesced in the DOC's solitary-confinement policies. *Id.* ¶¶ 24–26. Defendant Wenerowicz has sole authority to place or remove individuals on the RRL, and his decisions can only be overruled by the Secretary of Corrections, Defendant Harry. *Id.* ¶¶ 107, 117. These Defendants kept Plaintiffs in solitary confinement despite histories of mental illness and dangerous decompensation, and failed to take reasonable measures to protect Plaintiffs' health, safety, and psychological well-being. *Id.* ¶¶ 249, 284, 307, 332, 352, 376.

**Defendants Lucas Malishchak and Brian Schneider** are responsible for the provision of mental-health treatment in the DOC and have failed to take reasonable or adequate measures to protect Plaintiffs from isolation-related decompensation. *Id.* ¶¶ 68–74. They have failed to ensure that Plaintiffs and others like them receive confidential evaluations identifying risk factors for decompensation before placement in solitary confinement or meaningful assessments designed to identify and treat adverse symptoms while in isolation. *Id.* ¶¶ 70–73.

## QUESTIONS PRESENTED

1.    Should the claims of any unnamed putative class members be dismissed?

2.    Does the *Hammond* complaint state plausible ADA and RA claims?

3.      Does the *Henderson* complaint state a plausible Eighth Amendment claim based on the duration of Plaintiffs' solitary confinement?

4.      Do the *Walker* Plaintiffs adequately plead a liberty interest in avoiding continued placement on the RRL and IMU?

5.      Do the *Walker* Plaintiffs adequately plead that they have been denied the procedural protections required by the Due Process Clause?

6.      Does the more-specific-provision rule bar Plaintiffs' ADA and RA claims in *Hammond*?

7.      Is qualified immunity an available defense to Plaintiffs' ADA claim?

8.      Should any of the claims of unnamed putative class members be dismissed for lack of standing?

9.      Are Plaintiffs' claims in *Hammond* barred by issue or claim preclusion?

10.      Are Defendants entitled to qualified immunity on the *Henderson* Eighth Amendment claim?

11.      Are Defendants entitled to qualified immunity on the *Hammond* Eighth Amendment claim?

12.      Is 18 U.S.C. § 3626(a) a valid basis on which to dismiss Plaintiffs' prospective-relief claims in *Henderson*?

Plaintiffs request that Questions 2–5 be answered in the affirmative and 1 and 5–12 in the negative.

## LEGAL STANDARD

In ruling on a motion to dismiss under Rule 12(b)(6), the court must accept the complaint's factual allegations as true, construe them in the light most favorable to the plaintiff, and draw all reasonable inferences in the plaintiff's favor. *McTernan*

*v. City of York*, 577 F.3d 521, 526 (3d Cir. 2009). A complaint need not contain "detailed factual allegations" but merely "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up). "[P]lausible does not mean probable[.]" *Martinez v. UPMC Susquehanna*, 986 F.3d 261, 265 (3d Cir. 2021). Rather, "[t]he court need only be able to draw a 'reasonable inference' that the defendant has broken the law." *Id.* (quoting *Iqbal*, 556 U.S. at 678).

In considering a Rule 12(b)(6) motion, the court is "bound not to go beyond the facts alleged in the [c]omplaint and the documents on which the claims made therein are based." *Bruni v. City of Pittsburgh*, 824 F.3d 353, 360 (3d Cir. 2016) (cleaned up). Generally, when "matters outside the pleadings are presented to and not excluded by the court" on a motion under Rule 12(b)(6), "the motion must be treated as one for summary judgment under Rule 56 [and] [a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed R. Civ P. 12(d); *Bruni*, 824 F.3d at 360. The Third Circuit has recognized only limited exceptions to this rule: "exhibits attached to the complaint, matters of public record, [and] undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010).

**ARGUMENT**

**I.    The complaints state valid legal claims for the named Plaintiffs, which is all that is required at this stage.**

**A.    Defendants' arguments about the merits of unnamed putative class members' claims are premature and should be rejected.**

"It is axiomatic that an unnamed class member is not a party to the class-action litigation before the class is certified." *Home Depot USA, Inc. v. Lafarge N. Am., Inc.*, 59 F.4th 55, 63 (3d Cir. 2023) (cleaned up). Defendants nonetheless devote significant space to the potential claims of unnamed members of Plaintiffs' proposed classes. *See, e.g.*, *Hammond* Defs.' Br. 20–21, ECF No. 77 (addressing D-Roster individuals)[3]; *Henderson* Defs.' Br. 9–15, ECF No. 79 (seeking dismissal of "claims by Plaintiffs and prospective class members"); *id.* at 18–20 (asserting that claims "by the prospective class members on the A, B, and C Roster are barred by qualified immunity"); *id.* at 26 (asserting that individuals on the A and B Roster "do not have a claim against Malishchak and Schneider"). These putative class members are not

---

[3] In addition to improperly relying on material beyond the pleadings, Defendants' arguments about D-Roster individuals rest on a misunderstanding of Plaintiffs' proposed class definition. *See Hammond* Defs.' Br. 20–21 & n.6. Defendants imply that D-Roster individuals housed in a DTU are members of Plaintiffs' proposed classes, but the proposed damages class in the *Hammond* complaint is limited to "individuals housed in a Restricted Housing Unit (RHU) or Intensive Management Unit (IMU)" and the proposed injunctive classes to individuals housed in a RHU, IMU, "or any newly created SL5 unit with conditions that are substantially similar to the RHU or IMU." *Hammond* Am. Comp. ¶¶ 378–80; *but see Hammond* Defs.' Br. 38 (misquoting the definition of Plaintiffs' proposed Mental Health Damages Class).

parties to the case, so their potential claims are not before the court and cannot be dismissed. Moreover, to the extent Defendants' arguments about unnamed putative class members are tantamount to a request to strike Plaintiffs' class allegations or deny class certification, neither is appropriate at this early, pre-discovery stage.

Prior to class certification, unnamed putative class members are not parties, so their claims are not before the court. *Home Depot*, 59 F.4th at 63; *see Smith v. Bayer Corp.*, 564 U.S. 299, 313 (2011) (agreeing that an "argument that a nonnamed class member is a party to the class-action litigation *before the class is certified*" is "novel and surely erroneous" (quoting *Devlin v. Scardelletti*, 536 U.S. 1, 16 n.1 (2002) (Scalia, J., dissenting))). "Putative class members become parties to an action—and thus subject to dismissal—only after class certification." *Molock v. Whole Foods Mkt. Grp., Inc.*, 952 F.3d 293, 298 (D.C. Cir. 2020); *accord Cruson v. Jackson Nat'l Life Ins. Co.*, 954 F.3d 240, 250 (5th Cir. 2020); *Gibson v. Chrysler Corp.*, 261 F.3d 927, 940 (9th Cir. 2001). Prior to certification, unnamed putative class members are simply not "subject to the court's power." *In re Checking Account Overdraft Litig.*, 780 F.3d 1031, 1037 (11th Cir. 2015). "[A]ny claims that they might have . . . necessarily exist only by hypothesis." *Id.* Indeed, since plaintiffs do not even need to demonstrate that putative class members have standing, *infra* § II.C, it necessarily follows that plaintiffs do not need to meet the higher bar of demonstrating that putative class members state a claim.

When, as here, defendants seek dismissal of unnamed putative class members' claims, the proper response is to deny dismissal and defer consideration of the arguments until the class-certification stage. *See, e.g.*, *Morrelli v. Corizon Health, Inc.*, No. 18-1395, 2019 U.S. Dist. LEXIS 29717, at *36–43 (E.D. Cal. Feb. 25, 2019) (denying motion to dismiss premised on contention that named plaintiffs' allegations failed to state a claim as to unnamed putative class members, who defendants asserted were different in kind from the named plaintiffs); *Rosenberg v. Avis Rent A Car Sys.*, No. 07-1110, 2007 U.S. Dist. LEXIS 55219, at *14 n.5 (E.D. Pa. July 31, 2007) ("reject[ing] defendant's argument that the complaint should be dismissed with respect to" unnamed putative class members and deferring that issue until after the filing of a class-certification motion). Any decision addressing the merits of unnamed putative class members' claims at the Rule 12 stage would "be purely advisory" and therefore exceed the court's authority. *Molock*, 952 F.3d at 298.

To the extent Defendants' arguments about unnamed putative class members' claims are a backdoor effort to have the court strike Plaintiffs' class allegations or deny class certification at this early stage, the court should decline to take the bait. Addressing the merits of any of the unnamed putative class members' claims at this juncture would be tantamount to a ruling on class certification (either by foreclosing class certification or narrowing the potential class definitions). But Defendants have

16

not moved to strike under Rule 12(f) or Rule 23(d)(1)(D) or otherwise explicitly asked the court to deny class certification. The court should not grant relief that Defendants have not even seen fit to explicitly request.

Moreover, addressing class certification at the pleading stage, before a motion for class certification has even been filed, is an extraordinary step that is inappropriate except in the "rare few" instances "where the complaint itself demonstrates that the requirements for maintaining a class action cannot be met." *Landsman & Funk PC v. Skinder-Strauss Assocs.*, 640 F.3d 72, 93 n.30 (3d Cir. 2011). Determining the appropriateness of class certification requires "a 'rigorous analysis.'" *Id.* at 93 (citation omitted). In most cases, pre-certification discovery is necessary. *Id.* Without discovery, "a court very rarely has the information necessary to conduct the" class-certification analysis properly. *P.V. v. Sch. Dist. of Phila.*, No. 11-4027, 2011 U.S. Dist. LEXIS 125370, at *12 (E.D. Pa. Oct. 31, 2011); *see also S. Broward Hosp. Dist. v. MedQuist, Inc.*, 516 F. Supp. 2d 370, 402 (D.N.J. 2007) ("[T]he shape and form of a class action evolves only through the process of discovery." (citation omitted)).

Even when defendants explicitly move to strike class allegations, which Defendants here have not done, courts in this circuit routinely deny their requests as premature without even addressing the merits of their arguments. *See, e.g.*, *Ruffing v. Wipro Ltd.*, 529 F. Supp. 3d 359, 369–70 (E.D. Pa. 2021); *Gregory v. Metro Auto*

*Sales, Inc.*, 158 F. Supp. 3d 302, 309 (E.D. Pa. 2016); *Johnson v. Geico Cas. Co.*, 516 F. Supp. 2d 351, 357 (D. Del. 2007); *Korman v. Walking Co.*, 503 F. Supp. 2d 755, 762–63 (E.D. Pa. 2007). Defendants here have not explicitly moved to strike or dismiss Plaintiffs' class claims, let alone met (or even attempted to meet) their burden of demonstrating that this is one of the "rare few" cases in which addressing class certification at the pleading stage is appropriate. *Landsman & Funk PC*, 640 F.3d at 93 n.30. Ruling on anything other than whether Plaintiffs themselves have adequately pleaded the claims they have asserted would therefore be especially inappropriate.

Because unnamed putative class members are not parties to this case and Defendants' attempt to have their claims dismissed at this stage is a premature attack on class certification, the court should decline to address any of Defendants' arguments about unnamed putative class members.[4]

## B. The *Hammond* complaint states valid disability-discrimination claims based on Plaintiffs' placement in solitary confinement despite—and sometimes because of—their mental illness.

The facts alleged in Plaintiffs' complaint establish that the DOC discriminates against them on the basis of their psychiatric disabilities, in violation of the ADA

---

[4] This includes all of Defendants' arguments about individuals with A, B, and D-Roster designations since all named Plaintiffs are on the C Roster.

and RA, in at least two ways.[5] *First*, the DOC has failed to make reasonable modifications to its policies and Plaintiffs' conditions of confinement to ameliorate the particularly detrimental effects solitary confinement has on them in light of their mental illness. *Second*, the DOC has placed certain Plaintiffs in solitary confinement in response to behaviors that are manifestations of their disabilities. In arguing for dismissal, Defendants ignore binding precedent and defy the Rule 12 standard by disputing the veracity of Plaintiffs' allegations.[6]

Congress enacted the ADA "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). As a remedial statute, the ADA must be "broadly construed to effectuate its purposes." *Disabled in Action v. SEPTA*, 539 F.3d 199, 208 (3d Cir. 2008) (citation omitted). Title II of the ADA and Section 504 of the RA have the same "substantive standards for determining liability." *Furgess v. Pa. Dep't of Corr.*,

---

[5] Defendants do not seek dismissal of the Eighth Amendment claim in *Hammond* for failure to state a claim, so that claim is only addressed in the qualified-immunity section, *infra* § III.A.

[6] Because the court must accept Plaintiffs' factual allegations as true on this posture, Plaintiffs do not further address the numerous instances of Defendants contesting the veracity of Plaintiffs' allegations in their argument for dismissal of Plaintiffs' ADA and RA claims. *See, e.g.*, *Hammond* Defs.' Br. 28 (calling Plaintiffs' allegations "brazenly false"); *id.* ("Plaintiffs erroneously assert that . . . ."); *id.* at 29 ("Plaintiffs also mistakenly contend that . . . ."). That Defendants cite to DOC policies to support their attacks on the accuracy of Plaintiffs' allegations does not change the fact that the court must accept Plaintiffs' allegations as true. *See Doe v. Princeton Univ.*, 30 F.4th 335, 342 (3d Cir. 2022); *see also infra* § I.C.2.

