**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **KHALIL HAMMOND, et al.,** | : | **CIVIL NO. 1:25-CV-00048** |
| | : | |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | |
| | : | **(Magistrate Judge Carlson)** |
| **PENNSYLVANIA DEP'T OF CORRECTIONS, et al.,** | : | |
| | : | |
| **Defendants.** | : | |

**MEMORANDUM OPINION**

## I. Introduction

This case is the latest in a line of recent challenges to the constitutionality of prolonged solitary confinement of mentally ill inmates. Six individual inmates initiated this suit, alleging they have been diagnosed with mental illnesses and that the Pennsylvania Department of Corrections and several of its officials have exposed them to years-long solitary confinement, despite a growing consensus of legal and medical precedent showing the substantial risk of harm of such conduct. The complaint is framed as a putative class action case, thus in addition to asserting the claims of the individual plaintiffs, these litigants also seek to certify this action as a Class Action pursuant to Federal Rule of Civil Procedure 23.

Despite the potentially sweeping relief sought by the plaintiffs, the putative classes, and the circuitous path this case has already taken prior to being reassigned to the undersigned on September 5, 2025, this case is still in its infancy. On this score, the defendants have filed a series of motions to dismiss this case on the pleadings alone, arguing that the plaintiffs have failed to state a claim upon which relief can be granted. In so moving, the defendants have cast a wide net, arguing for dismissal of claims, classes, and relief which are simply not at issue at this early stage of the litigation. Moreover, against the clearly defined precedent in this circuit which widely endorses the view that constitutional claims may lie in this arena where mentally ill inmates are subjected to prolonged solitary confinement, we find the plaintiffs have cleared the procedural benchmarks to state a plausible claim for relief, which is all that is required at this stage. Accordingly, for the reasons set forth below, we will deny the defendants' motions to dismiss.

## II. <u>Factual Background</u>

This case challenges the prolonged solitary confinement of six individuals, Khalil Hammond, David Thompson, Antoine Walker, Muwsa Green, Tyrone Leonard, and Malika Henderson, who are incarcerated within the Pennsylvania Department of Corrections (DOC). Each of these individual plaintiffs alleges they suffer from a mental health disorder and that they have been confined to a solitary

confinement placement, which the plaintiffs characterize as "SL5" placement, for five or more years. Because of this prolonged solitary confinement, the plaintiffs allege their mental health has deteriorated to the point that they have attempted suicide multiple times. Moreover, several of the defendants allege they have been confined without any opportunity to challenge their placement.

Since the plaintiffs allege a putative class action, they have defined and outlined several DOC policies and practices which will guide our assessment. At the outset, since their causes of action, in part, rely upon their mental health designation, the plaintiffs outline the DOC's Mental Health/Intellectual Disability (MH/ID) Roster which assigned a letter designation to every prisoner. (Doc. 29, ¶¶ 157-61). According to the MH/ID, A and B Roster individuals have no need for treatment or support from prison psychology staff. (Id., ¶¶ 158-59). Conversely, C and D-Roster individuals are receiving psychological treatment; C-Roster individuals are currently receiving treatment but are no currently diagnosed with a "serious mental illness" (SMI) as defined by the DOC while D-Roster individuals are currently diagnosed with an SMI, intellectual disability, or "credible functional impairment," or were found "guilty but mentally ill" in their criminal cases. (Id., ¶¶ 160-61). DOC policies contemplate special requirements for D-Roster individuals in administrative custody (AC) or disciplinary custody (DC), including at least 20 hours of out-of-cell time per

week, which the plaintiffs allege demonstrates that the ordinary conditions of SL5 units are not appropriate for individuals with severe mental illness because of the substantial risk of harm such conditions pose for them. (Id., ⁋ 162). Moreover, the plaintiffs allege that the DOC's contracted psychiatric providers determine the diagnoses and whether they are considered to be SMIs, often without proper evaluation or explanation, causing roster statuses to be changed from D to C. (Id., ⁋ 164, 166). The plaintiffs are all C-Roster individuals, who are receiving mental health treatment but are not subject to the DOC's special requirements for solitary confinement, allowing them to be subjected to the most restrictive forms of solitary confinement while also providing them fewer psychological services. (Id., ⁋ 165). Furthermore, the plaintiffs allege that, as C Roster individuals, they are statistically more likely to be placed in solitary confinement compared to the general population. (Id., ⁋⁋ 167-68).

The plaintiffs also lay out the variety of solitary confinement units in the DOC under the umbrella of Security Level 5 or SL5 housing units, including Restricted Housing Unit (RHU), where individuals classified as being on either Disciplinary Custody (DC) or Administrative Custody (AC) are housed, Restricted Release List (RRL), and Intensive Management Unit (IMU). The plaintiffs allege that, as a general practice individuals in SL5 units in the DOC are kept inside their cells for 21 to 24

hours every day with severe restrictions in their ability to communicate within the prison and with those outside the prison and in the property they can keep in their cell and are not able to participate in confidential communications with mental health staff. (Doc. 29, ⁋⁋ 81-90).

The plaintiffs take specific issue with the management and application of the RRL, which they allege is a list of individuals who are subject to indefinite solitary confinement. (Id., ⁋⁋ 104-28). On this score, the plaintiffs allege individuals on the RRL are not provided with the reason for their placement on the RRL, their placement and continuation on the RRL is not appealable, and, although their placement on the RRL is subject to annual review, including a staff "vote sheet" and consideration of a psychological evaluation, the standards and considerations used by the DOC in conducting the annual reviews, if any, are unknown to those on the RRL and the individuals on the RRL are not permitted to participate in the annual review process. (Id.) They allege that final authority to remove or continue someone on the RRL rests with Defendant Wenerowicz whose decision can only be overruled by Defendant Harry. Moreover, individuals on the RRL are not informed of what they need to do in order to be released from RRL and there are no known or identifiable criteria individuals can fulfill in order to be removed from the RRL. (Id.)

Similarly, the plaintiffs highlight the IMU, a phased solitary confinement

program used at three DOC prisons with six phases which takes a minimum of three years to complete. (Id., ¶¶ 129-56). As individuals progress through the six phases, privileges increase – for example, in phases 6 through 4, individuals are offered only two hours of out-of-cell time per day, increasing to three hours per day in Phase 3 - although the plaintiffs allege DOC often offers much less out-of-cell time than what is stated in DOC policy. (Id.) Further, individuals are restrained for any out of cell time for the first 21 months in IMU. (Id.) The plaintiffs allege individuals are deprived of meaningful social and programmatic activities while in IMU, are regularly restrained when offered opportunities for socialization, and that there are no clear criteria for phase advancement and individuals can be set back a phase for various, unspecified reasons. (Id.) According to the plaintiffs, Defendant Wenerowicz has final approve to progress individuals to Phase 1 of the IMU. (Id.)

Overall, the plaintiffs allege the conditions in SL5 units are intolerable and inhumane. According to the plaintiffs individuals are physically isolated in windowless cells for 21 to 24 hours per day with a permanently illuminated fluorescent light, making sleep difficult and disorienting their sense of time. (Id., ¶¶ 169-82). Individuals incarcerated in solitary confinement units are not allowed contact visitation, and visitation hours are significantly restricted making it difficult for visitors, and they have no access to vocational, rehabilitative, or therapeutic

programs, gyms or exercise equipment. (Id., ¶¶ 183-96). Most significantly, the plaintiffs allege that individuals in solitary confinement receive grossly inadequate mental health treatment or none at all, with mental health staff infrequently speaking to these individuals through the food slot or crack between the side of the cell door for only a few seconds with no privacy, known as "drive-bys." (Id., ¶¶ 197-206). Moreover, these individuals are deprived of psychosocial rehabilitation services which they allege are required as part of their treatment. (Id.) The plaintiffs allege that the severely restrictive conditions in solitary confinement statistically increase rates of self-harm, suicide attempts, and suicides and that the defendants are either aware of the vastly disproportionate rates of self-injury, suicide attempts, and suicides in solitary confinement units or have opted, with deliberate indifference, not to review the data which is readily available to them.

