**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **KHALIL HAMMOND, et al.,** | : | **CIVIL NO. 1:25-CV-00048** |
| | : | |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | |
| | : | **(Magistrate Judge Carlson)** |
| **PENNSYLVANIA DEP'T OF CORRECTIONS, et al.,** | : | |
| | : | |
| **Defendants.** | : | |

**MEMORANDUM OPINION**

## I. Introduction

This putative prisoner class action lawsuit comes before us for consideration of a discovery dispute. This dispute revolves around the scope and timing of discovery. For their part, the defendants invite us to bifurcate discovery, initially limiting discovery to class certification issues, and then only later addressing merits discovery. The plaintiffs oppose this bifurcated approach, arguing that merits and class certification issues are so closely intertwined that any effort to bifurcate these questions will lead to confusion, delay and duplication of efforts.

Upon consideration, for the reasons set forth below, we will decline the invitation to bifurcate discovery but will provide some guidance on the course of discovery going forward.

## II. Background

### A. The Complaint and Class Allegations

This case is a putative class action which also challenges the prolonged solitary confinement of six individual inmates, Khalil Hammond, David Thompson, Antoine Walker, Muwsa Green, Tyrone Leonard, and Malika Henderson, who are incarcerated within the Pennsylvania Department of Corrections (DOC). Each of these individual plaintiffs alleges they suffer from a mental health disorder and that they have been confined to a solitary confinement placement, which the plaintiffs characterize as "SL5" placement, for five or more years. Because of this prolonged solitary confinement, the plaintiffs allege their mental health has deteriorated to the point that they have attempted suicide multiple times. Moreover, several of the defendants allege they have been confined without any opportunity to challenge their placement.

The plaintiffs allege a putative class action, in part, relying upon their mental health designations, as set forth in the DOC's Mental Health/Intellectual Disability (MH/ID) Roster which assigns a letter designation to every prisoner. (Doc. 29, ⁋⁋ 157-61). According to the MH/ID, A- and B-Roster individuals have no need for treatment or support from prison psychology staff. (Id., ⁋⁋ 158-59). Conversely, C- and D-Roster individuals are receiving psychological treatment; C-Roster individuals

are currently receiving treatment but are not currently diagnosed with a "serious mental illness" (SMI) as defined by the DOC while D-Roster individuals are currently diagnosed with an SMI, intellectual disability, or "credible functional impairment," or were found "guilty but mentally ill" in their criminal cases. (Id., ⁋⁋ 160-61). DOC policies contemplate special requirements for D-Roster individuals in administrative custody (AC) or disciplinary custody (DC), including at least twenty hours of out-of-cell time per week, which the plaintiffs allege demonstrates that the ordinary conditions of SL5 units are not appropriate for individuals with severe mental illness because of the substantial risk of harm such conditions pose for them. (Id., ⁋ 162). Moreover, the plaintiffs allege that the DOC's contracted psychiatric providers determine the diagnoses and whether they are considered to be SMIs, often without proper evaluation or explanation, causing roster statuses to be changed from D to C. (Id., ⁋ 164, 166).

The plaintiffs are all C-Roster individuals who are receiving mental health treatment but are not subject to the DOC's special requirements for solitary confinement, allowing them to be subjected to the most restrictive forms of solitary confinement while also providing them with fewer psychological services. (Id., ⁋ 165). Furthermore, the plaintiffs allege that, as C-Roster individuals, they are statistically more likely to be placed in solitary confinement compared to the general

population. (Id., ¶¶ 167-68).

The plaintiffs also lay out the variety of solitary confinement units in the DOC under the umbrella of Security Level 5 or SL5 housing units, including Restricted Housing Unit (RHU), where individuals classified as being on either Disciplinary Custody (DC) or Administrative Custody (AC) are housed, Restricted Release List (RRL), and Intensive Management Unit (IMU). The plaintiffs allege that, as a general practice, individuals in SL5 units in the DOC are kept inside their cells for twenty-one to twenty-four hours every day with severe restrictions in their ability to communicate within the prison and with those outside the prison and in the property they can keep in their cell and are not able to participate in confidential communications with mental health staff. (Doc. 29, ¶¶ 81-90). In this complaint, the plaintiffs take specific issue with the management and application of the RRL, which they allege is a list of individuals who are subject to indefinite solitary confinement. (Id., ¶¶ 104-28). On this score, the plaintiffs allege individuals on the RRL are not provided with the reason for their placement on the RRL, their placement and continuation on the RRL is not appealable, and, although their placement on the RRL is subject to annual review, including a staff "vote sheet" and consideration of a psychological evaluation, the standards and considerations used by the DOC in conducting the annual reviews, if any, are unknown to those on the RRL and the