933 F.3d 285, 288 (3d Cir. 2019). To state a claim, "plaintiffs must demonstrate that: (1) they are qualified individuals; (2) with a disability; and (3) they were excluded from participation in or denied the benefits of the services, programs, or activities of a public entity, or were subjected to discrimination by any such entity; (4) by reason of their disability." *Durham v. Kelley*, 82 F.4th 217, 225 (3d Cir. 2023).[7]

The ADA's "subjected to discrimination" prong "is a catch-all . . . that prohibits all discrimination by a public entity, regardless of context." *Haberle v. Troxell*, 885 F.3d 171, 180 (3d Cir. 2018) (cleaned up). Failing to make reasonable accommodations for a plaintiff's disabilities is a form of prohibited disability discrimination. *Id.*; *see Berardelli v. Allied Servs. Inst. of Rehab. Med.*, 900 F.3d 104, 117 (3d Cir. 2018) ("An essential feature of [the ADA's and RA's] 'prohibition against discrimination' is . . . the duty to make 'reasonable accommodations' and 'reasonable modifications[.]'").[8] Moreover, Title II's "subjected to discrimination" prong is distinct from its "services, programs, or activities" prongs, so discrimination under the ADA does not require exclusion from or denial of the benefits of services,

---

[7] Defendants do not dispute that Plaintiffs are qualified individuals with disabilities nor that the DOC is a public entity to which Title II applies. Nor could they. *See Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 213 (1998); *Williams v. Sec'y Pa. Dep't of Corr.*, 117 F.4th 503, 528 (3d Cir. 2024) ("Mental illness qualifies as a disability under the ADA." (cleaned up)).

[8] The terms "reasonable modifications" and "reasonable accommodations" are used interchangeably. *See Berardelli*, 900 F.3d at 117–18.

programs, or activities. *See Haberle*, 885 F.3d at 179–80.[9] Plaintiffs' allegations establish discrimination in at least two distinct ways.

*First*, the DOC has discriminated against Plaintiffs by failing to make reasonable modifications to its policies and Plaintiffs' conditions of confinement to ameliorate the especially detrimental effects solitary confinement has on them due to their mental illness. Although Defendants repeatedly suggest that this theory of liability is novel, it has been expressly countenanced by the Third Circuit—in a case to which the DOC is a party. *Compare, e.g.*, *Hammond* Defs.' Br. 26 ("Plaintiffs contort the protections of the ADA and RA into an unrecognizable form. . . . ."), *with Williams v. Sec'y Pa. Dep't of Corr.*, 117 F.4th 503, 527–29 (3d Cir. 2024).[10]

In *Williams*, the DOC kept the plaintiff in solitary confinement pursuant to a policy that required that all death-sentenced prisoners be kept in solitary confinement. *Id.* at 528. The court held the plaintiff's ADA claim should survive summary judgment because, in light of the plaintiff's "known mental illness, the DOC had an obligation to modify its practices to ameliorate the harms of prolonged solitary confinement on [him]," but failed to do so. *Id.* at 529.[11] It did not matter that

---

[9] Several of the cases cited by Defendants, none of which is binding on this court, ignore this distinction. *See Hammond* Defs.' Br. 24–25.

[10] There is a certiorari petition pending in *Williams*, but it does not challenge the ADA holding.

[11] The DOC could have avoided liability only "by 'demonstrat[ing] that making the modifications would fundamentally alter the nature of the service,

the policy at issue was not facially discriminatory. "[B]ecause facially neutral policies may disparately impact people with disabilities, a public entity may be required to make reasonable modifications to these policies." *Id.* (cleaned up). Nor did it matter that the plaintiff was treated the same as other death-sentenced prisoners because "[a] person with a disability may be the victim of discrimination precisely because she did not receive disparate treatment when she needed accommodation." *Id.* (citation omitted).

Plaintiffs' allegations here mirror the facts of *Williams* in all relevant respects. Plaintiffs allege they have known mental illness diagnoses, that solitary confinement is therefore especially harmful to them, and that the DOC has nonetheless kept them in solitary confinement. Even before *Williams*, courts recognized that facts like these give rise to liability under the ADA. *See, e.g.*, *Partridge v. Smith*, No. 17-2941, 2020 U.S. Dist. LEXIS 31693, at *34 (D. Colo. Feb. 25, 2020); *Harvard v. Inch*, 411 F. Supp. 3d 1220, 1241–42 (N.D. Fla 2019).

That Plaintiffs here may have been placed in solitary confinement due to rule violations is of no moment. *See Hammond* Defs.' Br. 23, 25–26.[12] "A prisoner's

---

program, or activity.'" *Williams*, 117 F.4th at 529 (quoting 28 C.F.R. § 35.130(b)(7)(i)). Whether a modification is a "fundamental alteration" is a fact-intensive inquiry inappropriate for resolution on a motion to dismiss. *Frazier v. Pa. State Univ.*, 603 F. Supp. 3d 158, 170 (M.D. Pa. 2022).

[12] *But see infra* § III.A (discussing the various reasons Plaintiffs are in solitary).

misconduct does not strip him of his right to reasonable accommodations, and a prison's obligation to comply with the ADA and the RA does not disappear when inmates are placed in a segregated housing unit, regardless of the reason for which they are housed there." *Furgess*, 933 F.3d at 291.

Nor does it matter that some Plaintiffs' solitary confinement might be "time-limited." *Hammond* Defs.' Br. 26; *cf. Chisolm v. McManimon*, 275 F.3d 315, 327 (3d Cir. 2001) (rejecting argument that plaintiff's short incarceration term absolved a jail of its duty to provide reasonable accommodations). Defendants cite no authority for the bizarre proposition that disability discrimination is only actionable if it is "permanent or indefinite." *Hammond* Defs.' Br. 26.[13]

And, finally, to the extent Defendants dispute the reasonableness of various possible modifications to their practices, that is a question for another day. It is Defendants' burden to prove any proposed modifications are not reasonable, *see Hovsons, Inc. v. Twp. of Brick*, 89 F.3d 1096, 1103 (3d Cir. 1996), and it will ultimately be for the factfinder to determine the reasonableness and effectiveness of any proposed modifications, *see Brooklyn Ctr. for Indep. of the Disabled v. Metro.*

---

[13] Regardless, Plaintiffs on the RRL *are* in solitary indefinitely.

*Transp. Auth.*, 11 F.4th 55, 62 (2d Cir. 2021) (reasonableness); *Chisolm*, 275 F.3d at 327–28 (effectiveness).[14]

Since *Williams* is binding on this court, Plaintiffs' claims that the DOC discriminated against them on the basis of their disabilities by failing to make reasonable modifications to its practices should proceed to discovery.

*Second*, the DOC has discriminated against Plaintiffs by placing them in solitary confinement due to manifestations of their disabilities. *See, e.g.*, *Hammond* Am. Compl. ¶¶ 261–63, 280, 348. The ADA "does not contemplate a stark dichotomy between 'disability' and 'disability-caused misconduct,' but rather protects both." *McKenzie v. Dovala*, 242 F.3d 967, 974 (10th Cir. 2001) (citation omitted); *accord Salley v. Circuit City Stores*, 160 F.3d 977, 981 (3d Cir. 1998). That is why "courts in this circuit have found that subjecting a disabled inmate to standard disciplinary procedures for actions that are manifestations of his or her disability amounts to a failure to accommodate the inmate's disability." *McDonald-Witherspoon v. City of Philadelphia*, No. 17-1914, 2018 U.S. Dist. LEXIS 143338, at *30 (E.D. Pa. Aug. 23, 2018). So when a prison places a deaf person in solitary confinement as punishment for failing to obey commands that he cannot hear, the

---

[14] Defendants' attempt to rely on a broadly worded state regulation to evade the requirements of the ADA is a nonstarter. *See Hammond* Defs.' Br. 24 (citing 37 Pa. Code § 93.11). "One who violates the ADA . . . cannot escape liability merely because the violation is a result [of] a state policy that conflicts with federal law." *Williams*, 117 F.4th at 528.

prison violates the ADA. *Parms v. Pa. Dep't of Corr.*, No. 14-84, 2015 U.S. Dist. LEXIS 37821, at *6–7 (W.D. Pa. Mar. 25, 2015).

The analysis is no different when the disability at issue is a mental illness. *See, e.g.*, *Snider v. Motter*, No. 13-1226, 2016 U.S. Dist. LEXIS 72718, at *26–27 (M.D. Pa. June 2, 2016), *report & recommendation adopted*, 2016 U.S. Dist. LEXIS 102153 (M.D. Pa. Aug. 4, 2016). In *Snider*, the incarcerated plaintiff alleged that he was disciplined for behaviors that were manifestations of his mental illness, including "hitting a door[] and being disruptive." *Id.* at *26. The court allowed his ADA claim to proceed because, "by punishing him in the same way other non-mentally ill inmates would have been punished, [the jail] failed to accommodate his disability, and, thus, discriminated against him." *Id.* at *26–27.

Here, too, to the extent Plaintiffs have been placed in solitary in response to suicide attempts and other manifestations of their mental illness, including failures to abide by prison rules, the DOC has violated the ADA and RA.[15]

---

[15] Defendants' only response to this aspect of Plaintiffs' claim is that a DOC policy bars the issuance of misconducts for suicide attempts and self-injurious behavior. *Hammond* Defs. Br. 30. Notably, they do not contend that DOC policy prohibits punishment for other manifestations of incarcerated individuals' mental illness. More importantly, though, on this posture, Defendants are not entitled to any presumption that their policies accurately describe what occurs in their prisons.

**C.    The *Henderson* complaint states a valid Eighth Amendment claim against all Defendants based on the duration and conditions of Plaintiffs' solitary confinement.**

"Continued solitary confinement . . . poses a grave threat to well-being." *Williams v. Sec'y Pa. Dep't of Corr.*, 848 F.3d 549, 568–69 (3d Cir. 2017). Defendants concede that solitary confinement can be unconstitutional. *Henderson* Defs.' Br. 7. The torturous conditions of the DOC's solitary-confinement units, including the denial of meaningful human contact and 24-hour-a-day lighting, are inhumane and, when imposed for prolonged periods of time, violate the Eighth Amendment.

Prison officials violate the Eighth Amendment when they are deliberately indifferent to an incarcerated person's health or safety. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). While prisons may punish incarcerated people, they "may not do so in a manner that threatens the[ir] physical and mental health." *Young v. Quinlan*, 960 F.2d 351, 364 (3d Cir. 1992). The Eighth Amendment's objective component is satisfied when plaintiffs are denied "the minimal civilized measure of life's necessities" or "incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834. The "basic human needs" incarcerated individuals cannot be deprived of include "exercise, sleep, social contact and interaction, and environmental stimulation." *Johnston v. Wetzel*, 431 F. Supp. 3d 666, 678 (W.D. Pa. 2019); *accord Johnson v. Wetzel*, 209 F. Supp. 3d 766, 777 (M.D. Pa. 2016). Central

to the objective component of the Eighth Amendment are the totality of the conditions being challenged, their duration, and their effects on the plaintiffs. *See Young*, 960 F.2d at 364.

"[P]rolonged solitary confinement satisfies the objective prong of the Eighth Amendment test." *Porter v. Pa. Dep't of Corr.*, 974 F.3d 431, 451 (3d Cir. 2020). Moreover, the cumulative time a person has spent in solitary cannot be ignored in evaluating its constitutionality. *See, e.g.*, *Stuart v. Pierce*, 587 F. Supp. 3d 127, 139 n.5 (D. Del. 2022) (Restrepo, J.). In light of the overwhelming evidence of grave harm that can be caused by solitary confinement of just days or weeks, *see, e.g.*, *Williams*, 848 F.3d at 562, it is unsurprising that multiple courts have found potential constitutional violations when individuals with no preexisting mental illness were placed in solitary confinement for periods of a few years or less. *See, e.g.*, *Cintron v. Bibeault*, 148 F.4th 37, 49 (1st Cir. 2025) (450 days); *Blanco v. Talutto*, No. 24-534, 2024 U.S. Dist. LEXIS 181489, at *5–8 (M.D. Pa. Oct. 4, 2024) (less than 9 months)*; Bertolette v. Little*, No. 23-330, 2024 U.S. Dist. LEXIS 143243, at *10–11, 17 (W.D. Pa. Aug. 6, 2024), *report and recommendation adopted*, 2024 U.S. Dist. LEXIS 169925 (W.D. Pa. Sep. 20, 2024) (less than six years in DOC's RHU and IMU); *Blount v. Unit Manager Ackrom*, No. 22-1040, 2024 U.S. Dist. LEXIS 98766, at *10–14 (W.D. Pa. June 4, 2024) (less than three years in IMU); *Morris v.*

*Zaken*, No. 21-1338, 2022 U.S. Dist. LEXIS 217991, at *14–17 (W.D. Pa. Nov. 30, 2022) (approximately three years on RRL).

With the extensiveness of case law, scientific research, and correctional standards conveying the serious risk of harm posed by solitary confinement, the subjective component of the Eighth Amendment analysis is easily met. To satisfy the Eighth Amendment's subjective component, a plaintiff must show that the defendant "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Porter*, 974 F.3d at 444 (citation omitted). The requisite knowledge can be demonstrated with circumstantial evidence, including the fact the risk was obvious. *Farmer*, 511 U.S. at 842. Given Defendants' "status as corrections professionals, it would defy logic to suggest that they were unaware of the potential harm that the lack of human interaction" in solitary confinement can cause. *Porter v. Clarke*, 923 F.3d 348, 361 (4th Cir. 2019).