Against this backdrop, the six individual plaintiffs in this case are each classified as Roster C, thus they are currently to be receiving mental health treatment but are not currently diagnosed with a "serious mental illness" (SMI) as defined by the DOC and are thus not subject to any exceptions from the SL5 restrictions. Each alleges that, despite their preexisting mental illness, they were subjected to prolonged solitary confinement which exacerbated their mental illness. Specifically, Plaintiff Khalil Hammond was diagnosed with depression, bipolar disorder, ADHD, and

PTSD, and has been in the IMU since November 2020, on the RRL since 2013, and in solitary confinement for over a decade. (Doc. 29, ¶¶ 232-50). He is confined to his cell for 22 or more hours every day and alleges that the extreme isolation and brutal conditions of solitary confinement have caused his mental illness symptoms to worsen, that he experiences trouble focusing, intrusive thoughts, memory problems, and has attempted suicide eight times and inflicted self-harm on over 100 separate occasions. (Id.) Hammond's inability to complete the mandatory programming prevents him from being eligible for parole. (Id.)

David Thompson was diagnosed with anxiety and depression at age twelve and has been held in solitary confinement for approximately five of the six years he has been in DOC custody. (Id., ¶¶ 251-84). He alleges he has been frequently placed in solitary confinement and returned to general population without explanation and that, as a result of his repeated placement in solitary confinement he experiences constant, uncontrolled high-intensity anxiety and depression, and suicidal thoughts resulting in three suicide attempts, including hanging himself with a bedsheet in December 2020. (Id.)

Antoine Walker has been diagnosed with anxiety and has been in solitary confinement for approximately six consecutive years on the RRL. (Id., ¶¶ 285-307). He spends 22 hours each day confined in his cell and, as a result, has experienced

sensory overload, depression, intrusive thoughts, sleep difficulty, concentration difficulties, anger, auditory hallucinations, and suicidality, including attempting suicide six times. (Id.) Walker alleges he has never been told the official reason for his initial or continued placement on the RRL, has never had an annual RRL review to his knowledge, and has never been given notice of what he must do to be removed from the RRL. (Id.) Moreover, his continued placement on the RRL prevents him from being able to be paroled despite him being past his parole minimum date. (Id.)

Muwsa Green has been diagnosed with schizophrenia, borderline intellectual function disorder, and impulse control disorder. (Id., ⁋⁋ 308-32). He has spent more than ten cumulative years in solitary confinement since his incarceration in 2008, including a consecutive span of solitary confinement from 2009 to 2015. (Id.) He was, at one time, designated Roster D and provided more out-of-cell time and access to structured activities but, without explanation, in 2020, his status was changed to Roster C after the removal of his schizophrenia diagnosis despite him being diagnosed withs schizophrenia since childhood. (Id.) He has been on DC status in the RHU since October 2023 where he is not permitted to make phone calls, have contact visits, send emails on the tablet, or have possession of his tablet, radio, or television. (Id.) His request for a mental health evaluation and release from solitary at a December 2023 PRC hearing was denied. (Id.) As a result of his placement in solitary

confinement, Green has experienced the deterioration of his mental health including memory problems, auditory hallucinations, heightened anxiety, inability to concentrate, feelings of being stigmatized, emotional lability, and depression, and has attempted suicide eight times. (Id.)

Tyrone Leonard has been diagnosed with bipolar disorder and antisocial personality disorder and has spent approximately five years in solitary confinement since being incarcerated in 2016. (Doc. 29, ¶¶ 333-52). As a result of his repeated placement in solitary confinement, he had experienced increased anxiety, mood swings, difficulty with anger, and suicidal thoughts and has attempted suicide three times while in solitary confinement, including twice in 2023. (Id.) He also alleges that, after each period in the RHU, he is more prone to angry outbursts and difficulty staying calm. (Id.)

Malika Henderson has been diagnosed with mood disorder, anxiety, intermittent explosive disorder, ADHD, antisocial personality disorder, and PTSD. (Doc. 29, ¶¶ 353-76). Since being incarcerated in the DOC in 2015, she has spent a cumulative six years in solitary confinement and received more than 100 misconducts. (Id.) She has been in solitary confinement consecutively for more than twenty-one months. (Id.) She alleges she spends 20-21 hours per day in her cell and all 48 hours on the weekend and all of her out-of-cell time consists of placement in

another cage with severely limited opportunities to interact with other people. (Id.) As a result of her placement on solitary confinement, Henderson's anxiety and suicidality have severely worsened and she has attempted suicide on more than ten occasions while in solitary confinement. (Id.)

## III. Procedural History

On these facts, in March 2024 the plaintiffs initiated this case in the Eastern District of Pennsylvania as a single cause of action. (Doc. 1). Their initial complaint sought relief both for themselves and on behalf of three overlapping categories of individuals held in solitary confinement in the DOC: (1) individuals in solitary confinement who have mental illness, (2) individuals held in solitary confinement for prolonged periods of time, and (3) individuals on RRL and/or in the IMU. (Id., ¶¶ 369-75). This case was then divided into three separate actions in the Eastern District of Pennsylvania, the instant case, Hammond, was narrowed to focus solely on individuals with mental illness in solitary confinement; a new action Henderson v. Harry, 1:25-CV-00049, was filed focusing on prolonged solitary confinement; and another new action, Walker v. Harry, 1:25-CV-00050, was filed focusing on the RRL and IMU.

After being transferred to the Middle District, the case was again consolidated for the purposes of discovery and pretrial motions. (Doc. 63). Thus, we view these

previously distinct cases now as a single unit, with the operative pleading being the amended complaint submitted by the plaintiffs on May 29, 2024. (Doc. 29).

In this amended complaint, the plaintiffs assert causes of action under the Eighth and Fourteenth Amendments to the United States Constitution as well as violations of the Americans with Disabilities Act (ADA) and the Rehabilitation Act of 1973 (RA). Specifically, the plaintiffs allege that the defendants violated the Eighth Amendment through their deliberate indifference to the serious risk of harm posed by their prolonged solitary confinement as individuals with mental illness. They also allege that their initial and continued placement on the RRL without notice of the reasons or any meaningful review violated their Procedural Due Process rights under the Fourteenth Amendment. Further, the plaintiffs allege that they were placed in solitary confinement both because of the manifestations of their mental impairments and without appropriate accommodations for their mental impairments in violation of the ADA and that they failed to reasonably accommodate their psychiatric disabilities in DOC programs, activities, and services in violation of the RA. They have asserted these claims against the Pennsylvania Department of Corrections (DOC) and five institutional defendants at the DOC: Secretary of Corrections Laurel Harry, Acting Secretary of Corrections from September 2021 until January 2023 George Little, Executive Deputy Secretary for Institutional

Operations of the Department of Corrections Michael Wenerowicz, Deputy Secretary for Office of Reentry for the DOC, Lucas Malishchak, and Director of Psychology for the DOC, Brian Schneider. Broadly speaking, the plaintiffs impute liability on the defendants by arguing that they are aware of the serious risks and harms presented by prolonged indefinite solitary confinement of individuals with psychiatric disabilities but approved of and oversaw policies which continued these harmful practices and directly oversaw the placement of these individuals in solitary confinement.

In addition to asserting these claims on their own behalf, the plaintiffs have framed their complaint as a putative class action case, which seeks to invoke these constitutional and statutory protections on behalf of seven distinct classes of incarcerated individuals which they allege are directly affected by these policies. They seek declaratory, injunctive, compensatory, punitive, and nominal relief for these violations and seek class certification pursuant to Federal Rule of Civil Procedure 23.

Against this circuitous procedural past and in anticipation of a potentially complex future, the defendants have moved to dismiss the plaintiff's claims under Federal Rule of Civil Procedure 12(b)(6). Despite this case having been consolidated in this Court, the defendants have filed three separate motions and supporting briefs,

addressing the pre-consolidation Hammond, Henderson, and Walker complaints. In turn the plaintiffs have, conveniently, filed one brief in opposition which addresses the arguments raised in all three motions to dismiss. In our view, the overlapping claims in these three complaints are thoroughly addressed by the amended complaint filed in the instant action, which we treat as the operative pleading in this case. Thus, we too address these three motions simultaneously.

After consideration of the pleadings and multitude arguments made by the defendants, we will decline the defendants' invitation to put the cart before the horse in this case. Indeed, many of the arguments advanced by the defendants in their motions would require us to look far beyond the pleadings and address issues of class certification and DOC policy which are simply not appropriate on a motion to dismiss. To the contrary, given existing case law the plaintiffs have articulated their claims sufficiently to raise a plausible right to relief on their causes of action. Accordingly, for the reasons that follow, the defendants' motions to dismiss, (Docs. 74, 76, 78), will be denied.