individuals on the RRL are not permitted to participate in the annual review process. (Id.) They allege that final authority to remove or continue someone on the RRL rests with Defendant Wenerowicz whose decision can only be overruled by Defendant Harry. Moreover, individuals on the RRL are not informed of what they need to do in order to be released from RRL and there are no known or identifiable criteria individuals can fulfill in order to be removed from the RRL. (Id.)

Similarly, the plaintiffs highlight the IMU, a phased solitary confinement program used at three DOC prisons with six phases which takes a minimum of three years to complete. (Id., ¶¶ 129-56). As individuals progress through the six phases, privileges increase – for example, in phases 6 through 4, individuals are offered only two hours of out-of-cell time per day, increasing to three hours per day in Phase 3 - although the plaintiffs allege DOC often offers much less out-of-cell time than what is stated in DOC policy. (Id.) Further, individuals are restrained for any out of cell time for the first 21 months in IMU. (Id.) The plaintiffs allege individuals are deprived of meaningful social and programmatic activities while in IMU, are regularly restrained when offered opportunities for socialization, and that there are no clear criteria for phase advancement and individuals can be set back a phase for various, unspecified reasons. (Id.) According to the plaintiffs, Defendant Wenerowicz has final approve to progress individuals to Phase 1 of the IMU. (Id.)

Overall, the plaintiffs allege the conditions in SL5 units are intolerable and inhumane. According to the plaintiffs, individuals are physically isolated in windowless cells for twenty-one to twenty-four hours per day with a permanently illuminated fluorescent light, making sleep difficult and disorienting their sense of time. (Id., ⁋⁋ 169-82). Individuals incarcerated in solitary confinement units are not allowed contact visitation, and visitation hours are significantly restricted, making it difficult for visitors, and they have no access to vocational, rehabilitative, or therapeutic programs, gyms or exercise equipment. (Id., ⁋⁋ 183-96). Most significantly, the plaintiffs allege that individuals in solitary confinement receive grossly inadequate mental health treatment or none at all, with mental health staff infrequently speaking to these individuals through the food slot or crack between the side of the cell door for only a few seconds with no privacy, known as "drive-bys." (Id., ⁋⁋ 197-206). Moreover, these individuals are deprived of psychosocial rehabilitation services which they allege are required as part of their treatment. (Id.) The plaintiffs allege that the severely restrictive conditions in solitary confinement statistically increase rates of self-harm, suicide attempts, and suicides and that the defendants are either aware of the vastly disproportionate rates of self-injury, suicide attempts, and suicides in solitary confinement units or have opted, with deliberate indifference, not to review the data which is readily available to them. Thus, in our

view the plaintiffs' individual and class-based allegations are often wedded to factual issues which relate to the merits of these claims such as questions regarding the severity of various inmates' mental impairments; the level of care prescribed by DOC policy for these inmates; and the degree of care actually extended to prisoners.

In their amended complaint, the plaintiffs assert causes of action under the Eighth and Fourteenth Amendments to the United States Constitution as well as violations of the Americans with Disabilities Act (ADA) and the Rehabilitation Act of 1973 (RA). Specifically, the plaintiffs allege that the defendants violated the Eighth Amendment through their deliberate indifference to the serious risk of harm posed by their prolonged solitary confinement as individuals with mental illness. They also allege that their initial and continued placement on the RRL without notice of the reasons or any meaningful review violated their Procedural Due Process rights under the Fourteenth Amendment. Further, the plaintiffs allege that they were placed in solitary confinement both because of the manifestations of their mental impairments and without appropriate accommodations for their mental impairments in violation of the ADA and that they failed to reasonably accommodate their psychiatric disabilities in DOC programs, activities, and services in violation of the RA. They have asserted these claims against the Pennsylvania Department of Corrections (DOC) and five institutional defendants at the DOC: Secretary of