Since at least 2016, high-ranking officials within the DOC have repeatedly admitted that they were aware of the dangers of solitary confinement. *Henderson* Compl. ¶¶ 54–57. The DOC's own policies explicitly state that "the potential for suicide is greater" for individuals in solitary confinement. *Id.* ¶ 54. Further, the DOC's own statistics show significant increased risk of self-harm and suicide while individuals are housed in solitary. *Id*. ¶¶ 210–20. In sum, "the substantial risks of prolonged solitary confinement are obvious, longstanding, pervasive, well-

documented, and expressly noted by prison officials in the past." *Porter*, 974 F.3d at 445 (cleaned up).

Defendants Harry, Little, Wenerowicz, Malishchak, and Schneider are liable for the constitutional violations experienced by Plaintiffs because they are aware that the DOC's solitary-confinement policies and practices are not only substantially likely to cause harm, but are actively causing harm, and yet continue the DOC's regime of torturous solitary confinement.[16] Defendants' personal-involvement argument is belied by *Palakovic v. Wetzel*, 854 F.3d 209 (3d Cir. 2017). *See Henderson* Defs.' Br. 22–23, 27–28. In *Palakovic*, the court vacated the dismissal of plaintiffs' Eighth Amendment claim against the DOC Secretary and other "supervisory officials" because their roles with respect to "policies and practices" made them "indirectly responsible" for Mr. Palakovic's repeated placement in solitary confinement. 854 F.3d at 225–26.

Here, Defendants Harry and Little were responsible for approving and implementing the very policies at issue in this case, which, as they know, subjected Plaintiffs to unreasonable risks of mental and physical injury. *Henderson* Compl. ¶¶ 22–23. They were also either aware of the DOC's readily available data which shows the highly disproportionate rate of suicide and self-harm in solitary, or they chose,

---

[16] Defendants concede the personal involvement of Harry, Little, and Wenerowicz with respect to Plaintiffs on the RRL. *Henderson* Defs. Br. 23.

with deliberate indifference, not to review the data. *Id.* ¶ 222; *see Farmer*, 511 U.S. at 843 n.8. It is simply implausible that an official at their level in the DOC was not aware of these risks. The continued existence of these practices, when they have the power to eliminate them, demonstrates their deliberate indifference. *Cf. Palakovic*, 854 F.3d at 226 (considering similar allegations "more than sufficient to state a plausible claim").

As high-level mental health officials responsible for ensuring the psychological well-being of individuals in the DOC's care, Defendants Malishchak and Schneider failed at every step to take any actions that would prevent harm in the obviously harsh and dangerous conditions of the DOC's solitary regime. *Id.* ¶¶ 25–26. They failed to enact policies and practices to ensure confidential evaluations for risks of decompensation, to implement procedures to ensure that mental-health staff performed evaluations tailored to identify and treat the adverse symptoms associated with isolation, and to remove individuals from solitary once their suffering became apparent. *Id.* ¶¶ 62–68.[17]

---

[17] Defendants' argument that Malishchak and Schneider are misjoined is based on a misconstrual of Plaintiffs' claim and a misunderstanding of the law. *See Henderson* Defs.' Br. 25–26. Defendants Malishchak and Schneider are named in the same Eighth Amendment count as the other Defendants, a conditions-of-confinement claim based on Plaintiffs' prolonged solitary confinement. *Henderson* Compl. ¶¶ 386–90. Like the other Defendants, Malishchak and Schneider are being sued for their involvement in crafting, approving, and acquiescing in the DOC's solitary-confinement policies and practices. The claims are thus based on countless

Consequently, Plaintiffs have adequately stated an Eighth Amendment claim against Defendants for being deliberately indifferent to the substantial risks and serious injuries caused by their prolonged placements in solitary confinement.[18]

**D.    The *Walker* complaint states valid Fourteenth Amendment procedural-due-process claims based on Plaintiffs Hammond's and Walker's continued placement on the RRL and in the IMU.**

Defendants advance only two narrow arguments in their motion to partially dismiss the *Walker* complaint: that Pennsylvania prisoners do not have a liberty interest in qualifying for parole, and that the DOC's administrative custody policy,

---

common factual predicates and raise countless common factual and legal questions. *See* Fed. R. Civ. P. 20(a)(2). Moreover, even if Plaintiffs *were* bringing a claim against them regarding mental-health treatment, as Defendants wrongly contend, they would still be properly joined. *See, e.g.*, *Palakovic*, 854 F.3d at 217 n.5, 225–27 (discussing conditions-of-confinement and inadequate-mental-healthcare claims brought in the same action, against correctional officials and a psychologist). The alternative—one action against Malishchak and Schneider and another against the other Defendants—demonstrates the absurdity of Defendants' argument.

[18] Defendants' argument that the Eighth Amendment claim in *Henderson* should be dismissed as duplicative of the Eighth Amendment claim in *Hammond* is meritless. *See Henderson* Defs.' Br. 15–16. The case on which Defendants rely explicitly acknowledges that, even when cases are duplicative—which these cases are not—consolidation is appropriate. *Walton v. Eaton Corp.,* 563 F.2d 66, 71 (3d Cir. 1977). These cases are now consolidated, so there is no basis for dismissal. Moreover, that the two Eighth Amendment claims were originally brought in a single action, and divided into separate actions at the urging of the court, further distinguishes these cases from *Walton. See id.* at 69–70. Crucially, Defendants do not argue that the two Eighth Amendment claims could not have been asserted in a single action, as they originally, and appropriately, were. Pleading in the alternative and bringing multiple claims arising from the same set of facts are plainly permitted. *See* Fed. R. Civ. P. 8(d)(2)–(3); Fed. R. Civ. P. 20(a)(2).

DC-ADM 802, provides constitutionally sufficient procedural protections for individuals on the RRL. *Walker* Defs.' Br. 7, ECF No. 75. Both of Defendants' arguments fail, in large part because they misconstrue Plaintiffs' claims.

*First*, Plaintiffs do not assert a liberty interest based solely on ineligibility for parole. The inability to qualify for parole is just one of several factors that Plaintiffs allege combine to create a constitutionally-protected liberty interest in avoiding continued placement on the RRL and in the IMU. *Second*, Plaintiffs' allegations demonstrate a deprivation of the most basic procedural due process rights—notice and a fair opportunity to be heard. It is these allegations, not the contents of DOC policies, that are properly before the court.

### 1. Plaintiffs have a liberty interest in avoiding continued placement on the RRL and IMU, and their ineligibility for parole is a relevant consideration.

Plaintiffs have a liberty interest in avoiding conditions that "impose[] atypical and significant hardship on [them] in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 483–84 (1995). To determine whether restrictive conditions of confinement create a constitutionally-protected liberty interest, courts consider "(1) the duration of the challenged conditions; and (2) whether the conditions overall impose[ ] a significant hardship in relation to the ordinary incidents of prison life." *Williams*, 848 F.3d at 560. This inquiry requires an evaluation of the totality of the conditions, including, among other factors, the

amount and quality of out-of-cell time, the frequency of strip searches, the amount of social interaction, the availability of programming, the psychological effects, and whether the duration is indefinite. *Wilkinson v. Austin*, 545 U.S. 209, 222–23 (2005); *Williams*, 848 F.3d at 562–64, 569.

There is "wide consensus that prolonged and indefinite solitary confinement gives rise to a due process liberty interest." *Porter*, 974 F.3d at 450; *see also, e.g.*, *Talley v. Clark*, 851 F. App'x 306, 307, 309–10 (3d Cir. 2021) (reversing dismissal of due-process claim based on thirteen months in solitary confinement); *Williams*, 848 F.3d at 561 (holding periods of six and eight years in solitary sufficient to establish a due-process liberty interest); *Shoats v. Horn*, 213 F.3d 140, 144 (3d Cir. 2000) ("We have no difficulty concluding that eight years in administrative custody, with no prospect of immediate release in the near future, is 'atypical' in relation to the ordinary incidents of prison life."); *Brathwaite v. Phelps*, No. 10-646, 2023 U.S. Dist. LEXIS 54827, at *24 (D. Del. Mar. 30, 2023) (Bibas, J.) (three years); *Mack v. Clark*, No. 21-4, 2022 U.S. Dist. LEXIS 121813, at *22 (W.D. Pa. July 11, 2022) (approximately three years); *Bramble v. Wetzel*, No. 20-2394, 2022 U.S. Dist. LEXIS 2316, at *26 (M.D. Pa. Jan. 5, 2022) (approximately two and a half years).

Consequently, Plaintiffs Walker and Hammond, who have been in indefinite solitary confinement on the RRL for approximately six and eleven years, respectively, would easily establish the requisite liberty interest, even in the absence

33

of any allegations about parole ineligibility. *Walker* Compl. ¶¶ 208–09, 235. Defendants do not dispute this.

Indeed, the conditions Plaintiffs allege are nearly identical to those the Third Circuit found sufficient to state a liberty interest in *Williams*, including in-cell confinement of 22–24 hours a day, eating meals alone, placement in a cage when out of their cells, and invasive strip searches. 848 F.3d at 563; *Walker* Compl. ¶¶ 60, 64, 108, 154, 155, 221, 238. And, like the *Williams* plaintiffs, Plaintiffs here have alleged their solitary confinement is indefinite. 848 F.3d at 562; *Walker* Compl. ¶¶ 72, 83–89, 103.

Nonetheless, the effects Plaintiffs' RRL and IMU placements have on their parole eligibility are a proper consideration in evaluating their liberty interest.[19] *Wilkinson*, 545 U.S. at 224.  In *Wilkinson*, the Court identified two primary factors that pushed the plaintiffs' solitary confinement over the liberty-interest line: its indefinite duration and the fact "that placement disqualifies an otherwise eligible inmate for parole consideration." *Id.* The Court acknowledged that any one of the

_____

[19] The Third Circuit's nonprecedential opinion in *Saleem v. Brungart*, cited by Defendants, does not undercut this point. *See Walker* Defs.' Br. 11. There, the plaintiff spent only 30 days in solitary confinement and pegged his liberty-interest argument solely to the effects of his solitary confinement on his ability to attend programming and, in turn, to seek parole. *Saleem v. Brungart*, No. 20-1610, 2022 U.S. App. LEXIS 33018, at *7 (3d Cir. Nov. 30, 2022).

factors it considered "standing alone might not be sufficient to create a liberty interest" but explained that, "taken together," they did. *Id.*

Here, too, the duration and conditions of Plaintiffs' solitary confinement—including their inability to be granted parole—combine to create a protected liberty interest entitling them to due process.

### 2.    Plaintiffs have been denied the procedural protections the Due Process Clause requires.

Rather than contend with the facts alleged in Plaintiffs' complaint, Defendants flip the Rule 12 standard on its head, introducing new evidence and implicitly asking the court to assume its truth, and address a strawman argument that Plaintiffs have not asserted. The facts Plaintiffs allege establish that Defendants have not provided them with the procedural protections the Due Process Clause requires. Defendants do not dispute this. Since Plaintiffs also adequately plead a liberty interest in avoiding continued placement on the RRL and IMU, *supra* § I.C.1, the *Walker* claims should proceed to discovery. Defendants' "facial challenge" argument is therefore a red herring.

Even assuming *arguendo* that the court can take judicial notice of the DOC policies Defendants attached to their motion and consider them on this posture, they

are irrelevant at this stage of the case.[20] For one thing, "consideration only goes so far." *Doe v. Princeton Univ.*, 30 F.4th 335, 342 (3d Cir. 2022). Judicial notice would permit the court to acknowledge the existence of the policies, but it would not require the court to accept as true that they accurately describe how the RRL operates in practice. *See id.* (explaining that a judicially-noticed public record cannot be considered "for the truth of its contents"). On this posture, it is "the facts in the complaint [that] must prevail." *Id.* Moreover, Defendants acknowledge the possibility that Plaintiffs are "alleging those written policies were not applied to them personally," and they do not seek dismissal of Plaintiffs' claims based on the facts Plaintiffs actually allege. *Walker* Defs. Br. 10 n.11.

Plaintiffs allege facts that demonstrate a denial of the most basic of due-process rights. "The essential requirements of due process . . . are notice and an opportunity to respond." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985). This is no less true for incarcerated individuals. *Wilkinson*, 545 U.S. at 225–26. For incarcerated individuals placed in prolonged or indefinite solitary

---

[20] Defendants' reliance on a policy that was issued and "took effect after Plaintiffs filed their Complaint" is particularly dubious. *Walker* Defs.' Br. 2 n.2.; *see Walker* Defs.' Ex. 4, ECF No. 75-4. Plaintiffs' complaint cannot possibly be based on a document that did not exist when it was filed. The case on which Defendants rely is inapposite, as the executive orders there were issued before the plaintiffs' complaint was filed. *See Child.'s Health Def., Inc. v. Rutgers*, 93 F.4th 66, 71 & n.3, 73 n.14 (3d Cir. 2024) (taking judicial notice of orders issued in "mid-to-late March [2020]" where the operative complaint was filed in October 2021).

confinement, the Due Process Clause requires "'regular and meaningful review of [their] continued placement . . . ,' including 'a statement of reasons for the continued placement,' 'meaningful opportunity to respond to the reasons provided,' and a hearing." *Porter*, 974 F.3d at 440 (quoting *Williams*, 848 F.3d at 576).