## IV. Discussion

### A. Motion to Dismiss – Standard of Review

A motion to dismiss tests the legal sufficiency of a complaint. It is proper for the court to dismiss a complaint in accordance with Rule 12(b)(6) of the Federal Rules

of Civil Procedure only if the complaint fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). With respect to this benchmark standard for the legal sufficiency of a complaint, the United States Court of Appeals for the Third Circuit has aptly noted the evolving standards governing pleading practice in federal court, stating that:

> Standards of pleading have been in the forefront of jurisprudence in recent years. Beginning with the Supreme Court's opinion in Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), continuing with our opinion in Phillips [v. County of Allegheny, 515 F.3d 224, 230 (3d Cir. 2008)], and culminating recently with the Supreme Court's decision in Ashcroft v. Iqbal, BU.S.B, 129 S. Ct. 1937 (2009), pleading standards have seemingly shifted from simple notice pleading to a more heightened form of pleading, requiring a plaintiff to plead more than the possibility of relief to survive a motion to dismiss.

Fowler v. UPMC Shadyside, 578 F.3d 203, 209-10 (3d Cir. 2009).

In considering whether a complaint fails to state a claim upon which relief may be granted, the court must accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom are to be construed in the light most favorable to the plaintiff. Jordan v. Fox, Rothschild, O'Brien & Frankel, Inc., 20 F.3d 1250, 1261 (3d Cir. 1994). However, a court "need not credit a complaint's bald assertions or legal conclusions when deciding a motion to dismiss." Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3d Cir. 1997). Additionally, a court need not "assume that a . . . plaintiff can prove facts that the . . . plaintiff has not

alleged." Associated Gen. Contractors of Cal. v. California State Council of Carpenters, 459 U.S. 519, 526 (1983). As the Supreme Court held in Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), in order to state a valid cause of action, a plaintiff must provide some factual grounds for relief which "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of actions will not do." Id., at 555. "Factual allegations must be enough to raise a right to relief above the speculative level." Id.

In keeping with the principles of Twombly, the Supreme Court has underscored that a trial court must assess whether a complaint states facts upon which relief can be granted when ruling on a motion to dismiss. In Ashcroft v. Iqbal, 556 U.S. 662 (2009), the Supreme Court held that, when considering a motion to dismiss, a court should "begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." Id., at 679. According to the Supreme Court, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id., at 678. Rather, in conducting a review of the adequacy of a complaint, the Supreme Court has advised trial courts that they must:

> [B]egin by identifying pleadings that because they are no more than conclusions are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual

> allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

Id., at 679.

Thus, following Twombly and Iqbal, a well-pleaded complaint must contain more than mere legal labels and conclusions; it must recite factual allegations sufficient to raise the plaintiff's claimed right to relief beyond the level of mere speculation. As the United States Court of Appeals for the Third Circuit has stated:

> [A]fter Iqbal, when presented with a motion to dismiss for failure to state a claim, district courts should conduct a two-part analysis. First, the factual and legal elements of a claim should be separated. The District Court must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions. Second, a District Court must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a "plausible claim for relief." In other words, a complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to "show" such an entitlement with its facts.

Fowler, 578 F.3d at 210-11.

As the court of appeals has observed:

> The Supreme Court in Twombly set forth the "plausibility" standard for overcoming a motion to dismiss and refined this approach in Iqbal. The plausibility standard requires the complaint to allege "enough facts to state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570, 127 S. Ct. 1955. A complaint satisfies the plausibility standard when the factual pleadings "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 129 S. Ct. at 1949 (citing Twombly, 550 U.S. at 556, 127 S. Ct. 1955). This standard requires showing "more than a sheer possibility that a defendant has acted unlawfully." Id. A complaint which pleads facts "merely consistent with" a defendant's liability, [ ] "stops short of the

line between possibility and plausibility of 'entitlement of relief.' "

Burtch v. Milberg Factors, Inc., 662 F.3d 212, 220-21 (3d Cir. 2011), cert. denied, 132 S. Ct. 1861 (2012).

In practice, consideration of the legal sufficiency of a complaint entails a three-step analysis:

> First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim." Iqbal, 129 S. Ct. at 1947. Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." Id., at 1950. Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."

Santiago v. Warminster Twp., 629 F.3d 121, 130 (3d Cir. 2010) (quoting Iqbal, 129 S. Ct. at 1950).

In considering a motion to dismiss, the court generally relies on the complaint, attached exhibits, and matters of public record. Sands v. McCormick, 502 F.3d 263, 268 (3d Cir. 2007). The court may also consider "undisputedly authentic document[s] that a defendant attached as an exhibit to a motion to dismiss if the plaintiff's claims are based on the [attached] documents." Pension Benefit Guar. Corp. v. White Consol. Indus., 998 F.2d 1192, 1196 (3d Cir. 1993). Moreover, "documents whose contents are alleged in the complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered." Pryor v. Nat'l

Collegiate Athletic Ass'n, 288 F.3d 548, 560 (3d Cir. 2002); see also U.S. Express Lines, Ltd. v. Higgins, 281 F.3d 382, 388 (3d Cir. 2002) (holding that "[a]lthough a district court may not consider matters extraneous to the pleadings, a document integral to or explicitly relied upon in the complaint may be considered without converting the motion to dismiss in one for summary judgment"). However, the court may not rely on other parts of the record in determining a motion to dismiss, or when determining whether a proposed amended complaint is futile because it fails to state a claim upon which relief may be granted. Jordan v. Fox, Rothschild, O'Brien & Frankel, 20 F.3d 1250, 1261 (3d Cir. 1994).

**B. The Motions to Dismiss Will Be Denied.**

From the outside, this case appears complex, involving various classes, claims, and iterations of a much simpler and straightforward proposition: the claim that the prolonged solitary confinement of mentally ill inmates is unconstitutional. The defendants in this case have attempted to utilize this case's circuitous path in arguing for dismissal, filing three separate motions to dismiss what is now a single consolidated complaint, arguing that various purported classes should be dismissed before they are even certified, and presenting a host of largely inapplicable procedural arguments. Moreover, the defendants argue for dismissal on the parsed-out elements of the plaintiffs' claims when our view of this case at this stage, without the benefit

of discovery, is much broader. Indeed, we view the plaintiffs' claims as the broad assertion that these mentally ill inmates have spent five or more years in solitary confinement in violation of their constitutional rights and rights under the ADA and RA. On this straightforward assertion, the plaintiffs have met their threshold burden of stating a colorable claim for each of the alleged causes of actions.

**1. The Constitutional Confines of Solitary Confinement**

In this case, it is not only the substance of these constitutional claims which require a robust understanding of the current landscape of constitutional precedent as it relates to solitary confinement but also the issue of whether these institutional defendants were deliberately indifferent to a known risk and ignored well-settled law with regard to the potentially constitutionally violative nature of the actions they are alleged to have engaged in in confining the plaintiffs to SL5 status for prolonged periods. For this reason, we find it prudent to first discuss the current precedent to which we are bound on this issue.

The Eighth Amendment to the United States Constitution provides that, "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. This constitutional protection against cruel and unusual punishment has long been extended by the courts to claims like those made here, challenging an inmate's conditions of confinement.

On this score, "[w]hen an Eighth Amendment claim arises in the context of a challenge to conditions of confinement, we must determine if prison officials acted with 'deliberate indifference' to the inmate's health. Farmer v. Brennan, 511 U.S. 825, 837 (1994). In this setting, the Eighth Amendment prohibits punishments inconsistent with "evolving standards of decency that mark the progress of a maturing society." Estelle v. Gamble, 429 U.S. 97, 102 (1976). Conditions of prison confinement violate the Eighth Amendment when they "deprive inmates of the minimal civilized measure of life's necessities." Rhodes v. Chapman, 452 U.S. 337, 347 (1981).

Over the past four decades, the evolving standards of decency which mark the progress of our maturing society have led to a more informed view regarding the harms inflicted upon inmates by prolonged solitary confinement, particularly when prison officials are dealing with inmates who they know suffer from mental illness. Initially, in 1988, the Court of Appeals suggested that extended solitary confinement of death row inmates, standing alone, did not violate the Eighth Amendment. Peterkin v. Jeffes, 855 F.2d 1021, 1028-29 (3d Cir. 1988). This holding in Peterkin, however, has not withstood the test of time. Rather, the courts have come to a more mature and informed understanding of the harms caused by prolonged solitary confinement, particularly as it relates to mentally ill inmates.

This deeper understanding is reflected by the Court of Appeals' decision in Palakovic v. Wetzel, 854 F.3d 209 (3d Cir. 2017). In Palakovic, the appellate court was presented with an Eighth Amendment conditions of confinement claim lodged by the parents of a deceased prisoner, who had suffered from mental illness and had committed suicide while held in solitary confinement for protracted periods of time. Id. at 224. Thus, the allegations in Palakovic closely parallel those made here; namely, an Eighth Amendment conditions of confinement claim premised upon the prolonged solitary confinement of a mentally ill inmate.