Corrections Laurel Harry, Acting Secretary of Corrections from September 2021 until January 2023 George Little, Executive Deputy Secretary for Institutional Operations of the Department of Corrections Michael Wenerowicz, Deputy Secretary for Office of Reentry for the DOC, Lucas Malishchak, and Director of Psychology for the DOC, Brian Schneider. Broadly speaking, the plaintiffs impute liability on the defendants by arguing that they are aware of the serious risks and harms presented by prolonged indefinite solitary confinement of individuals with psychiatric disabilities but approved of and oversaw policies which continued these harmful practices and directly oversaw the placement of these individuals in solitary confinement.

In addition to asserting these claims on their own behalf, the plaintiffs have framed their complaint as a putative class action case, which seeks to invoke these constitutional and statutory protections on behalf of seven distinct classes of incarcerated individuals which they allege are directly affected by these policies. They seek declaratory, injunctive, compensatory, punitive, and nominal relief for these violations and seek class certification pursuant to Federal Rule of Civil Procedure 23.

It is against this backdrop that we are presented with a dispute concerning the scope and staging of discovery. For their part, the defendants recommend that

discovery be bifurcated, and that the parties first engage in class certification discovery before turning to any merits discovery. Viewing issues of class certification narrowly, the defendants suggest that the necessary documentary evidence to determine class certification issues could be assembled and analyzed without the necessity of depositions. (Doc. 111).

The plaintiffs disagree. Embracing a more holistic approach, they insist that class and merits issues of closely intertwined and insist that fairness and efficiency would be promoted by pursuing discovery in a comprehensive manner without bifurcation of merits and class discovery. While these competing approaches each have some merit, upon consideration, we conclude that the better approach to take in this case is one which permits the parties to simultaneously engage in fulsome and complete class and merits discovery. Therefore, we will decline the invitation to formally bifurcate discovery in this case but will direct the parties to focus their discovery initially upon those issues which relate to class certification, while noting that class certification questions necessarily implicate issues relating to the merits of these claims.

## III. Discussion

Questions relating to bifurcation of discovery in the context of putative class action litigation entail a balancing of competing considerations. On one hand we are enjoined to address class certification as early as is practicable, a factor which cautions against the delay which wholesale discovery may entail. Yet the very factors cited by Rule 23 as relevant to class certification—which include commonality and typicality—by their nature entail some merits consideration. As one court has aptly noted:

> This Court has broad discretion to resolve discovery disputes, including whether to bifurcate discovery. See, e.g., Richards v. Johnson & Johnson, Inc., Civ. No. 05-3663 (KSH), 2007 WL 2123697, at *1 (D.N.J. July 20, 2007); Physicians Healthsource, Inc. v. Janssen Pharms., Inc., Civ. No. 12-2132 (FLW), 2014 WL 413534, at *4 (D.N.J. Feb. 4, 2014) (Bongiovanni, J.) (explaining that "broad discretion afforded courts in handling discovery disputes extends to decision over bifurcating discovery" as part of the courts' "wide discretion in trial management"). Rule 42(b) provides that a court may exercise its discretion to bifurcate discovery "[f]or convenience, to avoid prejudice, or to expedite and economize." Fed. R. Civ. P. 42(b). But courts . . . have made clear that "bifurcation is the exception rather than the rule in managing cases." Webstaurant Store, Inc. v. Everything Is In Stock LLC, Civ. No. 20-02558 (CCC), 2020 WL 4040842, at *1 (D.N.J. July 15, 2020); see also Cephalon, Inc. v. Sun Pharm. Indus., Ltd., Civ. No. 11-5474 (FLW), 2013 WL 3417416, at *3 (D.N.J. July 8, 2013) ("Courts in this district do not routinely grant motions to bifurcate discovery, unless there is some showing on the part of the moving party as to why bifurcation is appropriate."). Consequently, [the defendant who advocates for bifurcation] bears the burden to establish that bifurcating discovery is warranted. Cephalon, 2013 WL 3417416, at *3.