The facts alleged by Plaintiffs demonstrate an absolute denial of notice or any opportunity to be heard. Individuals are not provided with the reason for their initial or continued placement on the RRL, and neither decision is appealable. *Walker* Compl. ¶¶ 70, 73, 82. Individuals on the RRL cannot participate in the annual review process. *Id.* ¶ 79. And the one "review" individuals on the RRL can participate in is with the Program Review Committee, which Defendants admit lacks authority to release them from solitary. *Id.* ¶¶ 71, 80; *see Walker* Defs.' Br. 4.

These facts constitute a deprivation of due process. *See, e.g.*, *Johnston*, 431 F. Supp. 3d at 684–85 (denying qualified immunity on RRL prisoner's procedural-due-process claim); *Shoatz v. Wetzel*, No. 13-657, 2014 U.S. Dist. LEXIS 9386, at *18–20 (W.D. Pa. Jan. 27, 2014) (listing alleged procedural deficiencies in review of plaintiff's RRL placement and denying motion to dismiss).

Rather than contend with controlling precedent, Defendants rely on several non-binding opinions, which they claim demonstrate that "the periodic review offered to Pennsylvania inmates who are indefinitely confined in [administrative custody] comports with procedural due process," regardless of whether they are on

the RRL. *Walker* Defs.' Br. 8 (citation omitted). In addition to not being binding on this court, each of the decisions Defendants cite is distinguishable or otherwise inapposite.

The Third Circuit's nonprecedential opinion in *Bracey* provides no basis to dismiss Plaintiffs' due-process claim. For one thing, there is no indication that the lack of procedural protections for individuals on the RRL that Plaintiffs allege here was even before the court in *Bracey. See generally Bracey v. Sec'y Pa. Dep't of Corr.*, 686 F. App'x 130 (3d Cir. 2017) (per curiam).

For another, the only authority *Bracey* cites for its conclusion that the review procedures available to RRL prisoners satisfy due-process requirements is *Shoats*, which has nothing to do with the RRL. *Id.* at 135–36; *see generally Shoats*, 213 F.3d at 141–43 (describing the plaintiff's placement in administrative custody for a prolonged period of time, not on the RRL); *see also Johnston*, 431 F. Supp. 3d at 684 (distinguishing *Shoats*). Indeed, the RRL did not even exist when *Shoats* was decided in 2000. *See Shoatz v. Wetzel*, No. 13-657, 2016 U.S. Dist. LEXIS 17515, at *28 (W.D. Pa. Feb. 12, 2016) (stating that the RRL was created in 2004).

Finally, the statement in *Bracey* that "placement on the RRL merely adds another layer of periodic review" to the usual review procedures for individuals in administrative custody, *Bracey*, 686 F. App'x at 136, finds no support in the facts described in the opinion and, more importantly, is belied by Plaintiffs' allegations.

*See generally Walker* Compl. ¶¶ 68–85; *see also Walker* Defs.' Br. 4 (acknowledging that the PRC does not have the authority to release RRL prisoners from administrative custody).[21]

In sum, the *Bracey* opinion simply cannot bear the weight Defendants put on it. Their attempt to rely on it is a paradigmatic example of why "district courts in this Circuit should be cautious when looking to not precedential opinions for statements of law." *Morgan v. Allison Crane & Rigging LLC*, 114 F.4th 214, 223 n.41 (3d Cir. 2024).

The district court opinions on which Defendants attempt to rely are equally unavailing. In *Reaves*, the court makes the same error as the court in *Bracey*—relying on the DOC's regular administrative-custody procedures to evaluate an RRL prisoner's due-process claim. *Reaves v. Rossman*, No. 21-1282, 2022 U.S. Dist. LEXIS 118438, at *16–17 (M.D. Pa. July 1, 2022). Moreover, unlike Plaintiffs here, the plaintiff in *Reaves* did not "allege *any* actual facts to plausibly demonstrate that his . . . continued confinement in administrative custody or on the RRL failed to comply with the minimal requirements of due process." *Id.* at *17.

---

[21] Nor does *Bracey*'s liberty-interest holding have any bearing on the analysis here. 686 F. App'x at 135. Unlike Plaintiffs here, who assert a liberty interest based on the totality of conditions associated with their continued placement on the RRL, the plaintiff in *Bracey* asserted a liberty interest in not being deprived of psychiatric treatment. *Id.* Regardless, Defendants do not dispute that Plaintiffs' complaint establishes a protected liberty interest.

*Teagle* similarly relies on cases concerning administrative-custody procedures generally, rather than the specifics of the RRL, and notes that the plaintiff had "not alleged any specific deficiencies in the PRC review framework set out by DC-ADM 802, or that he was otherwise denied due process." *Teagle v. Dep't of Corr.*, No. 24-5544, 2025 U.S. Dist. LEXIS 47601, at *18–19 (E.D. Pa. Mar. 17, 2025). Moreover, the *Teagle* opinion suggests that the PRC had the authority to determine whether the plaintiff remained on the RRL. *See id.* at *19 ("Although Teagle disagrees with the PRC's determination that he remain[ ] on the RRL. . . ."). Here, on the other hand, Plaintiffs allege—and Defendants acknowledge—that the PRC lacks that authority. *Walker* Compl. ¶¶ 71, 80; *Walker* Defs.' Br. 4.

Finally, in *Rivera*, a summary-judgment opinion, the court's holding that the plaintiff received the requisite process was rooted in its conclusion that he had a meaningful opportunity to be heard during his 90-day PRC reviews. *Rivera v. Wetzel*, No. 22-716, 2025 U.S. Dist. LEXIS 19317, at *29 (W.D. Pa. Feb. 4, 2025). Crucially, the plaintiff in *Rivera* did not dispute that those reviews occurred "or suggest they were perfunctory." *Id.* at *28. Here, in contrast, the complaint does not mention the PRC reviews—because, as Plaintiffs' allegations demonstrate, the PRC reviews play no meaningful role in the process (to the extent they even occur). If Defendants see things differently, they are free to support their contention with

evidence at summary judgment. But, for now, "the facts in the complaint must prevail." *Doe*, 30 F.4th at 342.[22]

Plaintiffs' allegations are more than sufficient to create the plausible inference that their continued placement on the RRL and IMU has deprived them of a protected liberty interest without due process. Defendants' narrow arguments for partial dismissal misconstrue Plaintiffs' complaint and rest on faulty reasoning and non-binding caselaw. Plaintiffs' due-process claims should proceed to discovery.

## II.    Defendants assert several frivolous arguments.

Several of the arguments advanced by Defendants are frivolous. That is, these arguments are "obviously without merit under existing law and unsupported by a good-faith argument to change or extend the law." *King v. Whitmer*, 71 F.4th 511, 528 (6th Cir. 2023) (cleaned up). In pressing these meritless arguments, Defendants have, at various points, failed to cite governing legal standards, ignored controlling precedent, relied on plainly inapposite caselaw, and failed to support their legal contentions with citations to authority.

---

[22] Reaching Defendants' argument about whether Plaintiffs should be able to personally meet with the decisionmaker would similarly require going beyond the allegations of the complaint. *See Walker* Defs.' Br. 10 n.10; *Rivera*, 2025 U.S. Dist. LEXIS 19317, at *29 (discussing facts, not alleged here, regarding recommendations received by the final decisionmakers from the officials who conducted the 90-day reviews). But *Rivera*'s analysis of this issue stands in stark contrast to that of the Supreme Court. *See Wilkinson*, 545 U.S. at 226.

While litigants are free to make good-faith arguments for extending existing law, "[a] party's position, even if superficially plausible, cannot be accepted as a good faith argument for the extension of the existing law if . . . the party ignores the controlling authority." *Terminix Int'l Co., L.P. v. Kay*, 150 F.R.D. 532, 537 (E.D. Pa. 1993); *cf. Kerchner v. Obama*, 612 F.3d 204, 210 n.5 (3d Cir. 2010) (noting, "with concern," a party's failure to cite binding authority adverse to their position).[23]

When, as here, attorneys make frivolous and unclear legal arguments, opposing counsel and the court are compelled to "wast[e] time chasing unavailing leads and tumbling down legal rabbit holes." *Keister v. PPL Corp.*, 318 F.R.D. 247, 264 (M.D. Pa. 2015).

### A. The more-specific-provision rule only applies to substantive-due-process claims so cannot bar Plaintiffs' statutory disability claims.

Defendants' argument that Plaintiffs' disability-discrimination claims—which are brought under federal statutes—are barred by the more-specific-provision rule—which only applies to substantive-due-process claims—is frivolous on its face. *See Hammond* Defs.' Br. 30–32. Under the more-specific-provision rule, "if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due

---

[23] *See also* Pa. R.P.C. 3.3(a)(2).

process." *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 260 (3d Cir. 2010) (quoting *United States v. Lanier*, 520 U.S. 259, 272 n.7 (1997)). The Supreme Court adopted this rule because it has "always been reluctant to expand the concept of substantive due process." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 842 (1998) (citation omitted). Thus, by its plain terms—and rationale—the more-specific-provision rule can only bar a substantive-due-process claim, not any other constitutional claim and certainly not a statutory claim.

That Plaintiffs assert an Eighth Amendment claim based on some of the same factual predicates as their ADA and RA claims is of no moment. It is axiomatic that a plaintiff may assert multiple legal claims based on the same events. *See* Fed. R. Civ. P. 8(d); *see also Soldal v. Cook Cnty.*, 506 U.S. 56, 70 (1992) ("Certain wrongs affect more than a single right and, accordingly, can implicate more than one of the Constitution's commands."). Indeed, it is common for plaintiffs to successfully assert Eighth Amendment and ADA claims with the same factual predicates. *See, e.g.*, *Williams v. Sec'y Pa. Dep't of Corr.*, 117 F.4th 503, 507–08 (3d Cir. 2024); *Durham v. Kelley*, 82 F.4th 217, 222 (3d Cir. 2023); *Spotz v. Wetzel*, No. 21-1799, 2024 U.S. Dist. LEXIS 18855, at *11–12 (M.D. Pa. Feb. 1, 2024), *report & recommendation adopted*, 2024 U.S. Dist. LEXIS 167728 (M.D. Pa. Sept. 18, 2024).

The single case cited by Defendants in support of their argument that Plaintiffs' claim is barred by the more-specific-provision rule, in fact, has nothing to

do with that rule. *See Hammond* Defs.' Br. 31 (citing *Chase v. Baskerville*, 508 F. Supp. 2d 492, 503 (E.D. Va. 2007)). In *Chase*, the court did not hold that (or even consider whether) plaintiffs' claim was barred by the more-specific-provision rule; rather, its discussion of the Eighth Amendment was part of its analysis of whether the plaintiffs' ADA claim was barred by Eleventh Amendment immunity (a defense Defendants here have not asserted). 508 F. Supp. 2d at 498–503.

Defendants' reliance on the more-specific-provision rule should therefore be rejected.

## B. Qualified immunity is only available to individual-capacity defendants sued for damages so cannot bar Plaintiffs' ADA claim.

Defendants' assertion of qualified immunity as to Plaintiffs' ADA claim flies in the face of decades of caselaw establishing qualified immunity as a defense available only to individual defendants sued for damages in their individual capacities.[24] Plaintiffs' complaint makes crystal clear that they are seeking damages on their ADA claim only from the DOC itself and that the DOC Secretary, in her official capacity, is named as a defendant on this claim for prospective relief only. *Hammond* Am. Compl. 53, Count II & n.36. Since qualified immunity "shields public officials from money damages only," it is categorically unavailable to the DOC and Secretary Harry as a defense to Plaintiffs' ADA claim for prospective

---

[24] Defendants do not assert qualified immunity on Plaintiffs' RA claim, but the arguments in this section apply with equal force to the RA.

relief. *Morse v. Frederick*, 551 U.S. 393, 400 n.1 (2007); *see Burns v. Pa. Dep't of Corr.*, 642 F.3d 163, 179 (3d Cir. 2011). Qualified immunity is also unavailable on Plaintiffs' ADA claim for damages because they seek damages only from the DOC itself, and only government *officials*, not government *agencies* or *entities*, can invoke qualified immunity.

Conspicuously absent from Defendants' argument on this point is even a single case supporting the availability of qualified immunity to government agencies, generally, or to any defendants sued under the ADA. *See generally Hammond* Defs.' Br. 39–42.[25] All indicators point clearly toward qualified immunity being unavailable to public entities sued for damages under the ADA.

*First*, the Supreme Court's qualified-immunity cases repeatedly describe it as a defense available to individuals only, starting with the Court's landmark decision establishing qualified immunity in its modern form. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (describing the immunity from damages liability to which "government officials" are entitled). The Court has reiterated this on numerous occasions. *See, e.g.*, *Filarsky v. Delia*, 566 U.S. 377, 380 (2012) (explaining that qualified immunity is available to "*individuals* sued under § 1983" to avoid "undue fear of *personal* exposure" (emphasis added)); *Anderson v. Creighton*, 483 U.S. 635,

---

[25] Indeed, Defendants cite no cases or other authorities in this section of their brief.

638 (1987) ("Our cases . . . provid[e] *government officials* performing discretionary functions with a qualified immunity[.]" (emphasis added)); *Owen v. City of Independence*, 445 U.S. 622, 653 (1980) (explaining that qualified immunity exists to give government "*official[s]* a measure of protection from *personal* liability" (emphasis added)).

*Second*, in an analogous context, the Supreme Court has held that qualified immunity is unavailable to governmental entities. *Owen*, 445 U.S. at 638. In *Owen*, the Court explained why the rationales for affording individual government employees qualified immunity are inapplicable to claims against government entities under § 1983. *Id.* at 652–56. These points apply with equal force to state agencies sued under Title II.