The Court of Appeals held that these allegations stated an Eighth Amendment claim and in doing so:

> [A]cknowledge[d] the robust body of legal and scientific authority recognizing the devastating mental health consequences caused by long-term isolation in solitary confinement. In our recent decision, Williams v. Secretary of the Pennsylvania Department of Corrections, 848 F.3d 549 (3d Cir. 2017), we observed a growing consensus—with roots going back a century—that conditions like those to which [the mentally ill inmate] repeatedly was subjected can cause severe and traumatic psychological damage, including anxiety, panic, paranoia, depression, post-traumatic stress disorder, psychosis, and even a disintegration of the basic sense of self identity. Id. at 566–67. And the damage does not stop at mental harm: "Physical harm can also result. Studies have documented high rates of suicide and self-mutilation amongst inmates who have been subjected to solitary confinement. These behaviors are believed to be maladaptive mechanisms for dealing with the psychological suffering that comes from isolation." Id. at 567–68 (citations omitted).

Palakovic, 854 F.3d at 225–26 (footnotes omitted). Therefore, the Third Circuit concluded that, "[c]onsidering these factual allegations in light of the increasingly obvious reality that extended stays in solitary confinement can cause serious damage to mental health, we view these allegations as more than sufficient to state a plausible claim that [the mentally ill inmate] experienced inhumane conditions of confinement to which the prison officials . . . were deliberately indifferent." Id. at 226. Thus, by 2017, the Third Circuit had clearly found that an Eighth Amendment conditions of confinement claim may lie when a mentally ill inmate is held in solitary confinement for prolonged periods of time.

The Third Circuit reaffirmed and extended this principle to solitary confinement conditions of confinement claims by state death row inmates in Porter v. Pennsylvania Dep't of Corr., 974 F.3d 431, 441 (3d Cir. 2020). Finding that such extended solitary confinement rose to the level of an Eighth Amendment violation, the Court of Appeals emphasized that:

> It is well established in both case law and scientific and medical research that prolonged solitary confinement poses a substantial risk of serious psychological and physical harm:
>
> > A comprehensive meta-analysis of the existing literature on solitary confinement within and beyond the criminal justice setting found that "[t]he empirical record compels an unmistakable conclusion: this experience is psychologically painful, can be traumatic and harmful, and puts many of those who have been subjected to it at risk of

long-term ... damage." Specifically, based on an examination of a representative sample of sensory deprivation studies, the researchers found that virtually *everyone* exposed to such conditions is affected in some way. They further explained that "[t]here is not a single study of solitary confinement wherein non-voluntary confinement that lasted for longer than 10 days failed to result in negative psychological effects." And as another researcher elaborated, "all [individuals subjected to solitary confinement] will ... experience a degree of stupor, difficulties with thinking and concentration, obsessional thinking, agitation, irritability, and difficulty tolerating external stimuli."

Anxiety and panic are common side effects. Depression, post-traumatic stress disorder, psychosis, hallucinations, paranoia, claustrophobia, and suicidal ideation are also frequent results. Additional studies included in the aforementioned meta-analysis further "underscored the importance of social contact for the creation and maintenance of 'self.' " In other words, in the absence of interaction with others, an individual's very identity is at risk of disintegration.

...

As if psychological damage was not enough, the impact of the deprivation does not always stop there. Physical harm can also result. Studies have documented high rates of suicide and self-mutilation amongst inmates who have been subjected to solitary confinement. These behaviors are believed to be maladaptive mechanisms for dealing with the psychological suffering that comes from isolation. In addition, the lack of opportunity for free movement is associated with more general physical deterioration. The constellations of symptoms include dangerous weight loss, hypertension, and heart abnormalities, as well as the aggravation of pre-existing medical problems.

> Williams, 848 F.3d at 566–68 (internal citations omitted) (alterations in original); see also Brief of Amici Curiae Professors and Practitioners of Psychiatry, Psychology, and Medicine at 1 ("[S]olitary confinement causes substantial harm to prisoners' mental and physical health. For prisoners subject to extreme lengths of solitary confinement, such as Appellant Porter here, such harm is inevitable.").
>
> We have repeatedly recognized the severe effects of prolonged solitary confinement, as have our sister circuits and Justices of the Supreme Court. See Shoats v. Horn, 213 F.3d 140, 144 (3d Cir. 2000) (noting that a special assistant to the Secretary of the Pennsylvania DOC would be concerned about the psychological damage to an inmate after only 90 days of solitary confinement); Palakovic v. Wetzel, 854 F.3d 209, 225 (3d Cir. 2017) (acknowledging the "robust body of legal and scientific authority recognizing the devastating mental health consequences caused by long-term isolation in solitary confinement"); Porter v. Clarke, 923 F.3d 348, 355–56 (4th Cir. 2019) (holding that conditions on Virginia's death row violated the Eighth Amendment and noting that "[i]n recent years, advances in our understanding of psychology and new empirical methods have allowed researchers to characterize and quantify the nature and severity of the adverse psychological effects attributable to prolonged placement of inmates in isolated conditions"); Davis v. Ayala, 576 U.S. 257, 135 S. Ct. 2187, 2210, 192 L.Ed.2d 323 (2015) (Kennedy, J., concurring) ("[R]esearch still confirms what this Court suggested over a century ago: Years on end of near-total isolation exact a terrible price."); Glossip v. Gross, 576 U.S. 863, 135 S. Ct. 2726, 2765, 192 L.Ed.2d 761 (2015) (Breyer, J., dissenting) (reviewing literature and stating that "it is well documented that such prolonged solitary confinement produces numerous deleterious harms").

Porter at 441–43.

This recognition by the Third Circuit that prolonged solitary confinement causes a substantial risk of harm that can rise to a constitutional violation was reaffirmed most recently in Williams v. Sec'y Pennsylvania Dep't of Corr., 117 F.4th

503 (3d Cir. 2024), cert. denied sub nom. Wetzel v. Williams, 146 S. Ct. 91, 223 L. Ed. 2d 8 (2025). In Williams, the court of appeals vacated a district court's grant of summary judgment on both the Eighth Amendment and ADA claims. In addition to reaffirming the view that the prolonged use of solitary confinement on mentally ill individuals can violate the Eighth Amendment and the ADA, the court of appeals in Williams also concluded that individuals with a known history of serious mental illness have a clearly established right not to be subjected to prolonged solitary confinement without penological justification. As the Third Circuit explained:

> It is well established that prison officials may not act with "deliberate indifference" to a person's health or safety, and that we may infer the existence of this subjective state of mind from the fact that the risk of harm at issue is obvious, though ignored. Further, this Court has long held that in assessing the conditions of segregated housing units, the "touchstone is the health of ... inmate[s]," including their mental health. Undoubtedly, holding a prisoner with a known preexisting serious mental illness in solitary confinement for a protracted period without penological justification would result in "unnecessary and wanton infliction of pain." This violation is so obvious that the Supreme Court and Third Circuit cases gave respondents fair notice that this treatment of Williams was unlawful.
>
> Our precedents leave no room for doubt that individuals with a known history of serious mental illness have a clearly established right not to be subjected to prolonged solitary confinement without penological justification, regardless of their sentence. In Young, one of the many cases the DOJ report relied upon, we held that the district court had erred by granting summary judgment to the defendants on Young's Eighth Amendment claims because Young had raised a material dispute as to the conditions of his solitary confinement. In so doing, we clarified that when evaluating Eighth Amendment allegations concerning

> segregated housing units, "[t]he touchstone is the health of the inmate." Further, we explained that "[t]he duration and conditions of segregated confinement cannot be ignored in deciding whether such confinement meets constitutional standards." Highly relevant to this analysis is that prisons may not punish in a way that "threatens the physical and mental health of prisoners." Indeed, after recognizing that segregated detention cannot be "foul, inhuman or totally without penological justification," we explained that Young's preexisting physical illness made his solitary confinement even more inhumane, just as Williams' preexisting mental illness did here.

Williams v. Sec'y Pennsylvania Dep't of Corr., 117 F.4th 503, 517–18 (3d Cir. 2024), cert. denied sub nom. Wetzel v. Williams, 146 S. Ct. 91, 223 L. Ed. 2d 8 (2025). The court of appeals concluded that the Secretary of the Pennsylvania Department of Corrections was not entitled to qualified immunity because prior Supreme Court and Third Circuit precedent, as well as a comprehensive 2014 DOJ report warning the Secretary that the DOC's practices of knowingly holding seriously mentally ill prisoners in solitary confinement for extended periods of time was cruel and unusual, made this violation so obvious that prison officials had fair warning that the conduct was unconstitutional. Id.