> Moreover, the Third Circuit has instructed that in putative class actions, district courts should address class certification "at an early practicable time," noting that such an inquiry "requires a thorough examination of the factual and legal allegations" and, at times, a "preliminary inquiry into the merits." In re Hydrogen Peroxide Antitrust Lit., 552 F.3d 305, 317–18 (3d Cir. 2008). Yet the Third Circuit also has observed that district courts should not inquire into the merits of the case before a motion for class certification, except insofar as is necessary to determine whether class certification is appropriate. Id. at 317. Accordingly, in putative class actions, courts . . . —whether they formally bifurcate or not—often have focused discovery first on class certification and then on the merits. See, e.g., Conner v. Perdue Farms, Inc., Civ. No. 11-888 (MAS), 2013 WL 5977361, at *7 (D.N.J. Nov. 7, 2013) (bifurcating discovery into two phases, with the first phase limited to issues necessary to address whether class certification is appropriate and the second phase on substantive issues regarding the merits of the parties' claims and defenses); Bell v. Lockheed Martin Corp., 270 F.R.D. 186, 199 (D.N.J. 2010), aff'd, Civ. No. 08-6292 (RBK), 2010 WL 3724271 (D.N.J. Sept. 15, 2010) (in a putative class action alleging gender discrimination, declining formally to bifurcate discovery into class and merits phases, but allowing the defendant to object to specific discovery requests unrelated in any way to class certification issues).

MacLean v. Wipro Ltd., No. CV2003414GCJBD, 2023 WL 3742832, at *2 (D.N.J. May 31, 2023).

Because there is frequently an overlap between merits and class certification questions, attempts to rigidly bifurcate these two issues can foster confusion and unnecessary conflict. On this score:

> This overlap between merits issues and class certification requirements, together with the challenge of distinguishing whether any given discovery falls into one category versus the other, and the likelihood that disputes over such distinctions will arise, has left courts "reluctant to bifurcate class-related discovery from discovery on the merits." Ahmed

> v. HSBC Bank USA, Nat'l Ass'n, Civ. No. 15-2057, 2018 WL 501413, at * 3 (C.D. Cal. Jan. 5, 2018) . . . . Even when bifurcation of class and merits discovery is warranted, "the frequent overlap between merits and class certification inquiries may make its enforcement fraught with difficult line-drawing disputes." 1 McLaughlin on Class Actions § 3:10 (18th ed. 2021) (observing so in the context of staying merits discovery in favor of an early class certification motion).

Wesley v. Samsung Elecs. Am., Inc., No. CV 20-18629-JMV-AME, 2022 WL 2870200, at *2 (D.N.J. July 21, 2022) (some citations omitted).

In our view, the allegations in this case do not lend themselves to some sort of easy mechanical distinction between merits and class certification discovery. At the outset, we note that bifurcation of the type proposed by the defendants may actually prolong and delay the discovery process since it is clear from the pleadings that, at a minimum, there will need to be fulsome merits discovery regarding the claims of the six named plaintiffs. In sum, this is not a case where the litigation, and need for discovery, would end once class certification was resolved. Therefore, under the current schedule case management schedule, if discovery was bifurcated and limited to class determination, once we received and resolved class certification motions—which the parties propose to file in February of 2028—it would likely be necessary to undertake extensive additional merits discovery.

Further, a determination of whether there is the degree of commonality and typicality necessary for class certification requires some inquiry into issues that are

bound up with the merits; namely, the conditions of putative class members' confinement and the extent to which various putative classes of inmate receive access to mental health treatment. All of these factors weigh against attempting to structure some formal bifurcation of discovery.

Yet, while we conclude that bifurcation of discovery is not appropriate in this case, we agree that the parties should endeavor to focus their initial energies and attention on class-based discovery so the Court can address this issue in the manner contemplated by Rule 23: "At an early practicable time after a person sues or is sued as a class representative. . . ." Fed. R. Civ. P. 23(c)(1)(A). Therefore, in the first instance, the parties should focus discovery on those factual and legal issues pertaining to class certification to enable a decision under Rule 23 at an early practicable time. See Hydrogen Peroxide Antitrust Lit., 552 F.3d at 317–18; Bell, 270 F.R.D. at 199. To the extent that disputes arise regarding individual discovery requests that cannot be resolved through good faith meet-and-confers, the parties may bring them to the Court's attention.

An appropriate order follows.

*S/ Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge

DATED: October 13, 2026