*Third*, Defendants have not pointed to any textual basis in Title II for the notion that public entities are entitled to qualified immunity—surely because none exists. To be sure, the Supreme Court has countenanced qualified immunity as a defense to § 1983 liability despite the absence of a textual basis. But that is because the Court has determined that "the tradition of immunity was so firmly rooted in the common law [at the time of § 1983's enactment] and was supported by such strong policy reasons that Congress would have specifically so provided had it wished to abolish the doctrine."[26] *Wyatt v. Cole*, 504 U.S. 158, 163–64 (1992). In contrast,

---

[26] *But see infra* § III.D.

when Congress enacted the ADA, there was no tradition of immunity for public entities, so Congress's silence regarding qualified immunity under Title II must be interpreted as an intention to preclude public entities from invoking it. *Cf. Doe v. Cnty. of Centre*, 242 F.3d 437, 455–58 (3d Cir. 2001) (holding, by analogy to the Supreme Court's § 1983 jurisprudence regarding punitive damages, that municipalities are not subject to punitive damages under Title II).

*Fourth*, the courts of appeals that have addressed the question in precedential opinions have held that qualified immunity is categorically unavailable to public entities sued under Title II. *See Everson v. Leis*, 556 F.3d 484, 501 n.7 (6th Cir. 2009); *Walker v. Snyder*, 213 F.3d 344, 346 (7th Cir. 2000).[27] The lack of caselaw from other circuit courts is no doubt a reflection of how widely understood it is that government entities cannot invoke qualified immunity.[28]

---

[27] Cases in which courts have granted qualified immunity on Title II claims involve claims against government officials in their individual capacities. *See, e.g.*, *Doe*, 242 F.3d at 454–55; *Key v. Grayson*, 179 F.3d 996, 1002 (6th Cir. 1999); *Gorman v. Bartch*, 152 F.3d 907, 915–16 (8th Cir. 1998); *but see Matthews v. Pa. Dep't of Corr.*, 613 F. App'x 163, 170 (3d Cir. 2015) (not precedential) ("Title II of the ADA does not provide for suits against state officers in their individual capacities.").

[28] Indeed, in another case, one of Defendants' attorneys, Attorney Mazeski, asserted qualified immunity on behalf of the DOC in a motion for summary judgment but then withdrew his argument in his reply brief. *See* Reply Br. in Support of Def.'s Mot. for Summ. J. 1, *Powell v. Pa. Dep't of Corr.*, No. 12-2455, ECF No. 152 (M.D. Pa. May 31, 2019) (citing *Harlow*).

Defendants' invocation of qualified immunity on Plaintiffs' ADA claim has no legal basis and should be rejected.

### C.    Unnamed putative class members do not need to have standing, so dismissal of their claims for lack of standing is inappropriate.

Defendants' argument that the claims of unnamed putative class members in the *Henderson* case should be dismissed for lack of standing ignores binding precedent. *See Henderson* Defs.' Br. 16–18. As Defendants acknowledge, this argument, which concerns unnamed individuals with A-Roster and B-Roster designations, is not directed at any of the named Plaintiffs. *See id.*; *Henderson* Compl. ¶¶ 226, 250, 271, 303, 327, 351 (pleading that all named Plaintiffs have C-Roster designations). Defendants' argument is thus directed solely at individuals who are not even parties to the case. *See Home Depot USA, Inc. v. Lafarge N. Am., Inc.*, 59 F.4th 55, 63 (3d Cir. 2023). Their argument therefore fails at the gate.

The fatal flaw with Defendants' argument is that "unnamed, putative class members need not establish Article III standing." *Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 362 (3d Cir. 2015). Instead, Article III's "'cases or controversies' requirement is satisfied so long as a class representative has standing." *Id.*; *see Huber v. Simon's Agency, Inc.*, 84 F.4th 132, 154–55 (3d Cir. 2023) (affirming the continued vitality of *Neale*). Indeed, demonstrating that unnamed class members have standing is not even a prerequisite for class certification. *Huber*, 84 F.4th at 155. It necessarily follows that, even if it were true

that certain unnamed putative class members lacked standing,[29] it would not be a proper basis for dismissal under Rule 12.

### D. Defendants' preclusion arguments rest on multiple errors of fact and law.

Defendants' preclusion arguments rest on multiple errors of fact and law. *See Hammond* Defs.' Br. 16–20. Defendants essentially argue that, because the DOC settled a case about the placement of individuals with mental illness in solitary confinement in 2015, the DOC's solitary-confinement policies and practices vis-á-vis mentally ill prisoners are forever insulated from legal challenge. Rest assured, this is as preposterous as it sounds. Plaintiffs here were not parties to the prior case, seek relief not sought in the prior case, and bring different claims based on entirely different facts from those that existed more than a decade ago when the prior case was filed. Moreover, there was never even a final judgment on the merits in the prior case. Defendants' preclusion defenses are therefore baseless.

The doctrines of claim preclusion and issue preclusion are meant to prevent the relitigation of cases and issues that have previously been decided. "Claim preclusion prevents the relitigation of identical cases, whereas issue preclusion prevents the relitigation of discrete issues." *Sec'y U.S. Dep't of Labor v. Kwasny*,

---

[29] Plaintiffs do not concede that any members of the putative classes lack standing. Rather, their standing is simply not a proper inquiry at this stage of the case.

49

853 F.3d 87, 94 (3d Cir. 2017).[30] The party seeking dismissal based on preclusion bears the burden of establishing that the necessary elements are present. *Taylor v. Sturgell*, 553 U.S. 880, 907 (2008).

Claim preclusion "promotes judicial economy," *Morgan v. Covington Twp.*, 648 F.3d 172, 177 (3d Cir. 2011), by "prohibit[ing] successive litigation of the very same claim by the same parties," *Whole Woman's Health v. Hellerstedt*, 579 U.S. 582, 599 (2016) (cleaned up). For a claim to be barred by claim preclusion, there must be "(1) a final judgment on the merits in a prior suit involving (2) the same parties or their privies and (3) a subsequent suit based on the same cause of action." *Davis v. Wells Fargo*, 824 F.3d 333, 341 (3d Cir. 2016) (citation omitted).

Issue preclusion "bars successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment." *Taylor*, 553 U.S. at 892 (cleaned up). Issue preclusion is inappropriate unless:

> (1) the identical issue was decided in a prior adjudication; (2) there was a final judgment on the merits; (3) the party against whom the bar is asserted was a party or in privity with a party to the prior adjudication; and (4) the party against whom the bar is asserted had a full and fair opportunity to litigate the issue in question.

*Doe v. Hesketh*, 828 F.3d 159, 171 (3d Cir. 2016).

---

[30] To avoid confusion, only the terms "claim preclusion" and "issue preclusion" are used here, given the ambiguity of the term "res judicata." *See United States v. 5 Unlabeled Boxes*, 572 F.3d 169, 174 (3d Cir. 2009).

Defendants' failure to establish either of the two elements common to both types of preclusion—the existence of a final judgment on the merits and privity between the parties to the two lawsuits—is fatal to both preclusion defenses. Their failure to establish any of the other required elements is icing on the cake.

*First*, there was no "final judgment on the merits" in *Disability Rights Network of Pennsylvania v. Wetzel* ("*DRN*"). *Id.*; *Davis*, 824 F.3d at 341. The judgment-on-the-merits requirement is best "understood in terms of its functional equivalent: whether a dismissal is *with prejudice*." *Papera v. Pa. Quarried Bluestone Co.*, 948 F.3d 607, 610 (3d Cir. 2020). Because a dismissal with prejudice "operates as an adjudication on the merits," but a dismissal without prejudice does not, only a prior dismissal with prejudice can have preclusive effect. *Id.* at 610–11 (citation omitted). The party asserting preclusion bears the burden of proving that the prior dismissal was with prejudice, and, when there are ambiguities about the kind of dismissal that was entered, they are resolved against preclusion. *Id.* at 611.

The *DRN* case was dismissed without prejudice, so it cannot have any preclusive effect. On January 5, 2015, the *DRN* parties executed a settlement agreement. *See* Settlement Agreement and General Release, *DRN*, No. 13-635, ECF No. 59 (M.D. Pa. Jan. 9, 2015) ("*DRN* Agreement"). The parties agreed that they would submit a joint stipulation of dismissal *without prejudice* within 20 days of the agreement's effective date and that the court would retain jurisdiction for the

duration of the agreement to enforce its provisions. *Id.* ¶ 70. The parties also agreed that, upon termination of the agreement, they would submit a joint stipulation of dismissal *with prejudice*. *Id.* But no such stipulation was ever filed. The parties submitted a joint stipulation of dismissal on January 14, 2015, explicitly stating that the case is "DISMISSED WITHOUT PREJUDICE." Stipulation of Dismissal, *DRN*, No. 13-635, ECF No. 61 (M.D. Pa. Jan. 14, 2015). The next day, the court issued a dismissal order, reiterating that the case was dismissed without prejudice. Order, *DRN*, No. 13-635, ECF No. 62 (M.D. Pa. Jan. 15, 2015). Defendants have not pointed to a dismissal with prejudice—neither a subsequent dismissal order nor another stipulation of dismissal—and none appears on the public docket.

That the parties stated in the settlement agreement that they *would* file a stipulation of dismissal with prejudice does not negate the import of the fact that they never actually did so. *Cf. Papera*, 948 F.3d at 612 (holding that, despite what the parties or the court may have intended, the absence of a clear, explicit statement that the dismissal was either involuntary or with prejudice meant that it was without prejudice). In short, "a silent or unclear record will not do." *Id.*

Nor does the release language in the DRN Agreement salvage Defendants' preclusion defenses. *See Hammond* Defs.' Br. 19. For one thing, it cannot change the fact that there was never a dismissal with prejudice. For another, Defendants brazenly misquote the DNR Agreement, omitting key language that undermines

their point. They claim "the agreement 'releases and completely and forever discharges' the Department from any claim 'which relates to the subject matter of this civil litigation.'" *Id.* (quoting *DRN* Agreement ¶ 73). In fact, the agreement "releases and completely and forever discharges" the DOC only from "*past or present* claims . . . *which have accrued as of the Effective Date of this Agreement,* and which relate[] to the subject matter of this civil litigation." *DRN* Agreement ¶ 73 (emphasis added). In other words, contrary to Defendants' assertion, the parties did not intend the agreement to preclude claims, like those of Plaintiffs here, that accrued years after the agreement was executed. *Cf. Hammond* Defs.' Br. 19 ("[T]he parties to the DRN litigation clearly intended the settlement agreement to have a preclusive effect[.]").[31]

*Second*, Plaintiffs here and the plaintiff in *DRN* are neither the same parties nor are they in privity. The Disability Rights Network, the plaintiff in *DRN*, is not a party here, and Plaintiffs were not parties in *DRN*. So Defendants must contend with "the deep-rooted historic tradition that everyone should have his own day in court." *Taylor*, 553 U.S. at 892–93 (cleaned up). There are six recognized categories of exceptions to this general principle; *i.e.*, circumstances in which a "nonparty will be

---

[31] Even if the DRN Agreement said what Defendants misquote it as saying, Defendants fail to explain how such a release could possibly be enforceable against Plaintiffs here, who were not parties to the agreement and had no opportunity to be heard in the *DRN* case.

found to be in privity with a party." *Doe*, 828 F.3d at 172 (citing *Taylor*, 553 U.S. at 894–95). Defendants do not acknowledge the different ways privity can be established nor attempt to explain which one applies here. Instead, they appear to make a circular argument that the plaintiffs' "collective statuses in both cases" cause them to be in privity. *Hammond* Defs.' Br. 19.[32]

Since Defendants bear the burden of establishing their entitlement to preclusion, Plaintiffs need not walk through each type of privity and explain why it does not apply here. *See Taylor*, 553 U.S. at 907. Defendants have not established any relationship at all between Plaintiffs and the Disability Rights Network. But even close relationships between parties represented by the same attorney are not necessarily sufficient for preclusion. *See, e.g.*, *id.* at 889, 904–05.

*Third*, given the passage of time and differences in the individuals involved, this case could not possibly be based on the same cause of action or present the same legal and factual issues as *DRN*. To determine whether claims are the same for purposes of claim preclusion, courts "focus upon whether the acts complained of were the same, whether the material facts alleged in each suit were the same, and whether the witnesses and documentation required to prove such allegations were

---

[32] Defendants refer to "sets of putative plaintiffs" as if there were more than one plaintiff in *DRN* or it was a putative class action. *Hammond* Defs.' Br. 19. There was one plaintiff in *DRN*, the Disability Rights Network of Pennsylvania, and it was not a class action. *See generally* Complaint, *DRN*, No. 13-635, ECF No. 1 (M.D. Pa. Mar. 11, 2013).

the same." *Lubrizol Corp. v. Exxon Corp.*, 929 F.2d 960, 963 (3d Cir. 1991) (cleaned up). "[E]ven a slight change of circumstances" can be sufficient to defeat claim preclusion, especially where "important human values—such as the lawfulness of continuing personal disability or restraint—are at stake." *Whole Woman's Health*, 579 U.S. at 600 (citation omitted). Crucially, the Third Circuit has a bright-line rule that claim preclusion "does not bar claims that are predicated on events that postdate the filing of the initial complaint." *Morgan*, 648 F.3d at 178.