### 2. **The Plaintiffs Have Stated An Eighth Amendment Claim.**

Against this constitutional backdrop in which the Third Circuit court of appeals has concluded it is clearly established that mentally ill prisoners have a right to be free from prolonged solitary confinement, the plaintiffs argue that the defendants in this case have violated their constitutional rights under the Eighth Amendment to the

United States Constitution by displaying "deliberate indifference" to their needs by placing and maintaining them in solitary confinement for prolonged periods despite their mental illness.

Judged against these legal benchmarks, the motion to dismiss should be denied.[1] The defendants first argue that, on its face, the plaintiffs' Eight Amendment claims fail because "[i]t is simply not facially unconstitutional to house an inmate in the RHU for three years, cumulative or consecutive," where they are not alleging

[1] We only briefly address the defendants' assertion that the doctrine of *res judicata* is an absolute legal bar to the plaintiffs' pursuit of their constitutional claims. According to the defendants, identical claims to those raised here were litigated and settled in a 2013 case, Disability Rights Network of Pennsylvania v. John Wetzel, et al., 13-CV-0635 (M.D. Pa., March 11, 2013). The *res judicata* doctrine precludes relitigation of certain issues and, "prevents parties from relitigating an issue that has already been actually litigated," but requires the satisfaction of certain elements: "(1) the issue sought to be precluded [is] the same as that involved in the prior action; (2) that issue [was] actually litigated; (3) it [was] determined by a final and valid judgment; and (4) the determination [was] essential to the prior judgment." McFadden v. United States, No. 3:14-CV-1166, 2014 WL 6633251, at *5 (M.D. Pa. Nov. 21, 2014) (citing Peloro v. United States, 488 F.3d 163, 174-5 (3d Cir. 2007)). While it surely would be convenient for the defendants if no party were ever able to challenge the conditions of their solitary confinement following the settlement and reform of the DOC's mental health system in 2013, we are simply not willing to state as a matter of law that the reforms addressed all of the concerns identified by the plaintiffs. Quite the contrary, viewing the complaint in the light most favorable to the plaintiffs it appears many of the problems with these prison policies persist. Indeed, resolution of this case under *res judicata* is particularly inappropriate on the pleadings alone, since there are many issues of fact that have yet to be developed. Accordingly, we will decline the defendants' invitation to dismiss this case under the doctrine of *res judicata.*

denial of basic human needs such as food, clothing, shelter, medical care, and reasonable safety. They also argue that the plaintiffs' claims fail as applied because they have not alleged a denial of life's basic necessities since "conditions in restrictive housing in Pennsylvania prisons do not, in and of themselves, violate the Eighth Amendment," lack of social contact or meaningful out of cell time has not been recognized as a human need, and that their allegations that they were denied mental healthcare amount to a mere disagreement with their treatment.[2] (Doc. 79, at 17) (quoting Bacon v. Luzerne Cnty., No. 3:23-CV-1699, 2024 WL 1837217 (M.D. Pa. Apr. 26, 2024). Thus, the defendants attack the first prong of the Eighth Amendment analysis, arguing that solitary confinement alone simply does not pose a substantial risk of harm to inmates.

2 The defendants' argument that the plaintiffs have failed to allege denial of mental healthcare fails where what the plaintiffs allege clearly amounts to a denial of mental healthcare – including that inmates in solitary confinement are not able to participate in confidential communications with mental health staff, (Doc. 29, ⁋ 90), and the infrequent "drive by" visits by mental health staff occur with staff members standing outside the cell and speaking with incarcerated individuals through the foot slot or the crack between the side of the cell door and frame for a few seconds. (Id., ⁋⁋ 197-206). Clearly, this allegation is more than a disagreement with the mental health services but amounts to a deprivation of such services altogether. With our review cabined and confined by the well-pleaded allegations set forth in the complaint, these averments suffice to state a claim. The question of what the evidence may ultimately show must await another day.

The defendants' arguments miss the mark and ignore the rising tide of caselaw in this circuit concluding that "[i]t is well established in both case law and scientific and medical research that prolonged solitary confinement poses a substantial risk of serious psychological and physical harm." Porter at 441–43. At the outset, the fact that this court has found that the conditions in solitary confinement in Pennsylvania prisons alone do not violate the Eighth Amendment is inapposite where the plaintiffs allege a much more precise violation which has been recognized by the Third Circuit – that the *prolonged* solitary confinement of mentally ill individuals can be considered cruel and unusual punishment under the Eighth Amendment. Indeed, the deep and mature understanding of the potentially devastating psychological and physical effects of extended solitary confinement has been repeatedly voiced by the Court of Appeals since 2017.[3] Thus, "it is well-established in our Circuit that . . .

[3] Moreover, at this juncture since each of the plaintiffs has alleged they have been diagnosed with a mental illness and have been subjected to years-long solitary confinement, it is not necessary to address the defendants' argument that the prolonged solitary confinement of inmates without mental illness would necessarily fail under the Eighth Amendment. Nonetheless, it is worth noting that cases have recognized an Eighth Amendment claim in the context of prolonged solitary confinement of individuals with mental health issues because this prolonged solitary confinement exacerbates their mental health issues. It seems only a small step to say that subjecting someone without mental health issues to prolonged solitary confinement may complicate their mental health as well. Indeed, these two claims involve the same core premise, recognized by a body of cases in the Third Circuit acknowledging that years-long solitary confinement cause one's mental state to deteriorate. The only difference is the mental starting point of the person subjected to

prolonged solitary confinement satisfies the objective prong of the Eighth Amendment test and may give rise to an Eighth Amendment claim, particularly where . . . Defendants have failed to provide any meaningful penological justification." Id. at 451. See also Williams v. Sec'y Pennsylvania Dep't of Corr., 117 F.4th 503, 517–18 (3d Cir. 2024) ("Undoubtedly, holding a prisoner with a known preexisting serious mental illness in solitary confinement for a protracted period without penological justification would result in "unnecessary and wanton infliction of pain."). Here, the plaintiffs allege they have known preexisting serious mental illness and have been housed in solitary confinement for five or more years. Moreover, they allege there is no penological justification for their continued and prolonged confinement, and, to the extent that the defendants could provide some penological justification for the extended confinement of these individuals, that determination is inappropriate at this stage which relies upon the pleadings alone and resolves all questions in favor of the plaintiffs.

Moreover, the Third Circuit's decision in Williams reaffirms the proposition that prison officials are on notice that the type of conduct alleged by the plaintiffs violates the Eighth Amendment. Indeed, the court of appeals stated that "[t]his violation is so obvious that the Supreme Court and Third Circuit cases gave

---

the prolonged solitary confinement.

respondents fair notice that this treatment of [the plaintiff] was unlawful." 117 F.4th 503 at 517–18. Here, the plaintiffs impute liability on the defendants by arguing that these are aware of the serious risks and harms presented by prolonged indefinite solitary confinement of individuals with psychiatric disabilities. Specifically, they cite statements from the DOC's own policies on Access to Mental Health Care which recognize, "[t]he potential for suicide is greater if the individual is subjected to pressures such as, but not limited to: . . . placement in RHU/SMU [and] any movement to and from Level 5 Housing Unit[.]" (Doc. 1, ⁋ 55) (citing DOC Policy 13.8.1, Access to Mental Health Care, § 2(L)(1)(d), available at https://www.cor.pa.gov/About%20Us/Documents/DOC%20Policies/13.08.01%20 Access%20to %20Mental%20Health%20Care.pdf.). They also cite the same 2014 Department of Justice findings letter cited in Williams, which was sent to then-Secretary of the DOC and the superintendent of each DOC prison, including Defendants Harry and Wenerowicz, stating, "“[t]he manner in which [the DOC] subjects prisoners with [serious mental illness] to prolonged periods of solitary confinement involves conditions that are often unjustifiably harsh and in which these prisoners routinely have difficulty obtaining adequate mental health care" and "results in serious harm." (Doc. 1, ⁋ 58), and argue that all of the defendants are aware of the DOJ's findings letter. (Id., ⁋ 60). Moreover, the plaintiffs highlight a

growing body of Third Circuit case law acknowledging the growing consensus that solitary confinement can cause severe psychological damage, indicating that prison officials should be aware that their policies are constitutionally violative. See e.g. Porter v. Clarke, 923 F.3d 348, 361 (4th Cir. 2019), as amended (May 6, 2019) ("Additionally, the extensive scholarly literature describing and quantifying the adverse mental health effects of prolonged solitary confinement that has emerged in recent years provides circumstantial evidence that the risk of such harm 'was so obvious that it had to have been known.' As the district court correctly pointed out, '[g]iven [State D]efendants' status as corrections professionals, it would defy logic to suggest that they were unaware of the potential harm that the lack of human interaction on death row could cause'") (internal citations omitted).