Plaintiffs here filed their initial complaint in 2024—eleven years after the *DRN* case was filed—and the facts on which Plaintiffs' claims are based long postdate the filing of *DRN*. The material facts alleged and the witnesses and documents required to prove Plaintiffs' claims are obviously different from those in *DRN*. *See Lubrizol Corp.*, 929 F.2d at 963. Moreover, Defendants' claim-preclusion defense runs head-on into *Morgan*'s bright-line rule. Defendants do not even attempt to explain why they should nonetheless be entitled to claim preclusion—or even pause to acknowledge this binding precedent.

Similarly, this case presents numerous factual and legal issues that were not present in *DRN*, in light of the passage of time and different individuals involved. Even when the parties are the same (which they are not here), factual differences between two cases can foreclose issue preclusion. *See, e.g.*, *Suppan v. Dadonna*, 203 F.3d 228, 232–34 (3d Cir. 2000); *Mable v. Beard*, No. 10-1214, 2011 U.S. Dist.

LEXIS 44801, at *8–9 (M.D. Pa. Jan. 27, 2011), *report & recommendation adopted*, 2011 U.S. Dist. LEXIS 44792 (M.D. Pa. Apr. 26, 2011).

Defendants appear to contend that all of Plaintiffs' claims in *Hammond* should be dismissed on issue-preclusion grounds, but the presence of ADA and RA claims in *Hammond*—neither of which was asserted in *DRN*—means there are necessarily factual and legal issues associated with those claims that were not present in *DRN*. *See* Complaint ¶¶ 134–38, *DRN*, No. 13-635, ECF No. 1 (M.D. Pa. Mar. 11, 2013) (asserting only one claim for relief, under the Eighth and Fourteenth Amendments). Defendants fail even to mention this crucial difference between the two cases.

Even if there were common issues between the two cases, Defendants would still not be entitled to issue preclusion because none of the issues presented in this action were actually decided in *DRN*.[33] Indeed, because *DRN* was resolved via settlement, no issues were decided in that case. *See Arizona v. California*, 530 U.S. 392, 414 (2000) ("In the case of a judgment entered by confession, consent, or default, none of the issues is actually litigated." (quoting Restatement (Second) of Judgments § 27, p. 250 (1982))). That alone forecloses Defendants' issue-preclusion defense. *See id.* ("[S]ettlements ordinarily occasion no *issue preclusion*[.]").

---

[33] Defendants never actually identify what precise legal or factual issue (or issues) they contend are common to the two cases and therefore barred by issue preclusion.

*Fourth*, given that Plaintiffs here were not parties in *DRN*, "it is unsurprising that [they] also lacked the 'full and fair opportunity to litigate'" the issues presented in that case. *Home Depot*, 59 F.4th at 63; *see Taylor*, 553 U.S. at 892 ("A person who was not a party to a suit generally has not had a 'full and fair opportunity to litigate' the claims and issues settled in that suit.").

As Defendants have not demonstrated any of the required elements for either type of preclusion, their preclusion defenses fail.

## III.    Defendants are not entitled to qualified immunity.

Qualified immunity does not shield government officials from personal liability for constitutional violations unless they can show that "reasonable officers could not have known that their actions violated clearly established law." *Mack v. Yost*, 63 F.4th 211, 228 (3d Cir. 2023). When analyzing a qualified-immunity defense, courts apply a non-sequential, two-part test, asking whether, "[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged show the officer's conduct violated a constitutional right," and "whether the right was clearly established." *Peroza-Benitez v. Smith*, 994 F.3d 157, 165 (3d Cir. 2021) (citations omitted). Defendants bear the burden of establishing they are entitled to qualified immunity, *E.D. v. Sharkey*, 928 F.3d 299, 306 (3d Cir. 2019), which they can do by showing "[a]n answer in the negative to either prong" of the analysis, *Peroza-Benitez*, 994 F.3d at 165.

57

The Third Circuit takes "a broad view of what makes a right clearly established." *Mack*, 63 F.4th at 232 (cleaned up). Courts look first to applicable Supreme Court cases and then to precedential Third Circuit opinions. *Porter v. Pa. Dep't of Corr.*, 974 F.3d 431, 449 (3d Cir. 2020). But, if binding authority does not exist, courts "turn to persuasive authority in the Courts of Appeals and district courts." *Peroza-Benitez*, 994 F.3d at 167. If a "robust consensus of persuasive authority" establishes the unlawfulness of defendants' conduct, they are not entitled to qualified immunity. *El v. City of Pittsburgh*, 975 F.3d 327, 340 n.7 (3d Cir. 2020) (cleaned up). Moreover, "general statements of the law are not inherently incapable" of providing the "fair and clear warning" required to overcome qualified immunity. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). Officials can "'be on notice that their conduct violates established law even in novel factual circumstances' as long as the law gives [them] 'fair warning' that their treatment of the inmate is unconstitutional." *Porter*, 974 F.3d at 449 (quoting *Hope*, 536 U.S. at 741).

Because the facts alleged in the *Hammond* and *Henderson* complaints show that Defendants have violated Plaintiffs' rights under the Eighth Amendment, and the rights at issue are clearly established, Defendants are not entitled to qualified immunity. Moreover, the Rule 12 posture and the nature of Plaintiffs' claims make qualified immunity particularly inappropriate.

A.    **The Eighth Amendment right asserted in the *Hammond* complaint, based on their preexisting mental illness, is clearly established.**

The Third Circuit's decisions in *Palakovic v. Wetzel*, 854 F.3d 209 (2017), and *Clark v. Coupe*, 55 F.4th 167 (3d Cir. 2022), conclusively establish that Defendants are not entitled to qualified immunity on Plaintiffs' Eighth Amendment claim in *Hammond*.[34] Defendants' arguments to the contrary rest on factual assertions that are belied by Plaintiffs' complaint and a misreading of caselaw.

In *Palakovic*, the court held that allegations that DOC officials were aware of Brandon Palakovic's serious mental illness, but nonetheless permitted him to be repeatedly placed in solitary confinement, were "more than sufficient" to state an

---

[34] Plaintiffs only address here whether Defendants are entitled to qualified immunity as to the named Plaintiffs' claims. *Cf. Hammond* Defs.' Br. 33–39 (asserting qualified immunity as to the proposed class's claim). The claims of unnamed putative class members are not before the court at this time, so it would be premature for the court to address qualified immunity as to them. *See supra* § I.A; *see also Rouse v. Plaintier*, 182 F.3d 192, 194, 199 (3d Cir. 1999) (explaining how qualified immunity is analyzed in a class action).

That said, Defendants' attacks on Plaintiffs' proposed classes are incoherent and at odds with Plaintiffs' complaint. Defendants' assert that they are entitled to qualified immunity on the Eighth Amendment claim in *Hammond* because "the proposed classes exhibit substantial overlap" and Plaintiffs seek relief "on behalf of loosely defined subclasses." *Hammond* Defs.' Br. 39. But there are no subclasses proposed in the *Hammond* complaint, and there is a total of one proposed Eighth Amendment damages class, which is defined with precision. *See Hammond* Am. Compl. ¶¶ 378–80, p.52 (Count I). Defendants also claim that "the damages class does not expressly denote the existence of a pre-existing mental health condition." *Hammond* Defs.' Br. 38–39. But the proposed damages class is limited to individuals who were given C-Roster or D-Roster designations, which necessarily means the DOC considered them to have mental illness. *Hammond* Am. Compl. ¶ 380; *see id.* ¶¶ 160–61.

Eighth Amendment conditions-of-confinement claim, especially "in light of the increasingly obvious reality that extended stays in solitary confinement can cause serious damage to mental health." 854 F.3d at 226. Mr. Palakovic, who had a known history of suicide attempts and suicidality, was repeatedly placed in solitary confinement in response to his behavior, for "multiple 30-day stints" over the course of thirteen months. *Id.* at 216–17.

In *Clark*, the court held that prison officials who, in 2016, kept a man "in solitary confinement for seven months despite knowing of his serious mental illness" were not entitled to qualified immunity on his Eighth Amendment conditions-of-confinement claim because "the circumstances of his time spent in solitary confinement violated rights long protected by Eighth Amendment jurisprudence." 55 F.4th at 173, 181, 182. Prison officials placed and retained the plaintiff in solitary confinement in response to his behavior. *Id.* at 173. Nonetheless, the court held that his solitary confinement served "[n]o penological purpose," given the damage it inflicted on his mental health. *Id.* at 183.

Defendants acknowledge these precedents, but they misrepresent their facts and, thus, misapprehend their significance. *Hammond* Defs.' Br. 35–36. Defendants go so far as to imply that the incarcerated individuals in *Clark* and *Palakovic* were placed in solitary confinement "by virtue of the sentence imposed on them," rather than due to their behavior. *Id.* at 36. Not so. *See Clark*, 55 F.4th at 173; *Palakovic*,

60

854 F.3d at 216. So Defendants' unsupported assertion that Plaintiffs here "were held in restrictive conditions due to their unwillingness to abide by institutional rules"—even if true—would not distinguish their claims from those in *Clark* and *Palakovic*. *Hammond* Defs.' Br. 36.

Defendants' definition of the Eighth Amendment right at issue in *Hammond* is flawed both legally and factually. *See Hammond* Defs. Br. 37–38 (including in their definition of the right that Defendants were "compelled to act due to [Plaintiffs'] misconduct and disregard for institutional rules").

Defendants' legal error is that their definition of the right ignores the fact that "the touchstone of an Eighth Amendment analysis has long been . . . the health of the inmate," not the reason he was placed in the conditions he is challenging. *Williams v. Sec'y Pa. Dep't of Corr.*, 117 F.4th 503, 522 (3d Cir. 2024) (cleaned up). "Why a prisoner is placed in solitary confinement is not an element in challenging that condition." *Clark*, 55 F.4th at 177 n.9. So, in holding there was a viable Eighth Amendment claim in *Palakovic*, the court saw no reason to address the reasons Mr. Palakovic was repeatedly placed in solitary confinement. *Id.* (citing *Palakovic*, 854 F.3d at 225–26). Similarly, in *Clark*, the court defined the right at issue without reference to the reasons the plaintiff had been placed in solitary confinement. *Id.* at 182. Defendants' focus on the purported reasons Plaintiffs were placed in solitary

61

confinement thus runs afoul of precedent because it would make Eighth Amendment protections "turn on . . . a non-health related concern." *Williams*, 117 F.4th at 523.

Defendants' definition of the right is also unmoored from the facts in Plaintiffs' complaint and improperly incorporates inferences drawn in Defendants' favor. Defendants' burden at this stage is to show, "*based on the pleadings alone*," that the right at issue "was neither clearly established nor obvious." *Stringer v. Cnty. of Bucks*, 141 F.4th 76, 88 (3d Cir. 2025) (emphasis added). The right must be defined accepting the truth of Plaintiffs' allegations and with all inferences drawn in Plaintiffs' favor. *Rivera v. Monko*, 37 F.4th 909, 914 (3d Cir. 2022). So even if the reasons for Plaintiffs' solitary-confinement placements are a proper consideration, Defendants' framing of the right at issue is inaccurate.

For two of the Plaintiffs, Mr. Hammond and Mr. Walker, the complaint says nothing about institutional misconduct. Indeed, both are on the RRL, which means they are not serving a fixed term in solitary confinement as punishment for misconduct but are instead in solitary indefinitely. *See Hammond* Am. Comp. ¶¶ 17, 19, 104. Mr. Hammond was told he is on the RRL "due to his failure out of" a solitary-confinement program. *Id.* ¶¶ 237, 241. And even prison officials told Mr. Walker they did not know why he was on the RRL. *Id.* ¶¶ 295–96.

The other Plaintiffs have been placed in solitary confinement for various reasons, including misconduct violations, but also for vague reasons like being

"problematic" or because they were "under investigation." *Id.* ¶¶ 257–58, 264, 271–72, 325–26, 338–39, 359. Moreover, just like the incarcerated individuals in *Palakovic* and *Clark*, Plaintiffs here have been placed in solitary because of behaviors caused by their mental illness, including a suicide attempt. *Compare id.* ¶¶ 261–63, 280, 348, *with Palakovic*, 854 F.3d at 216 ("[B]ecause of Brandon's particular mental illnesses . . . , his behavior [led him to be] repeatedly subjected to solitary confinement[.]"), *and Clark*, 55 F.4th at 182 (describing allegations that the plaintiff was kept in solitary "because the manifestations of his mental illness [were] treated as prison rule infractions").

    While, as the case progresses, Defendants will be free to try to adduce evidence that they were "compelled to" place Plaintiffs in solitary confinement "due to [their] misconduct and disregard for institutional rules," this as-yet unsupported assertion cannot entitle them to qualified immunity. *Hammond* Defs. Br. 37–38. To the contrary, a proper reading of Plaintiffs' allegations, with all reasonable inferences drawn in their favor, suggests Plaintiffs' solitary confinement lacks penological justification. *See, e.g.*, *Hammond* Am. Compl. ¶¶ 76–81 (describing the lack of empirical support for the use of solitary confinement); *id.* ¶¶ 261–63, 280 (describing placements in solitary due to mental illness symptoms); *id.* ¶ 281 (describing the broad discretion corrections officers possess regarding solitary-confinement placements); *id.* ¶ 350 (explaining how the psychological harms of

solitary make it harder for people to comply with prison rules); *cf. Clark*, 55 F.4th at 178 ("Established law . . . prohibited prison officials from imposing conditions that threatened a substantial risk of serious harm and inflicted such harm for no penological reason.").