Thus, the plaintiffs cite to the same caselaw and reports cited by the Williams court in concluding it was obvious that "[o]ur precedents leave no room for doubt that individuals with a known history of serious mental illness have a clearly established right not to be subjected to prolonged solitary confinement without penological justification, regardless of their sentence." 117 F.4th 503 at 518. With the allegations framed in this way, it is clear that the plaintiffs have sufficiently alleged that the defendants knew of and were indifferent to the serious risks to their health imposed by their prolonged solitary confinement.

Moreover, the obviousness of the harmful nature of these policies further bolsters the plaintiffs' allegations that the supervisory defendants in this case were personally involved in violating their rights. On this score, On this score,

> To state a claim under section 1983, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." Iqbal, 556 U.S. at 676. That is, "a plaintiff must demonstrate a defendant's 'personal involvement in the alleged wrongs.' " Chavarriaga, 806 F.3d at 222 (quoting Rode, 845 at 1207). "A plaintiff makes sufficient allegations of a defendant's personal involvement by describing the defendant's participation in or actual knowledge of and acquiescence in the wrongful conduct." Id. "Although a court can infer that a defendant had contemporaneous knowledge of wrongful conduct from the circumstances surrounding a case, the knowledge must be actual, not constructive." Id.

Abu-Jamal v. Kerestes, No. 3:15-CV-967, 2018 WL 2166052, at *20–21 (M.D. Pa. May 10, 2018), aff'd in part, appeal dismissed in part, 779 F. App'x 893 (3d Cir. 2019). The allegations in the complaint sufficiently state the personal involvement of the defendants since they identify the defendants not only as the individuals who had the power to place the plaintiffs in solitary confinement and oversee their prolonged confinement but also as the individuals responsible for overseeing and approving the solitary confinement policies and practices which they challenge, despite their knowledge that these policies were harmful.[4] See Palakovic v. Wetzel, 854 F.3d 209,

---

[4] This is equally true for the psychological supervisory defendants named by the plaintiffs, Defendants Malishchak and Schneider. Indeed, the defendants' argument that the claims against these defendants are not based upon the same transaction or

226 (3d Cir. 2017); Abu-Jamal, 2018 WL 2166052 (Denying correctional supervisory defendants motion to dismiss where the plaintiffs had adequately pleaded the personal involvement of the institutional defendants in the development and/or enforcement of the challenged prison policy).

**3. The Plaintiffs Have Also Stated a Claim For Violations of Procedural Due Process.**

In addition to alleging that the defendants were deliberately indifferent to a serious risk to their mental health by placing them in solitary confinement for prolonged periods, they also allege that they were denied due process under the Fourteenth Amendment because they have not been provided the reasons for their confinement or a meaningful opportunity to challenge their prolonged placement in solitary confinement. For their part, the defendants argue that DC-ADM 802 provides a constitutionally sufficient process regarding inmates' placement and continuation on the RRL.[5]

---

occurrence because the plaintiffs challenge the mental healthcare they were provided while in the RHU misses the mark. The allegations against these defendants are based upon their supervisory role in overseeing the treatment of the mental health patients in the DOC as well as their hand in developing and applying the policies and accommodations with regard to these inmates. At this juncture, this is sufficient to state a claim against them.

[5] The plaintiffs acknowledge they do not assert a liberty interest in qualifying for parole but rather argue the disqualification from parole eligibility of inmates in solitary confinement is one factor which contributes to the atypical hardship which triggers due process. It is true that ineligibility for parole has been acknowledged by

In analyzing these procedural due process claims, "the first step is to determine whether the nature of the interest is one within the contemplation of the 'liberty or property' language of the Fourteenth Amendment." Shoats v. Horn, 213 F.3d 140, 143 (3d Cir. 2000) (citing Fuentes v. Shevin, 407 U.S. 67 (1972)). Once we determine that a property or liberty interest asserted is protected by the Due Process Clause, the question then becomes what process is due to protect it. Id. (citing Morrissey v. Brewer, 408 U.S. 471, 481 (1972)).

When considering due process claims arising out of an inmate's RRL designation, it is well settled that:

> Procedural due process rights are [only] triggered by deprivation of a legally cognizable liberty interest. For a prisoner, such a deprivation occurs when the prison "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Sandin v. Conner, 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). In determining whether a protected liberty interest exists, the court must consider: (1) the duration of the disciplinary confinement; and (2) whether the conditions of confinement were significantly more restrictive than those imposed upon other inmates in solitary confinement. See id. at 468, 115 S.Ct. 2293; Shoats v. Horn, 213 F.3d 140, 144 (3d Cir.2000).

Huertas v. Sec'y Pennsylvania Dep't of Corr., 533 F. App'x 64, 66 (3d Cir. 2013). Applying these benchmarks, it has been held that RRL placement or detention in

---

the Supreme Court as one component which, considered in conjunction with the ordinary hardships experienced by inmates in solitary confinement, triggers due process. Wilkinson v. Austin, 545 U.S. 209, 223–24 (2005).

administrative custody for brief periods of six months or less do not impose the type of atypical and significant hardships on inmates which trigger due process protections. Smith v. Mensinger, 293 F.3d 641, 654 (3d Cir. 2002) (seven months in disciplinary confinement did not implicate a liberty interest); Torres v. Fauver, 292 F.3d 141, 151–52 (3d Cir. 2002) (disciplinary detention for fifteen days and administrative segregation for 120 days did not implicate a protected liberty interest).

Although there is no firm standard stating exactly when confinement in administrative custody becomes the type of atypical and significant hardship that triggers a liberty interest, prolonged detention in RRL status implicates greater due process concerns. Moreover, the Third Circuit has acknowledged that "conditions of extreme social isolation," like those alleged by the plaintiffs here, trigger due process scrutiny. Williams v. Sec'y Pennsylvania Dep't of Corr., 848 F.3d 549, 560 (3d Cir. 2017). Specifically, the Third Circuit relied on the Supreme Court's due process analysis in Wilkinson, in which the Court concluded that the type of restrictive limitations imposed in solitary confinement, including limitations on almost all human contact, the light being on 24 hours a day, limited exercise in a small indoor room, when coupled with indefinite placement and the fact that placement disqualifies an otherwise eligible inmate for parole consideration, imposes an atypical

and significant hardship within the correctional context, creating a liberty interest. 545 U.S. at 223–24.

Here, the plaintiffs' prolonged solitary confinement of five or more years is clearly an atypical length of time "in relation to the ordinary incidents of prison life," and subjects the plaintiffs to "conditions that differ significantly from 'routine' prison conditions in Pennsylvania state institutions." Shoats at 144. Moreover, the conditions described by the plaintiffs largely mirror the conditions the Supreme Court found to be atypical and significant in Wilkinson, including the indefinite nature of their confinement as well as the fact that placement disqualifies these otherwise eligible inmates for parole consideration. Against these benchmarks, the plaintiffs clearly have stated a protected liberty interest requiring due process.

Having found that due process rights have been triggered, we next determine whether the plaintiffs were afforded the minimum process due to them under the constitution. As to what type of process is due in such circumstances, when considering due process claims based upon allegations of prolonged confinement in RRL status, the Third Circuit has held that "an 'informal, nonadversary review' at which the prisoner has the opportunity to state his views, satisfies the requirements of due process." Shoats, 213 F.3d at 144 (8 years RRL detention). In this setting "the periodic reviews conducted by the PRC . . . comport with the minimum constitutional

standards for due process." Id. at 147. See Washington–El v. Beard, 562 F. App'x 61, 63 (3d Cir. 2014).