Moreover, even if Plaintiffs' misconduct did compel some sort of response, Defendants are not entitled to the inference that the harsh conditions of solitary confinement in the DOC are necessary or the only possible response. Indeed, Defendants recognize the necessity to divert certain individuals with mental illness from the DOC's harshest solitary-confinement units. *See Hammond* Defs.' Br. 27–28 (describing "diversion [of D-Roster individuals] from restrictive housing for disciplinary infractions"); *Hammond* Am. Compl. ¶¶ 155–59. That Defendants do this for some prisoners with mental illness shows they can do it for Plaintiffs as well.

Defendants' heavy reliance on an unreported district-court decision to support their qualified-immunity argument falls flat. *See Hammond* Defs.' Br. 36–37 (citing *Watson v. Wetzel*, No. 23-3246, 2024 U.S. Dist. LEXIS 224761 (E.D. Pa. Dec. 12, 2024)). For starters, to the extent Defendants are correct that *Watson*'s qualified-immunity analysis rests on the conclusion that "recent decisions of the Third Circuit . . . missed the mark" by failing to give sufficient weight to prison-disciplinary concerns, that would run afoul of vertical stare decisis. *Hammond* Defs.' Br. 36–37; *see Mack*, 63 F.4th at 226 ("[Lower courts] must faithfully apply both

the letter and spirit of binding precedent."). As explained above, *Clark* and *Palakovic* both involved individuals placed in solitary due to rule violations, but the court nonetheless focused on solitary confinement's impact on their health, not prison officials' reasons for subjecting them to it. The court in *Watson* went astray by focusing almost exclusively on the latter. *See* 2024 U.S. Dist. LEXIS 224761, at *36–38.

*Watson* also departs from precedent in a more fundamental way, by importing disputed facts regarding penological justification into its framing of the right. *See id.* at *33 ("This framing incorporates . . . any penological justification for keeping him in restricted confinement."). In its analysis of the merits of the plaintiff's Eighth Amendment claim, the court held that a reasonable jury could find that keeping him on the RRL was not justified by a penological purpose. *Id.* at *20–21. But, in defining the right at issue for qualified-immunity purposes, the court then resolved that factual dispute in the defendants' favor. *See id.* at *33. This was directly contrary to the Supreme Court's warning that "courts must take care not to define a case's 'context' in a manner that imports genuinely disputed factual propositions." *Tolan v. Cotton*, 572 U.S. 650, 657 (2014).

Finally, *Watson* is distinguishable from this case procedurally. That *Watson* was a summary-judgment decision, while *Clark* was a motion-to-dismiss opinion, was a crucial distinguishing factor in the *Watson* court's view. *See Watson*, 2024

U.S. Dist. LEXIS 224761, at *32, 36; *see also infra* § III.C (explaining why qualified immunity and Rule 12 are a bad fit).

In sum, the Third Circuit has held that it was clearly established at least as far back as 2016 that prison officials violate the Eighth Amendment when they keep mentally ill prisoners in solitary confinement despite knowing of the serious risks to their well-being such confinement causes.[35] *Clark*, 55 F.4th at 182–83. *Palakovic*, which was decided in 2017, confirms this principle. 854 F.3d at 226. That Plaintiffs here have been in solitary confinement for far longer than the seven months and multiple 30-day stints at issue in *Clark* and *Palakovic* makes Defendants' conduct here even more obviously unconstitutional. Defendants' qualified-immunity defense in *Hammond* should be rejected.

## B. The Eighth Amendment right asserted in the *Henderson* complaint, based on the duration of Plaintiffs' solitary confinement, is clearly established.

"The ultimate question" in the qualified-immunity analysis "is whether the defendant had 'fair warning' that his conduct deprived his victim of a constitutional right." *Schneyder v. Smith*, 653 F.3d 313, 329 (3d Cir. 2011) (quoting *Hope*, 536

---

[35] For present purposes, demonstrating that this right was clearly established by binding precedent as of at least 2016 is more than sufficient. But the right was clearly established even before then. *See Williams*, 117 F.4th at 521–22 (discussing the 2014 DOJ report); *Clark*, 55 F.4th at 186–87 (citing a "robust consensus of decisions specifically addressing the constitutionality of assigning mentally ill prisoners to solitary confinement" spanning 1988 to 2012)

U.S. at 740). The analysis is not limited to whether a court has "previously decided cases with identical facts and circumstances." *Williams*, 117 F.4th at 515–16. The reasoning of a prior decision can provide officials with fair warning of the unlawfulness of their conduct even if its holding does not. *See Hope*, 536 U.S. at 743. Here, the reasoning of binding judicial precedents, along with a robust consensus of persuasive authorities, give Defendants the requisite fair warning that the duration of Plaintiffs' solitary confinement makes it unconstitutional.

Since at least 2020, it has been "well-established in [the Third] Circuit that . . . prolonged solitary confinement satisfies the objective prong of the Eighth Amendment test." *Porter*, 974 F.3d at 451. The court reached this conclusion because "[i]t is well established in both case law and scientific and medical research that prolonged solitary confinement . . . poses a substantial risk of serious psychological and physical harm." *Id.* at 441. True, the plaintiff in *Porter* had been in solitary for over three decades. *Id.* at 443. But the court's reasoning and the authorities on which it relies make clear that "prolonged solitary confinement" includes periods far shorter than that experienced by the plaintiff in *Porter*. *See id.* at 441–43 (noting harmful effects after periods of 10 and 90 days); *see also Clark*, 55 F.4th at 180–81 (citing *Porter* and referring to seven months in solitary as "prolonged"); *id.* at 174 n.4 (noting that the American Psychiatric Association "defined prolonged segregation as three to four weeks").

67

Even before *Porter*, the Third Circuit "acknowledge[d] the robust body of legal and scientific authority recognizing the devastating mental health consequences caused by long-term isolation in solitary confinement." *Palakovic*, 854 F.3d at 225. The court's "precedents have made clear that solitary confinement can 'cause cognitive disturbances' after 'even *a few days*' in a person without a preexisting mental illness." *Williams*, 117 F.4th at 522 (quoting *Williams v. Sec'y Pa. Dep't of Corr.*, 848 F.3d 549, 562 (3d Cir. 2017)). It follows that keeping individuals in solitary confinement for periods of years is cruel and unusual punishment. *See Porter*, 974 F.3d at 441 (holding that even in the absence of "actual injury," exposure to "a substantial risk of serious harm" can violate the Eighth Amendment).

In its 2017 *Williams* decision, the Third Circuit could not have been clearer in concluding that the harms of solitary confinement are both well-documented and obvious. 848 F.3d at 566–69. Among other things, the court concluded that:

- solitary confinement "is psychologically painful, can be traumatic and harmful, and puts many of those who have been subjected to it at risk of long-term damage";

- "there is not a single study of solitary confinement wherein non-voluntary confinement that lasted for longer than 10 days failed to result in negative psychological effects";

- "all individuals subjected to solitary confinement will experience a degree of stupor, difficulties with thinking and concentration,

    obsessional thinking, agitation, irritability, and difficulty tolerating external stimuli";

- anxiety, "[d]epression, post-traumatic stress disorder, psychosis, hallucinations, paranoia, claustrophobia, and suicidal ideation are [ ] frequent results"; and

- "an individual's very identity is at risk of disintegration."

*Id.* at 566 (cleaned up).

    That the court made these statements in the context of a due-process claim rather than an Eighth Amendment claim does not detract from their import. Courts "need not—and should not—assume that government officials are incapable of drawing logical inferences, reasoning by analogy, or exercising common sense." *Dean v. McKinney*, 976 F.3d 407, 418 (4th Cir. 2020) (citation omitted). Moreover, the Third Circuit has itself imported the reasoning of its 2017 decision in *Williams* into its Eighth Amendment jurisprudence. *See Williams*, 117 F.4th at 522 & n.131; *Clark*, 55 F.4th at 180–81; *Porter*, 974 F.3d at 441–42; *Palakovic*, 854 F.3d at 225–26 & n.18.

    Indeed, the now-well-documented harms of solitary confinement are "neither surprising, nor novel." *Williams*, 848 F.3d at 567. Well over a century ago, the Supreme Court noted that, after only a short time in solitary confinement, a "considerable number of [ ] prisoners fell . . . into a semi-fatuous condition, from which it was next to impossible to arouse them, and others became violently insane; others, still, committed suicide." *In re Medley*, 134 U.S. 160, 168 (1890). That the

"prolonged isolation from social and environmental stimulation" solitary confinement entails "increases the risk of developing mental illness [is] not . . . rocket science." *Williams*, 848 F.3d at 574 (quoting *McClary v. Kelly*, 4 F. Supp. 2d 195, 208 (W.D.N.Y. 1998)).

Although the Third Circuit's binding precedents addressing solitary confinement are sufficient to provide Defendants with the requisite fair notice, additional support comes from a robust consensus of persuasive authorities. *See, e.g.*, *Cintron v. Bibeault*, 148 F.4th 37, 42, 51–54 (1st Cir. 2025) (holding it was clearly established in 2019 that 450 days in solitary confinement, with its attendant deprivations of sleep, social interaction, and sensory stimulation, violates the Eighth Amendment); *Porter v. Clarke*, 923 F.3d 348, 364 (4th Cir. 2019) (affirming summary judgment for plaintiffs challenging their prolonged solitary confinement on death row); *Blanco v. Talutto*, No. 24-534, 2024 U.S. Dist. LEXIS 181489, at *5–8 (M.D. Pa. Oct. 4, 2024); *Bertolette v. Little*, No. 23-330, 2024 U.S. Dist. LEXIS 143243, at *10–11, 17 (W.D. Pa. Aug. 6, 2024), *report and recommendation adopted*, 2024 U.S. Dist. LEXIS 169925 (W.D. Pa. Sep. 20, 2024); *Blount v. Unit Manager Ackrom*, No. 22-1040, 2024 U.S. Dist. LEXIS 98766, at *10–14 (W.D. Pa. June 4, 2024); *Morris v. Zaken*, No. 21-1338, 2022 U.S. Dist. LEXIS 217991, at

70

\*14–17 (W.D. Pa. Nov. 30, 2022); *Johnston v. Wetzel*, 431 F. Supp. 3d 666, 680 (W.D. Pa. 2019); *Johnson v. Wetzel*, 209 F. Supp. 3d 766, 777–78 (M.D. Pa. 2016).[36]

The cases on which Defendants rely do not disturb this robust consensus. *See Henderson* Defs. Br. 26. The Eighth Amendment analyses in *Wells* and *Simmons* (which are nearly identical) completely ignore the Third Circuit's solitary-confinement jurisprudence, instead relying on outdated and non-binding caselaw. *Wells v. Wetzel*, No. 16-842, 2021 U.S. Dist. LEXIS 60693, at \*10–12 (M.D. Pa. Mar. 30, 2021); *Simmons v. Wetzel*, No. 17-224, 2018 U.S. Dist. LEXIS 136500, at \*8–10 (W.D. Pa. Aug. 10, 2018). And *Green* and *Griffin* predate the precedents discussed in this section, so prison officials cannot reasonably rely on them. *See Griffin v. Vaughn*, 112 F.3d 703, 709 (3d Cir. 1997); *Green v. Coleman*, 575 F. App'x 44, 47 (3d Cir. 2014) (not precedential); *see also Porter*, 974 F.3d at 444 (explaining that a prior decision was "not controlling" because "the research and caselaw have advanced considerably").[37]

Defendants' separate argument that Defendants' Malishchak and Schneider are entitled to qualified immunity is also unavailing. *See Henderson* Defs.' Br. 28–29. *Taylor*, which had nothing to do with solitary confinement, is distinguishable.

---

[36] *Cf. Clark*, 55 F.4th at 186–87 (relying on district-court cases in qualified-immunity analysis); *Peroza-Benitez*, 994 F.3d at 167–69, 171–72 (same).

[37] Moreover, *Griffin* is also distinguishable by the duration of the plaintiff's solitary confinement—15 months. 112 F.3d at 705. The duration at issue in *Green* is not clear, which further undercuts its relevance.

There, the claim was that "an incarcerated individual had an Eighth Amendment right to the proper implementation of adequate suicide prevention protocols." *Taylor v. Barkes*, 575 U.S. 822, 824 (2015) (cleaned up). Specifically at issue were the suicide-risk screening conducted at intake and medical staff's access to information about incarcerated individuals' mental health history. *Id.* at 824–25. In other words, the claim focused on what prison officials must do to *obtain knowledge of potential risks of harm*. Here, in contrast, what is at issue is how prison officials must *respond to known risks of harm*.

The complaint plausibly alleges—and Defendants cannot plausibly dispute—that Defendants Malishchak and Schneider are aware of the conditions in the DOC's solitary-confinement units and the serious mental-health risks associated with solitary confinement. *Henderson* Compl. ¶¶ 53–60, 62. The complaint then lists various potential measures that they failed to take in response to these risks. *Id.* ¶¶ 64–69. If they took these measures, people suffering the psychological harms of solitary could be identified and removed from solitary. They also could have used their leadership roles to advocate for policy changes that would reduce the duration of Plaintiffs' solitary confinement or otherwise ameliorate conditions. Their failure to take any of these reasonable steps means they have violated Plaintiffs' clearly-established Eighth Amendment rights, just like the other Defendants.

72

### C.    The Rule 12 posture and the nature of Defendants' constitutional violations make qualified immunity particularly inappropriate here.

Qualified immunity is particularly inappropriate here for two additional reasons. As the Third Circuit recently reemphasized, granting qualified immunity at the pleading stage is strongly disfavored and rarely appropriate. In addition, caselaw counsels against granting qualified immunity to government officials for considered decisions made in the absence of any immediate threat.