On this score, the defendants simply argue that DC-ADM 802, the process for inmates confined to administrative custody, meets the due process standard contemplated in Shoats. But, in our view, the constitutional sufficiency of the process provided in DC-ADM 802 is not at issue at this juncture since the plaintiffs have alleged that this policy is not being followed. Instead, setting aside the process laid out in DC-ADM 802, which we do not need to summarize here, the plaintiffs allege they have been denied the "essential requirements of due process . . . notice and an opportunity to respond." Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 546 (1985). Indeed, according to the plaintiffs they are not provided with the reasons for their initial or continued placement on the RRL or the opportunity to appeal the decision and individuals on the RRL are denied participation in any meaningful way in the process which could release them from solitary confinement. Specifically, they allege that individuals such as themselves on the RRL are not provided with the reason for their placement on the RRL, their placement and continuation on the RRL is not appealable, and, although their placement on the RRL is subject to annual review, including a staff "vote sheet" and consideration of a psychological evaluation, the standards and considerations used by the DOC in conducting the

annual reviews, if any, are unknown to those on the RRL and the individuals on the RRL are not permitted to participate in the annual review process. Moreover, individuals on the RRL are not informed of what they need to do in order to be released from RRL and there are no known or identifiable criteria individuals can fulfill in order to be removed from the RRL. These allegations demonstrate that these individuals have no meaningful notice of the reasons for their prolonged solitary confinement nor any opportunity to respond, despite being subjected to atypical and significant hardship. Accordingly, based solely upon the pleadings the plaintiffs have sufficiently articulated a due process claim.

### C. **The Plaintiffs Have Stated a Claim Under the Americans With Disabilities Act.**

In addition to their claims of a constitutional dimension, the plaintiffs allege that their prolonged solitary confinement violated the ADA and RA[6] both because they were not provided accommodations for their mental illness, while the disparate treatment of D Roster individuals demonstrates that such accommodations are

[6] Section 504 of the Rehabilitation Act provides broad prohibitions against discrimination on the basis of disability and applies only to programs and activities receiving federal financial assistance. Title II of the ADA extends these protections to all state and local government programs and activities. The substantive provisions of the statutes are similar and are to be interpreted consistently. Yeskey v. Com. Of Pa. Dept. of Corrections, 118 F.3d 168, 170 (3d. Cir. 1997). Thus, our discussion of the plaintiffs' ADA claims also encompasses their Rehabilitation Act claims.

possible, and because they are being discriminated against for their mental illness by being placed in solitary confinement for the symptoms of these illnesses.

Title II of the ADA provides that "[n]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by such entity." 42 U.S.C. § 12132. Public entities under the ADA can include state correctional institutions, see Pennsylvania Dep't of Corr. V. Yeskey, 524 U.S. 206, 210 (1998); Chisolm v. McManimon, 275 F.3d 315, 625 (3d Cir. 2001), but not persons in their individual or official capacities. See Goodman v. Miceli, No. CV 20-1259, 2021 WL 2117933, at *16 (W.D. Pa. May 3, 2021), report and recommendation adopted, No. 2:20-CV-01259, 2021 WL 2115328 (W.D. Pa. May 25, 2021) (recognizing Third Circuit's approval of other circuits holdings that individuals are not liable under Titles I and II of the ADA but individuals may sue for prospective injunctive relief against state officials acting in their official capacities).

To state a claim for a violation of the ADA, a plaintiff must allege that they were precluded from receiving a service because of an alleged disability. Id. at 16 ("[The plaintiff] cannot maintain an ADA claim without alleging any facts

demonstrating that the denial of his IDA request was *because* of his alleged disabilities”). Specifically:

> To establish a violation of Title II of the ADA, an inmate must allege that: (1) he is a qualified individual with a disability; (2) he was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities; and (3) such exclusion, denial of benefits, or discrimination was by reason of his disability. *See* 42 U.S.C. § 12132.

Brown v. Deparlos, 492 F. App'x 211, 215 (3d Cir. 2012).

Further, in the prison context, “a prison's refusal to accommodate inmates’ disabilities in such fundamentals as mobility, hygiene, medical care, and virtually all other prison programs represents a denial of the benefits of a prison's services, programs, or activities.” Happel v. Bishop, No. 1:23-CV-13-SPB-RAL, 2024 WL 1508561, at *7 (W.D. Pa. Feb. 22, 2024), report and recommendation adopted, No. CV 23-13, 2024 WL 1003902 (W.D. Pa. Mar. 8, 2024) (quoting Furgess v. Pennsylvania Dep’t of Corrections, 933 F.3d 285, 290 (3d Cir. 2019). In Williams, the Third Circuit recognized that an ADA claim may lie “where—viewing the facts in the light most favorable to [the plaintiff]—the Secretary knew Williams had a preexisting serious mental illness, was aware of the risk of prisoner safety, and failed to act despite this knowledge.” Williams v. Sec'y Pennsylvania Dep't of Corr., 117 F.4th 503, 527 (3d Cir. 2024), cert. denied sub nom. Wetzel v. Williams, 146 S. Ct. 91, 223 L. Ed. 2d 8 (2025). The Third Circuit recognized that a plaintiff states a claim

under the ADA where he alleges that, "considering his disability, the DOC failed to 'take certain pro-active measures to avoid the discrimination proscribed by Title II [of the ADA].'" Id. (quoting Chisolm v. McManimon, 275 F.3d 315, 325 (3d Cir. 2001)). Thus, the court of appeals recognized that the DOC had an obligation to make reasonable modifications to their solitary confinement policies where modifications were necessary to avoid discrimination on the basis of his mental disability. On this score, the Third Circuit stated:

> Assuming that Williams had a known mental illness, the DOC had an obligation to modify its practices to ameliorate the harms of prolonged solitary confinement on Williams. The only way the DOC could avoid this responsibility is by "demonstrat[ing] that making the modifications would fundamentally alter the nature of the service, program, or activity." The record is devoid of evidence that providing Williams with accommodations would have fundamentally altered the DOC's services, programs, or activities.

Williams v. Sec'y Pennsylvania Dep't of Corr., 117 F.4th 503, 529 (3d Cir. 2024), cert. denied sub nom. Wetzel v. Williams, 146 S. Ct. 91, 223 L. Ed. 2d 8 (2025).

Here, the plaintiffs are all Roster C individuals with known mental illness who were receiving treatment by the DOC. Moreover, they allege that the DOC failed to provide accommodations which would account for, and not exacerbate, their mental illness. This clearly states a claim under the interpretation of the ADA in Williams. The defendants argue that the plaintiffs are not entitled to request certain levels of confinement based upon their medical conditions and that the medical determinations

reached by the DOC do not fall within the purview of the ADA. But the plaintiffs are not arguing their medical impairments entitle them to a different level of confinement but rather that the DOC failed to "modify its practices to ameliorate the harms of prolonged solitary confinement," on them as required under the ADA. This is precisely the type of claim contemplated in Williams as cognizable under the ADA.

Moreover, the defendants' argument that the plaintiffs were placed in solitary confinement for disciplinary reasons, not by reason of their disability, does not absolve the DOC of making reasonable accommodations to account for the plaintiffs' mental illness in solitary confinement. Quite the contrary, as the plaintiffs point out, when considering whether an institution has failed to make reasonable accommodations under the ADA:

> [T]he reason why [the plaintiffs were] housed in the RHU is irrelevant. A prisoner's misconduct does not strip him of his right to reasonable accommodations, and a prison's obligation to comply with the ADA and the RA does not disappear when inmates are placed in a segregated housing unit, regardless of the reason for which they are housed there.

Furgess, 933 F.3d 285 at 291. To the extent that the defendants advance this argument to rebut the plaintiffs' alternative ADA theory that they were placed in solitary confinement because of the manifestations of their mental illnesses, while they contend DOC policy explicitly bars the issuance of misconducts for the manifestation of mental illness in the form of suicide attempts and self-injurious behavior, the

plaintiffs explicitly allege that the defendants were not following DOC policy. Moreover, the plaintiffs allege that these punitive measure were used in response to behaviors that are expected from and consistent with their mental health conditions, but not limited to suicide attempts and self-injurious behavior. Indeed, as the plaintiffs point out, "courts in this circuit have found that subjecting a disabled inmate to standard disciplinary procedures for actions that are manifestations of his or her disability amounts to a failure to accommodate the inmate's disability." McDonald-Witherspoon v. City of Philadelphia, No. CV 17-1914, 2018 WL 4030702, at *10 (E.D. Pa. Aug. 23, 2018), aff'd, No. 21-1019, 2021 WL 6101246 (3d Cir. Dec. 21, 2021) (citing Parms v. Pa. Dep't of Corrs., Civ. A. No. 14-84, 2015 WL 1326323, at *3 (W.D. Pa. Mar. 25, 2015) (concluding that complaint alleging that plaintiff was disciplined for failure "to move for meals or stand for count on time" when his failures were due to his deafness stated a facially plausible claim for discrimination on the basis of plaintiff's disability in violation of Title II of the ADA); Snider v. Motter, Civ. A. No. 13-1226, 2016 WL 4154927, at *8 (M.D. Pa. June 2, 2016), report and recommendation adopted, Civ. A. No. 13-1226, 2016 WL 4140728 (M.D. Pa. Aug. 4, 2016) (recommending that complaint alleging that prison failed to accommodate plaintiff's mental illness when it disciplined him for actions that "were manifestations of his mental illness" and "punish[ed] him in the same way other non-

mentally ill inmates would have been punished" stated a claim for discrimination in violation of Title II of the ADA). Thus, on the facts alleged in the complaint, the plaintiffs have stated a claim under the ADA and RA.[7]