*First*, qualified immunity is "almost always a bad ground for dismissal" under Rule 12(b)(6). *Stringer*, 141 F.4th at 85 (quoting *Fogle v. Sokol*, 957 F.3d 148, 162 n.14 (3d Cir. 2020)). The "mismatch" between qualified immunity and Rule 12(b)(6) is rooted in "the parties' respective burden[s] at the 12(b)(6) stage" and the fact-intensive nature of the clearly-established-right inquiry. *Id.* at 85–86. On one hand, defendants bear the burden of pleading qualified immunity, and plaintiffs are "not obligated to plead a violation of clearly established law in order to avoid dismissal on qualified immunity grounds." *Id.* at 86 (cleaned up). On the other hand, determining whether a right is clearly established requires defining the right "at the appropriate level of specificity." *Id.* at 85 (citation omitted). This is a "fact-intensive inquiry" that "must be undertaken in light of the specific context of the case." *Id.* at 85–86 (citations omitted). As a result, "even well-pleaded complaints may not

include sufficient facts to allow a court to identify the right with the requisite specificity." *Id.* at 86.

It is therefore "difficult for a defendant to claim qualified immunity on the pleadings *before discovery* and before the parties (much less the courts) uncover the precise contours of the official's conduct and the context in which it occurred." *Id.* (cleaned up). The "bad fit" between qualified immunity and Rule 12(b)(6) is an additional reason for the court to reject Defendants' qualified-immunity defense at this juncture. *Id.* at 87.

*Second*, qualified immunity is particularly ill-suited to situations in which officials have time to deliberate before deciding to violate the Constitution. Indeed, the core purpose of qualified immunity is to protect officers who must make split-second decisions in difficult, quickly-evolving situations. *See Saucier v. Katz*, 533 U.S. 194, 206 (2001) ("[Q]ualified immunity operates . . . to protect officers from the sometimes hazy border between excessive and acceptable force" (cleaned up)); *Reedy v. Evanson*, 615 F.3d 197, 224 n.37 (3d Cir. 2010) ("[Q]ualified immunity exists, in part, to protect police officers in situations where they are forced to make difficult, split-second decisions."); *Griggs v. Brewer*, 841 F.3d 308, 316 (5th Cir. 2016) (stating that qualified immunity is "designed to protect" "split-second judgment[s] in . . . difficult situation[s]"); *Mullins v. Cyranek*, 805 F.3d 760, 766–67 (6th Cir. 2015) ("[Q]ualified immunity is available only where officers make

split-second decisions in the face of serious physical threats to themselves and others.").

The Third Circuit and courts around the country therefore consider an official's opportunity to deliberate as a factor weighing against qualified immunity. *E.g.*, *Reedy*, 615 F.3d at 224 n.37; *Intervarsity Christian Fellowship/USA v. Univ. of Iowa*, 5 F.4th 855, 867 (8th Cir. 2021); *Dean*, 976 F.3d at 418–19; *Pinkney v. Meadville*, 648 F. Supp. 3d 615, 646 (W.D. Pa. 2023); *Bostrom v. N.J. Div. of Youth & Family Servs.*, 969 F. Supp. 2d 393, 409, 413 (D.N.J. 2013). Even in excessive-force cases, where the potential justifications for qualified immunity are strongest, courts still view an officer's opportunity to consider their actions or reassess the situation as a reason to deny qualified immunity. *E.g.*, *Hyde v. City of Willcox*, 23 F.4th 863, 872–73 (9th Cir. 2022); *Jones v. Treubig*, 963 F.3d 214, 236 (2d Cir. 2020); *Cole v. Carson*, 935 F.3d 444, 453 (5th Cir. 2019) (en banc).

It therefore follows that cases challenging policy choices and other decisions made by high-ranking officials who have time to deliberate are the worst fit for qualified immunity. As Justice Thomas has observed, it makes little sense for officials "who have time to make calculated choices about enacting or enforcing unconstitutional policies" to "receive the same protection as a police officer who makes a split-second decision to use force in a dangerous setting." *Hoggard v. Rhodes*, 141 S. Ct. 2421, 2422 (2021) (Thomas, J., respecting denial of certiorari).

Defendants here have had years to consider and reconsider their solitary-confinement policies and their decisions to retain Plaintiffs in prolonged solitary confinement. They should not be able to hide behind qualified immunity to evade liability.

### D.    Qualified immunity is an unsound doctrine and should be discarded.

Qualified immunity is an unsound doctrine and should no longer be available as a defense to liability under § 1983.[38]

*First*, as the Supreme Court acknowledges, there is no textual basis for affording defendants any immunities under § 1983. *Wyatt v. Cole*, 504 U.S. 158, 163 (1992). And even if some sort of immunity is nonetheless justified by common-law principles, *see id.* at 163–64, the "objective inquiry into clearly established law" required by the Supreme Court's qualified-immunity jurisprudence has "no basis" in the common law, *Baxter v. Bracey*, 140 S. Ct. 1862, 1864 (2020) (Thomas, J., dissenting from denial of certiorari).

*Second*, as recent scholarship demonstrates, "the Supreme Court's original justification for qualified immunity—that Congress wouldn't have abrogated common-law immunities absent explicit language—is faulty because the 1871 Civil Rights Act *expressly included such language*." *Rogers v. Jarrett*, 63 F.4th 971, 980

---

[38] Plaintiffs acknowledge this argument is at odds with binding precedent but are including it for preservation purposes.

(5th Cir. 2023) (Willett, J., concurring); *accord Price v. Montgomery Cnty.*, 144 S. Ct. 2499, 2500 n.2 (2024) (Sotomayor, J., respecting denial of certiorari) (citing the same scholarship and stating that it "reinforces why, at a minimum, this immunity doctrine should be employed sparingly"); *see also Green v. Thomas*, 734 F. Supp. 3d 532, 543–48 (S.D. Miss. 2024) (compiling judicial and scholarly critiques of qualified immunity), *aff'd in part, rev'd in part*, 129 F.4th 877 (5th Cir. 2025).

## IV. The PLRA's prospective-relief provisions do not impose pleading requirements so are not a valid basis for dismissal.

The Prison Litigation Reform Act ("PLRA") imposes limitations on the prospective relief that can be awarded in prison-conditions cases. 18 U.S.C. § 3626(a). These limitations may constrain courts when they fashion injunctions, but nothing in the statutory text indicates that Congress intended to impose a new pleading requirement on plaintiffs. Because departures from normal procedural rules must be stated explicitly by Congress—and Defendants cite no authority to support the proposition that Section 3626 can be a basis for dismissal under Rule 12—the court should not dismiss Plaintiffs' request for injunctive relief. *Cf. Henderson* Defs.' Br. 20–22.[39]

---

[39] Defendants only make this argument in *Henderson*.

77

Since "[s]tatutory interpretation . . . begins with the text," the text of Section 3626(a) is the proper starting place. *Ross v. Blake*, 578 U.S. 632, 638 (2016). In relevant part, the statute says:

> Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right.

18 U.S.C. § 3626(a)(1)(A). The establishment of a "violation of the Federal right of a particular plaintiff or plaintiffs" is a necessary prerequisite to applying the statute's "no further than necessary" and "least intrusive means necessary" limitations, as both limitations are stated relative to "correct[ing] the violation of the Federal right." *Id.*; *see Brown v. Plata*, 563 U.S. 493, 531 (2011) ("[T]he scope of the order must be determined with reference to the constitutional violations established by the specific plaintiffs before the court."). These limitations therefore cannot be imposed at the pleading stage, as, necessarily, no violation of a federal right has yet been established. *See Williams v. Edwards*, 87 F.3d 126, 133 (5th Cir. 1996) ("[I]f the district court should . . . find a violation of a 'Federal right,' then any remedy it might fashion must conform to the standards set forth in the Act.").

In addition, that the second sentence begins, "The court shall not grant or approve . . ." demonstrates that the statute is restricting what *courts* can do, not dictating what *plaintiffs* must plead. *See Henderson v. Thomas*, 891 F. Supp. 1296, 1312 (M.D. Ala. 2012) (citing § 3626(a)(1)(A)); *cf. Lara v. Comm'r Pa. State Police*, 91 F.4th 122, 140 (3d Cir. 2024), *vacated on other grounds sub nom. Paris v. Lara*, 145 S. Ct. 369 (2024) ("Rule 65(d) governs the 'contents and scope of every injunction and restraining order' issued by a court, not the way in which a party requests injunctive relief."). Until the court "has fashioned . . . prospective relief . . . the provisions of [Section 3626(a)] have yet to be triggered." *Williams*, 87 F.3d at 133; *see also Johnson v. McCowan*, 549 F. Supp. 3d 469, 479 (W.D. Va. 2021) ("What restrictions [§ 3626(a)] may impose are not triggered unless and until the court actually fashions injunctive relief."); *Ashker v. Governor of Cal.*, No. 09-5796, 2014 U.S. Dist. LEXIS 75347, at *28 (N.D. Cal. June 2, 2014) ("[Section 3626(a)] governs the scope of injunctive relief that a federal court may issue in a 'prison conditions' case *after* liability has been assessed.").

Since neither the text of Section 3626 nor the Federal Rules of Civil Procedure say anything about what plaintiffs in prison-conditions cases who seek prospective relief must plead in their complaints, the usual pleading rules apply. *See Jones v. Bock*, 549 U.S. 199, 212 (2007). In *Jones*, the Court rejected a similar argument to that Defendants make here: that, because the PLRA requires plaintiffs to exhaust

administrative remedies, plaintiffs must plead exhaustion in their complaints. 549 U.S. at 211. The Court viewed the PLRA's silence regarding whether exhaustion must be pleaded by plaintiffs or is an affirmative defense as "strong evidence that the usual practice [*i.e.*, treating exhaustion as an affirmative defense] should be followed." *Id.* at 212. Moreover, another provision in the PLRA actually does alter the normal pleading rules, by allowing defendants to decline to respond to prison-conditions complaints without the usual consequences. *Id.* at 216. "This shows that when Congress meant to depart from the usual procedural requirements, it did so expressly." *Id.* With no express indication that Congress intended Section 3626 to impose a new pleading requirement, the usual rules apply: "at the motion-to-dismiss stage, a complaint is judged by whether it presents 'enough facts to state a claim to relief that is plausible on its face,' . . . not whether the relief requested will be granted in full." *Henderson*, 891 F. Supp. 2d at 1312 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

Courts around the country have therefore declined to consider Section 3626 at the pleading stage. *See, e.g.*, *Johnson*, 549 F. Supp. 3d at 479; *Griggs v. Holt*, No. 117-089, 2018 U.S. Dist. LEXIS 182592, at *28 (S.D. Ga. Oct. 24, 2018); *Archuleta v. Archuleta*, No. 15-2664, 2017 U.S. Dist. LEXIS 40399, at *26–27 (D. Colo. Feb. 27, 2017), *report and recommendation adopted*, 2017 U.S. Dist. LEXIS 40398 (D. Colo. Mar. 21, 2017); *Henderson*, 891 F. Supp. 2d at 1312. Indeed, even when cases

are further along, for example at the class-certification stage, courts still decline to consider Section 3626 before they are crafting remedial orders. *See, e.g.*, *Yates v. Collier*, 868 F.3d 354, 369 (5th Cir. 2017); *Shook v. El Paso Cnty.*, 386 F.3d 963, 969–70 (10th Cir. 2004); *Ashker*, 2014 U.S. Dist. LEXIS 75347, at *28.

Section 3626 therefore provides no basis for dismissal of any of Plaintiffs' claims or requests for relief.

## CONCLUSION

For these reasons, Defendants' motions to dismiss should be denied in full.

Respectfully submitted,

*/s/ Matthew A. Feldman*
Matthew A. Feldman (PA 326273)
PA INSTITUTIONAL LAW
    PROJECT
718 Arch St., Suite 304S
Philadelphia, PA 19106
215-925-2966
mfeldman@pilp.org

*/s/ Bret Grote*
Bret Grote (PA 317273)
Jaclyn Kurin (D.C. ID No. 1600719)
Dolly Prabhu (PA 328999)
ABOLITIONIST LAW CENTER
PO Box 16537
Philadelphia, PA 19122
(412) 654-9070
bretgrote@abolitionistlawcenter.org
jkurin@alcenter.org
dolly@alcenter.org

DATED: September 23, 2025

*/s/ Will W. Sachse*
Will W. Sachse (PA 84097)
Noah S. Becker (PA 327752)
Stormie Mauck (PA 328048)
DECHERT LLP
2929 Arch Street
Philadelphia, PA 19104
215-994-2496
will.sachse@dechert.com
noah.becker@dechert.com
stormie.mauck@dechert.com

*/s/ Alexandra Morgan-Kurtz*
Alexandra Morgan-Kurtz (PA312631)
PA INSTITUTIONAL LAW
    PROJECT
247 Fort Pitt Blvd., 4th Fl.
Pittsburgh, PA 15222
412-434-6004
amorgan-kurtz@pilp.org

## CERTIFICATE OF COMPLIANCE

In accordance with L.R. 7.8(b), I certify that this brief complies with the word-count limit contained in the Court's Order of September 8, 2025 (ECF No. 89) because it contains 19,920 words.

/s/ Matthew A. Feldman
Matthew A. Feldman
PENNSYLVANIA INSTITUTIONAL
LAW PROJECT

DATED: September 23, 2025