### D. The Defendants Are Not Entitled to Qualified Immunity At This Time

The defendants also argue they are entitled to qualified immunity on the plaintiffs' constitutional claims since no reasonable official would have understood they were violating their rights by continuing to confine the plaintiffs in restrictive housing by virtue of their misconduct. Within their qualified immunity argument, they make sweeping challenges to the prospective classes of plaintiffs, arguing that their scope and overlap would be too expansive and because, on their face, certain classes simply do not rise to the level of a constitutional violation. At the outset, we

[7] The defendants' argument that the plaintiffs' ADA claims should be dismissed because their claims are more appropriately addressed under the Eighth Amendment requires only brief consideration. Indeed, the defendants' position implies that, because the Eighth Amendment exists the ADA is effectively a nullity. Of course, this is not how the more specific provision doctrine functions. Rather, the more specific provision rule "states that if a constitutional claim is covered by a specific constitutional provision . . . the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." Pizarro v. Wetzel, No. 3:20-CV-00511, 2021 WL 4860774, at *4 (M.D. Pa. Oct. 19, 2021) (quoting United States v. Lanier, 520 U.S. 259, 272 n.7 (1997)) (internal quotations omitted). Thus, as the plaintiffs point out, this rule is applicable in the context of more specific constitutional provision, and we decline to expand its application to erase rights specifically defined by congressional statute.

need not address the defendants' arguments about the validity or eligibility of any class which has not yet been certified.[8] In the interest of the orderly management of this case, our inquiry at this juncture relates only to the claims of the plaintiffs and the arguments as to the appropriateness of the proposed classes must await the certification stage.

As to the defendants' arguments that they are entitled to qualified immunity on the constitutional claims of the plaintiffs, "[q]ualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." Reichle v. Howards, 566 U.S. 658, 664, 132 S.Ct. 2088, 182 L.Ed.2d 985 (2012). A qualified immunity analysis involves two questions: whether the official violated a statutory or constitutional right, and whether that right was clearly established at the time of the challenged conduct. Ashcroft v. al-Kidd, 563 U.S. 731, 735, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011). Lower courts have the discretion to decide which question to analyze first. Pearson v. Callahan, 555 U.S. 223, 236, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009).

---

[8] Similarly, we need not address the defendants' other arguments regarding the appropriateness of the putative classes for example, that they lack standing, are already receiving the relief they request (D Roster), or are duplicative as these arguments are more appropriately addressed at the class certification stage.

An official's conduct violates clearly established law when, "at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would [have understood] that what he is doing violates that right.'" al-Kidd, 563 U.S. at 741, 131 S.Ct. 2074 (quoting Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). The Supreme Court has stated that this standard does not require a case directly on point, but requires that "existing precedent must have placed the statutory or constitutional question beyond debate." al-Kidd, 563 U.S. at 741, 131 S.Ct. 2074. "When properly applied, [qualified immunity] protects all but the plainly incompetent or those who knowingly violate the law." Id. at 743, 131 S.Ct. 2074 (quoting Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)); see also Taylor v. Barkes, 135 S. Ct. 2042, 2044 (2015).

It is worth noting that the Third Circuit's most recent holding in Williams concludes that, taken as true, the constitutional rights the defendants allegedly violated were clearly established. Indeed, as previously discussed, the Third Circuit clearly stated "[o]ur precedents leave no room for doubt that individuals with a known history of serious mental illness have a clearly established right not to be subjected to prolonged solitary confinement without penological justification, regardless of their sentence." 117 F.4th 503 at 518. Thus, to the extent the plaintiffs

allege their prolonged solitary confinement was without penological justification, the defendants are not entitled to qualified immunity.

Nonetheless, on the pleadings alone, we are mindful that, "the Third Circuit has cautioned that it is generally unwise to venture into a qualified immunity analysis at the pleading stage as it is necessary to develop the factual record in the vast majority of cases." Williams v. Papi, 30 F. Supp. 3d 306, 313 (M.D. Pa. 2014) (quoting Newland v. Reehorst, 328 Fed.Appx. 788, 791 n. 3 (3d Cir.2009)) (internal quotations omitted). Given the clear holding in Williams, it will be difficult for the defendants to argue they are entitled to immunity on these Eighth Amendment claims. Nonetheless, given the fact-specific nature of the qualified immunity inquiry, our ultimate determination on this issue must await further development of the record.[9]

[9] We do conclude, however, that the defendants' argument that they are entitled to qualified immunity on the plaintiffs' ADA claims is without merit since the plaintiffs seek damages only from the DOC itself and prospective relief from Defendant Harry in her official capacity. Though it seems quite clear on the face of the complaint, to the extent the defendants argue this was unclear from the pleadings, the plaintiffs have clarified and conceded as much in the briefing. Thus, since qualified immunity is only available to shield public *officials* from *individual* liability, it is not appropriate to protect the DOC from liability or the prospective relief sought against Defendant Harry in her official capacity. See Cruz v. Klemm, No. 3:25-CV-665, 2026 WL 116493, at *3 (M.D. Pa. Jan. 15, 2026) (quoting W.B. v. Matula, 67 F.3d 484, 499 (3d Cir. 1995) ("[T]he doctrine of qualified immunity shields officials acting only in their individual capacities and does not apply to official capacity claims")); Doe v. Se. Delco Sch. Dist., 140 F. Supp. 3d 396, 403 (E.D. Pa. 2015) (citing Kentucky v. Graham, 473 U.S. 159, 166 (1985) (concluding qualified immunity is not an available defense for a government official sued in his official capacity just as

### E. We Need Not Address the Plaintiffs' Demands for Prospective Injunctive Relief

Finally, the defendants seek dismissal of the plaintiffs' demands for prospective injunctive relief, citing the PLRA's requirement that:

> Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief.

18 U.S.C. § 3626. The defendants argue that the prospective relief sought by the plaintiffs, in the form of an injunction against housing inmates in the RHU beyond three years, is not the least intrusive means of correcting the alleged violations and thus should be dismissed. For their part, the plaintiffs argue that these PLRA requirements are not grounds for dismissal but rather guides for the court when, and if addressing and granting injunctive relief becomes appropriate. We agree. At this juncture, the plaintiffs are not requesting that the court rule on the injunction but rather have included it as a demand for relief should their claims succeed on the

---

it would not constitute a defense for the government entity).

merits. Indeed, should the Court at some point in this litigation conclude that injunctive relief is appropriate, such relief will have to be fashioned around the PLRA's precept that such relief be narrowly drawn. But at this early stage of the litigation, the PLRA's requirement on prospective relief has not yet been triggered. See Williams v. Edwards, 87 F.3d 126, 133 (5th Cir. 1996) ("The district court has fashioned no prospective relief and the provisions of the [PLRA] have yet to be triggered in this case."). Accordingly we will deny the defendants' motion to dismiss this claim of relief at this early stage. See Skelton v. New Jersey Dep't of Corr., No. CV 19-18597 (RMB), 2020 WL 6376652, at *5 (D.N.J. Oct. 30, 2020) (citing Geisinger Community Med. Ctr. v. Sec'y U.S. Dep't of Health & Human Servs., 794 F.3d 383, 391 (3d Cir. 2015) (Concluding plaintiff's claims for prospective injunctive relief under § 1983 were not barred by the PLRA since, "[b]y its plain language, the statute does not require that a plaintiff must plead a narrowly tailored claim for injunctive relief, but rather the statute expressly limits the court's power to grant or approve the prospective relief requested").

## III. Conclusion

In closing, at this stage the plaintiffs have sufficiently articulated their claims which allege the defendants violated their constitutional rights and the ADA by subjecting them to prolonged solitary confinement. Moreover, on the pleadings alone

it cannot be said that these defendants are entitled to qualified immunity. Accordingly, we will deny the defendants' motions to dismiss, (Docs. 74, 76, 78), and allow these claims to move forward. An appropriate order follows.

*S/ Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge

DATED: August 6, 2026